**EXHIBIT G**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

```
ANGELO CUONZO, ESQ.,        )
ADMINISTRATOR PENDENTE      )
LITE FOR THE ESTATE OF      )
DONALD A. YOUNG,            )
                            )
          Plaintiff,        )
                            )
     v.                     )   C.A. No. 05C-12-099 RRC
                            )
CATHERINE L. SHORE          )
and BARBARA P. YOUNG,       )
                            )
          Defendants.       )
```

BEFORE:  THE HONORABLE RICHARD R. COOCH,
                and a Jury

APPEARANCES:

BRUCE L. HUDSON, ESQ.
    Attorney for Plaintiff

LOUIS B. FERRARA, ESQ.
FERRARA, HALEY, BEVIS & COLLINS
    Attorney for Defendant Catherine L. Shore

- - - -
JUNE 18, 2007
JURY TRIAL PROCEEDINGS
- - - - -

THOMAS E. MAURER, RPR
SUPERIOR COURT OFFICIAL REPORTER
NEW CASTLE COUNTY COURTHOUSE
500 N. KING STREET, SUITE 2609
WILMINGTON, DELAWARE  19801-3725
(302) 255-0566

---

## I N D E X   T O   T E S T I M O N Y

### OPENING STATEMENTS

PAGE

By Mr. Hudson.....................20
By Mr. Ferrara....................36

PLAINTIFF'S WITNESSES:                    PAGE

THOMAS F. MASON
    Videotape deposition....................50

HENRY BROWN
    Videotape deposition....................53

BARBARA P. YOUNG
    Direct examination by Mr. Hudson........53
    Cross-examination by Mr. Hudson........78

RAYMOND KAMM
    Read-in deposition,
    previously transcribed..................95

CATHY VITALE
    Direct examination by Mr. Hudson........95

## E X H I B I T   I N D E X

PLAINTIFF'S EXHIBITS:                     PAGE

No. 1..........Photograph..............64
No. 2......Medical Expense Record.......77
Nos. 3&4......Medical Records...........78
No. 5..........Photograph.............100

DEFENSE EXHIBIT:

No. 1.......Death Certificate.........83

---

### Page 3

```
                                        June 18, 2007
                                        Courtroom No. 6C
                                        10:25 a.m.
```

4  PRESENT:

5       As noted.

6       THE COURT:  Good morning, everyone.

7       JURY PANEL:  Good morning.

8       THE COURT:  We are ready to begin with the

9  jury selection in this case.  May I see the

10  prothonotary at sidebar.

11       (Clerk confers with judge.)

12       THE CLERK:  Good morning, ladies and

13  gentlemen.  We are about to select a jury in the case

14  of Angelo Cuonzo, Esquire, Administrator for the

15  Estate of Donald A. Young, the plaintiff, vs.

16  Catherine L. Shore, the defendant.  This is a lawsuit

17  for personal injuries that arose from an automobile

18  accident occurring on December 13th, 2003.  We

19  estimate this trial will take two to three days.

20       The plaintiff Angelo Cuonzo, Esquire, is

21  represented by Bruce Hudson, Esquire, of Bruce

22  Hudson, Attorney at Law.  The defendant Catherine L.

23  Shore is represented by Louis B. Ferrara, Esquire, of

---

### Page 4

1  the law firm of Ferrara, Haley, Bevis & Collins.

2       Do you know the attorneys in this case or

3  any other attorney or employee in their firms?

4       Do you know any of the following persons who

5  may be called to testify as witnesses:

6       Catherine Shore.  Barbara Young.  Officer

7  Thomas Mason.  William H. Sherkey.  Catherine Vitale.

8  Mariann Kamm.  That's spelled K-a-m-m.  Raymond Kamm.

9  Corporal H.J. Brown.

10       Do you know anything about this case through

11  personal knowledge, discussion with anyone, the news

12  media, or any other source?

13       Do you know any of the parties in this case,

14  their friends, relatives or employees?

15       Do you have any bias or prejudice either for

16  or against the plaintiff or the defendant?

17       Is there any reason why you cannot give this

18  case your undivided attention and render a fair and

19  impartial verdict?

20       Have you, or has anyone close to you, ever

21  been involved in a civil case either as a plaintiff

22  or a defendant?

23       Do you have any beliefs or opinions about

5

1  the rights of injured persons to be compensated for

2  injuries negligently caused by others which would

3  interfere with your ability to render a fair and

4  impartial verdict in this case?

5       Do you know anything about the facts giving

6  rise to this lawsuit?

7       Do you have any physical or emotional

8  problems that might affect your ability to serve as a

9  juror in this case?

10      Are you being prosecuted for any criminal

11  offense anywhere?

12      If your answer to any of these questions is

13  yes, or you cannot serve for two to three days,

14  please raise your hand and follow the instructions of

15  the bailiff.

16      Your Honor.

17      THE COURT:  Thank you.  I will meet with

18  those persons who have raised their hands, the

19  bailiff will organize you, I'll meet with counsel and

20  the court reporter and jurors coming up one by one

21  over in front of the jury box.  I'm about to turn on

22  the white noise button.  It's billed as a technology

23  advancement.  We'll let you all decide, but it does

6

1  keep conversations private.

2       (Indicating.)  Well, if technology works,

3  anyway.

4       (Not transcribed; jury was selected.)

5       THE COURT:  With both sides content, the

6  jury is selected.  First, to those four persons who

7  were not chosen as jurors in this case, please report

8  back to Jury Services for advice about a possible

9  other jury trial today.

10      (Remaining prospective jurors leave the

11  courtroom at 11:17 a.m.)

12      THE COURT:  May I see counsel at sidebar on

13  scheduling, without the court reporter.

14      (A sidebar, without reporter, was held.)

15      THE COURT:  Members of the jury, we're going

16  to take a recess for about 15 minutes.  We'll swear

17  you in as jurors when you come back.  Let me give you

18  this instruction that applies to this little recess,

19  even though you haven't heard much about the case at

20  all, as well as any recess, and that is you're not

21  allowed to discuss the case with anyone until the

22  case is given to you for deliberations, which we

23  expect to be tomorrow.  That includes jurors not

7

1  being able to talk with other jurors about the case.

2  Talk about anything else but this case with anybody.

3       Please take out the jury.

4       (Jury leaves the courtroom at 11:19 a.m.)

5       THE COURT:  Counsel, as you know when we met

6  in my chambers beforehand we did not have a court

7  reporter because I didn't think one was needed, we

8  briefly discussed some issues which apparently need

9  resolution.  Let's first deal with the vehicle -- the

10  photos of Ms. Young's vehicle that I believe

11  Mr. Hudson wants to introduce.

12      MR. HUDSON:  Thank you, your Honor.

13      The video deposition has been taken of

14  Corporal Mason, who was the investigating officer

15  from the New Castle County Police.  And he testified

16  in his trial video deposition as to --

17      THE COURT:  And when was that taken?  When

18  was that?

19      MR. HUDSON:  I think it was Tuesday or

20  Wednesday of last week.  And during that time, of the

21  many photos that he took he marked, I believe there

22  are 12 Exhibits A through J.  And he testified that

23  of the photos that he took, these are the ones that

8

1  were most useful in showing the accident scene, and

2  the conclusions that he made, and the measurements,

3  and so forth, of the skid marks and the location of

4  the skid marks, final resting place of the vehicles.

5  That is primarily my interest in opening statement.

6       Number one, these are exhibits that at the

7  deposition on-the-record but off the video when

8  Mr. Ferrara and I agreed we would just mark for

9  identification then, subject to your Honor's review

10  and ruling as to their admissibility into evidence as

11  exhibits for the plaintiff.

12      THE COURT:  How many photographs are there

13  at issue?

14      MR. HUDSON:  (Counts photos.)  Ten,

15  your Honor, marked A through J.

16      THE COURT:  And are these of the Shore

17  vehicle, the Young vehicle, and photos of both?

18      MR. HUDSON:  These are, they're photographs

19  that Corporal Mason, the investigating officer, took

20  at the scene before the vehicles were removed from

21  their final resting place.  It shows the vehicles and

22  their final resting place in the intersection from

23  various angles.  It shows photographs of skid marks

11

1  in the lane that he testified that the Shore vehicle
2  was driving in. And, quite frankly, some of them are
3  duplicative, but these are the ones that he had
4  selected out of the many that he took that he said
5  were most helpful in describing the area.
6        THE COURT: Any reason why they didn't come
7  into your possession earlier as part of discovery?
8        MR. HUDSON: They did, your Honor. I've had
9  these.
10        THE COURT: Was there a request for
11  production by defendant of these photos, for these
12  photos?
13        MR. HUDSON: He's had them also.
14        MR. FERRARA: Your Honor, we've had these
15  pictures for a very long time.
16        THE COURT: All right. Before I hear from
17  you, anything further, Mr. Hudson?
18        MR. HUDSON: Only to say that there's two
19  purposes of -- well, the immediate request is so that
20  I could show at least a picture or two to the jury.
21  Secondarily, of course, I would be offering them
22  during the trial primarily, I guess, through the
23  accident reconstruction expert Mr. Sherkey as

1  intersection or the Shore vehicle, I continue to have
2  no objection to. But as Mr. Hudson correctly points
3  out, at the time of Corporal Mason's deposition last
4  Tuesday we went through this on record but off camera
5  and ended up deciding that we couldn't agree and we'd
6  have to leave it to you.
7        THE COURT: Well, it does say under Exhibits
8  to be admitted by plaintiff, quote, Photographs of
9  accident scene and defendant Shore's vehicle. And
10  that's what you're objecting to?
11        MR. FERRARA: No. I don't object --
12        THE COURT: It's the Young vehicle that you
13  object to?
14        MR. FERRARA: The problem is I don't know
15  that he's got any pictures that don't show the Young
16  vehicle in that position. I mean, I have no
17  objection if he wants to wait and put it on the
18  computer and take out the Young vehicle, I don't care
19  if he does that, but I don't want any pictures of the
20  Young vehicle in. And that's what I objected to
21  initially. Again, because the jury is never going to
22  get to see it in the state it was in post-impact,
23  they're only going to see it after it was cut, and it

10

1  information describing the accident scene and things
2  that he based his --
3        THE COURT: All right. Looking at the
4  pretrial stipulation, under paragraph 5 it says,
5  "Exhibits to be admitted and any objections to such,"
6  it says, "by plaintiff," quote, Photographs of
7  accident scene and defendant Shore's vehicle.
8        Do these photos that you've just talked
9  about come within the parameter of, quote,
10  Photographs of accident scene?
11        MR. HUDSON: Yes, sir. That's all they are.
12        THE COURT: All right. Mr. Ferrara.
13        MR. FERRARA: Your Honor, if they're just
14  the scene and they don't have the Young vehicle in
15  them, I don't object. What I'm trying to avoid is
16  the Young vehicle coming in, because the Young
17  vehicle has extensive damage, the roof was cut off
18  the vehicle before the pictures were taken.
19        THE COURT: Cut off by?
20        MR. FERRARA: By the rescue folks.
21        THE COURT: Rescue squad.
22        MR. FERRARA: And so any picture that I
23  agreed to in the pretrial, which is the open

12

1  makes the damage look significantly more extensive
2  than it really was.
3        MR. HUDSON: And, your Honor, my suggestion
4  would be if you saw the photos you could understand
5  that can very easily be cured by an instruction to
6  the jury that to extricate the passengers the top had
7  to be cut off by the fire company, and the photos
8  could not be taken before that time. It's the
9  location of the vehicles that is primarily of
10  interest in --
11        THE COURT: Well, it does seem to me that
12  the phrase "photos of"...
13        What did you intend by your phrase,
14  "Photographs of accident scene and defendant Shore's
15  vehicle," Mr. Hudson?
16        MR. HUDSON: Well, actually, there is a
17  separate set of photographs that Mr. Ferrara provided
18  that were taken, I guess, at the salvage yard, or
19  wherever, just of her vehicle showing the different
20  angles, I'm not even going to offer those.
21        THE COURT: As a practical matter, could
22  the -- well, you want to be able to show the location
23  of both vehicles?

13

1  MR. HUDSON: Yes, beforehand.

2  THE COURT: Can that be done through Sherkey

3  diagrams, for example, and other photographs?

4  MR. HUDSON: Well, he will be doing that.

5  But he will be relying on these photographs for that

6  information. A survey by some plan surveyor was done

7  of the location of the intersection. So just to

8  repeat, there is going to be, I anticipate, some

9  contradiction between the parties as to which lane

10  she was driving in.

11  THE COURT: All right. I'm going to do

12  this: I do think that the only objection that was

13  made by the defendant was to the introduction of the

14  police report. These photographs were in the

15  possession of both counsel for quite a long time.

16  So I, for the reason that it wasn't objected to in

17  the pretrial stipulation, I'm going to allow the

18  photographs to be introduced. But I will give an

19  instruction, if defendant wishes same -- well,

20  actually, I don't think I even need to give an

21  instruction, the testimony's going to make it very

22  clear that the rescue squad had to remove the roof,

23  and that's why it was removed.

14

1  MR. FERRARA: Your Honor, I appreciate your

2  ruling, but he didn't tell me he wanted to put in the

3  Shore vehicle -- the Young vehicle, therefore there

4  was no reason for me to object to it.

5  I mean, you've been pretty precise in this

6  case about holding us to the pretrial, and it's

7  worked against me with regard to my motion in limine.

8  But I couldn't possibly objected to his pictures of

9  the Young vehicle since he never identified them as

10  pictures --

11  THE COURT: All right. If he had said, if

12  Mr. Hudson had said -- let me just think this through

13  further -- if he had said photographs of accident

14  scene and defendant Shore's vehicle and Barbara

15  Young's vehicle, what would have been defendant's

16  response on the pretrial?

17  MR. FERRARA: I would have objected to the

18  Young vehicle for the reasons I am now.

19  THE COURT: All right. I'm going to, I

20  think in fairness, and I was sort of headed that way,

21  then had thought differently, but I think in

22  fairness, the lack of clarity in the pretrial

23  stipulation ought not to work against defendant. So

15

1  I think it hasn't been sufficiently identified as a

2  photograph that you wanted to put in.

3  Now, is there another way around this,

4  Mr. Hudson? I'm going to, since I think it wasn't

5  described with sufficient particularity in the

6  pretrial stipulation -- which is a pretty brief

7  pretrial stipulation, it's not the most helpful -- it

8  can come in some other way. You can either excise,

9  it will come in through Sherkey's diagram, I guess,

10  or some other thing, but I'm not going to allow the

11  photograph of defendant Barbara Young's vehicle to

12  come in since it wasn't identified on the pretrial

13  stipulation. And, in fact, by usage of the phrase

14  "and defendant Shore's vehicle," that does seem to

15  imply that defendant Barbara Young's vehicle was not

16  at issue. So that's the ruling on that.

17  MR. HUDSON: Your Honor, may I? There is

18  one, one picture here -- and, again, we didn't take

19  the pictures --

20  THE COURT: I've already ruled.

21  MR. HUDSON: But my question is, and it's

22  just sort of a clarification, there is a picture here

23  which shows skid marks, it shows the Shore vehicle,

16

1  and in the very background is the Young vehicle. But

2  you can't tell, I mean, if I could show it to

3  your Honor, he's objecting to, I guess, severity of

4  the damage.

5  THE COURT: Show it to Mr. Ferrara. Let me

6  hear his position as to this particular photograph.

7  (Mr. Ferrara views photograph.)

8  MR. FERRARA: I don't object to that one,

9  your Honor.

10  THE COURT: All right. Without objection,

11  that will come in.

12  MR. HUDSON: And for the record, that is

13  marked as Deposition Exhibit C from the Mason

14  deposition.

15  THE COURT: All right. The second issue to

16  take up is amendment of the complaint. Mr. Hudson.

17  MR. HUDSON: Your Honor, it may be

18  premature, I was just advising the Court this morning

19  in chambers that we would be asking to do that after

20  the testimony is in the record of the back seat

21  passenger of the defendant, Ray Kamm. His trial

22  testimony was taken by deposition by Mr. Ferrara and

23  myself last Friday, on the grounds that Mr. Ferrara

17

1 requested it, because apparently the witness could
2 not be present at trial. During his deposition, as
3 part of his testimony, he gave the defendant's speed
4 prior to entering the intersection.
5         THE COURT: Well, you're not making the
6 application now, you want to make it at the end of
7 the testimony?
8         MR. HUDSON: Yes, sir.
9         THE COURT: Well, I won't hear from
10 Mr. Ferrara at this point, but I will, of course, as
11 we know, remind all of Rule 15(b) which does say that
12 the objecting party -- if Mr. Ferrara should
13 object -- fails to satisfy the Court that the
14 admission of such evidence would prejudice the party
15 in maintaining the party's actions depends on the
16 merits. So if Mr. Ferrara's going to claim
17 prejudice, I'm going to have to pay, of course, close
18 attention to that position. But it sounds like it's
19 premature to make now.
20         Lastly, I think the parties are in agreement
21 as to how to handle the fact that there's been a
22 settlement of the case by the plaintiff with Barbara
23 Young. Mr. Hudson, would you put the stipulation on

18

1 the record, please.
2         MR. HUDSON: (Pause.)
3         THE COURT: And do you need to consult
4 further with Mr. Ferrara about it? I don't think so,
5 I think it was announced in chambers.
6         MR. FERRARA: I'm pretty comfortable with
7 what we've agreed to, your Honor, I don't know
8 that --
9         THE COURT: All right. Let's just put it on
10 the record, though, because we were not on-the-record
11 in chambers.
12         MR. HUDSON: My understanding, your Honor,
13 is that it's been stipulated by the parties, and,
14 your Honor, it's agreed that Barbara Young will be
15 stricken as a defendant, and the jury will be
16 informed by your Honor that she is not a party to
17 this litigation and that there has been a settlement
18 entered into between the Estate and Barbara Young.
19         MR. FERRARA: Your Honor, I thought it went
20 a little further than that. I thought we agreed that
21 I could tell the jury that she was originally sued as
22 a defendant in the case, and that subsequent to a
23 settlement she was dismissed from the case.

19

1         THE COURT: That's my recollection of the
2 understanding. Any problem with that?
3         MR. HUDSON: No.
4         THE COURT: Then, I think usually I let the
5 attorneys tell the jury that. So I'll let
6 Mr. Ferrara do that, if it's not already covered by
7 Mr. Hudson in his opening statement.
8         Anything else to take up before we take a
9 ten-minute recess?
10         MR. FERRARA: No, sir.
11         THE COURT: All right. We're in recess.
12         (Recess taken, 11:34 to 11:51 p.m.)
13         THE COURT: Are we ready to bring in the
14 jury?
15         MR. FERRARA: Yes.
16         THE COURT: Please bring in the jury.
17         (Jury enters the courtroom at 11:52 a.m.)
18         THE COURT: Let's swear the jury first to
19 make their duties official.
20         (Clerk swears the jury at 11:53 a.m.)
21         THE CLERK: Please be seated.
22         Members of the jury, you have all been
23 severally sworn or affirmed, stand together and hear

20

1 the evidence.
2         Your Honor.
3         THE COURT: Mr. Hudson, you may proceed to
4 give plaintiff's opening statement in the case.
5         MR. HUDSON: Thank you, your Honor.
6         Good morning, ladies and gentlemen. If it
7 please the Court. On Saturday, December 13th, 2004,
8 Mr. and Mrs. Donald Young left their home in
9 New Jersey to come to Delaware. They lived about an
10 hour away from Delaware. They left to come to
11 Delaware to visit their nephew who lived in Foulkland
12 Heights. The purpose of their visit was to come
13 visit and have dinner with him, as they have done on
14 several previous occasions.
15         Mr. Young was a retired chemist. They
16 arrived at the nephew's house about 1 p.m. on that
17 Saturday afternoon. About 4:30 that same afternoon a
18 woman by the name of Catherine Shore drove to the
19 community of Glenville, which some of you may be
20 familiar with, it's just outside of Newport. And the
21 reason she went there was to pick up a close friend
22 of hers by the name of Mariann Kamm, and Mariann
23 Kamm's brother Raymond Kamm. The three of them had

21

1 made plans that afternoon, for that afternoon and
2 evening to go to the Iron Hill Brewery for drinks and
3 dinner and socialization, and to celebrate Mariann
4 Kamm's birthday.
5          The three of them drove there, Catherine
6 Shore was driving, and they arrived at the Iron Hill
7 Brewery, according to testimony that's already been
8 taken by depositions of the witnesses and the
9 parties, they arrived at the Iron Hill Brewery about
10 5 p.m. that Saturday afternoon.
11          According to their testimony, they remained
12 there for the next three-and-a-half hours, at which
13 time they had drinks, they had dinner. And after
14 dinner the two women, Catherine Shore and her friend
15 Mariann Kamm, went upstairs at the Iron Hill Brewery
16 to what's, I guess, referred to as the pool room.
17 Mariann Kamm's brother went down to the bar, and
18 that's where he remained for the rest of the evening
19 until they left.
20          Between 8:30 and 8:45, again, roughly
21 three-and-a-half to three hours and 45 minutes after
22 they arrived at the Iron Hill Brewery they left.
23 Catherine Shore was driving. Mariann Kamm, her

22

1 girlfriend, was in the front seat. And Mariann
2 Kamm's brother, who was from Reno, Nevada, is in the
3 back seat. At approximately the same time that this
4 party was leaving the Iron Hill Brewery Mr. and Mrs.
5 Donald Young were leaving their nephew's home in
6 Foulkland Heights. They had been there, they had
7 dinner, and now they were leaving their nephew's home
8 to go back to their home in New Jersey, which is
9 about an hour away.
10          Mrs. Young was driving. Mr. Young, who had
11 a disability, he had a stroke several years earlier
12 and did not drive, but he was riding in the front
13 passenger's seat of the Young vehicle. They took the
14 same route that they always took, and that was
15 returning, going back home. They were coming down
16 the street known as James Street in Newport, which is
17 shown on this diagram (indicating) which has been
18 prepared by a surveyor showing the streets, the
19 relative distances, everything is to scale.
20          For those of you who are familiar with
21 Newport, this is the Wilmington Trust Bank. Over
22 here on this corner is an Exxon gas station.
23 This is Justis Street heading west. This is

23

1 James Street heading south. North is straight to the
2 top (indicating). The Young vehicle was proceeding
3 south on James Street, and to return would have gone,
4 continued, gone down James Street, gotten on to 141
5 and taken the 95 exit, and proceeded back to
6 New Jersey.
7          The Shore vehicle was proceeding, after
8 getting off of 95 and 141, onto Marshall Street, was
9 going this direction initially and then turned and
10 was heading westbound (indicating). As the Young
11 vehicle approached and continued through the
12 intersection on their way back to New Jersey there
13 was a crash. The Young vehicle and the Shore
14 vehicles collided in the middle of this intersection.
15          The accident was investigated by both the
16 Newark -- I'm sorry -- Newport Police Department and
17 the New Castle County Police Department. And you
18 will hear and see video testimony of both of the
19 investigating officers. And you will hear that the
20 officer who did the accident reconstruction, as part
21 of that investigation, Corporal Mason, who you will
22 hear by video later today, measured skid marks of the
23 Shore vehicle. And these are just to indicate the

24

1 location, not the length. But these entries were put
2 on this diagram by Corporal Mason at his video
3 deposition, which was taken last week because he is
4 away and is unable to be here in person today.
5          In showing you deposition of P1 from
6 Corporal Mason's deposition, the entries, the red
7 entries on here were done by Corporal Mason. You
8 will see him do that in his deposition, and he's
9 showing the lanes that each of the vehicles were in.
10 And you'll note that he's showing the Shore vehicle
11 is in the right lane, the far right lane. There's
12 also a center lane, and then there is a left turn
13 lane. So there's really three, but he showed, based
14 on his investigation, the location of skid marks, the
15 measurement of skid marks, the final resting places
16 of the vehicles, that the Shore vehicle was traveling
17 westbound in the right lane prior to the impact.
18          He found that the Young vehicle was
19 traveling southbound in the left lane prior to
20 the impact. And what you see shown here is him
21 sketching in on this diagram at his video deposition
22 the location, final resting place of the Shore
23 vehicle and the final resting place of the Young

1  vehicle (indicating).

2      There is a photo, there are several photos

3  that were taken by Corporal Mason, there is one that

4  shows the skid marks that were left. And you will

5  hear him testify he measured these skid marks, these

6  were left by the Shore vehicle, the defendant's

7  vehicle, and they measured 34 feet. And that is

8  going to become a very important fact for you to

9  remember in this case, not only the length of the

10 skid marks but the location of the skid marks of the

11 Shore vehicle as determined by Corporal Mason who did

12 his investigation. Actually, he was the first

13 officer on-the-scene. He even got there before the

14 Newport Police did, he just happened to be driving

15 through shortly after the accident happened and he

16 basically came up on the accident.

17     You will see here (indicating), this is the

18 direction of the Shore vehicle prior to the accident,

19 and this is the far right lane. The Young vehicle

20 was proceeding perpendicular on James Street heading

21 south (indicating on ELMO). What you see over here

22 is the final resting place and the actual vehicle

23 that was driven by Ms. Shore, which was a Volkswagen

1  Passat. Further in the background you can see the

2  Young vehicle, which again is in reference to the

3  final resting place where Corporal Mason showed that

4  on the diagram. The Young vehicle was proceeding

5  this direction, the Shore vehicle this direction,

6  impact approximately there, the momentum carried both

7  cars further to the left. And that was the final

8  resting place of the two vehicles.

9      The Young vehicle, which you can barely see,

10 which is the plus to the upper left, final resting

11 place was against a telephone pole. The telephone

12 pole actually was what stopped its travel to the left

13 in a sidewards condition. And in the left pass --

14 I'm sorry -- the right passenger's seat on the right

15 side of the -- and I may have misspoken -- the

16 telephone pole impacted the right side of the Young

17 vehicle, it's a station wagon. Mr. Young was sitting

18 in the right passenger's seat where the telephone

19 pole impacted the car as it was careening to the

20 right.

21     Both Mr. and Mrs. Young were injured.

22 Barbara Young, the driver, sustained various

23 injuries, including a broken pelvis, broken ribs,

1  internal bleeding. And she was hospitalized for

2  approximately two weeks at Christiana Care Hospital

3  before being transferred to a step-down unit in

4  New Jersey close to her home.

5      Mr. Young suffered serious injuries,

6  including serious head injuries, from which, although

7  he was responsive to pain, he remained basically

8  unable to communicate with his family, wife, before

9  ultimately dying from his injuries at home six months

10 later. The medical bills for Mr. Young were in

11 excess of $430,000.

12     Good morning again, ladies and gentlemen.

13 My name is Bruce Hudson, and I'm representing the

14 Estate of Donald Young, who is the plaintiff in this

15 matter. The defendant is Catherine Shore, who is

16 sitting at the far table to my left. Sitting at

17 counsel table immediately in front of you is

18 Mr. Angelo Cuonzo, who is the Executor, the

19 Administrator of the Estate of Mr. Young. And

20 sitting to my left is my associate Carrie Huang,

21 who's assisting me in this trial. Sitting next to

22 you, Ms. Shore, and I apologize for the layout of the

23 court, but next to Ms. Shore is Mr. Ferrara, who is

1  defending her.

2      Your role in this case is going to be to

3  decide, quite simply, who was at fault and who caused

4  this accident. The legal term is negligence. And

5  Judge Cooch is going to instruct you, before your

6  deliberations he's going to give you instructions,

7  and, among other things, he's going to define

8  negligence. And he will define it as the lack of

9  ordinary care. It's conduct that a reasonable and

10 prudent person would engage in. And if the person

11 involved in an accident is not reasonably prudent and

12 careful, then that person is deemed to be negligent.

13 Careless is another term that sometimes is used.

14 Your determination is going to be who was negligent

15 in this case which resulted in the collision, the

16 crash, and the injuries that Donald Young sustained.

17     The plaintiff is the Estate of Mr. Young,

18 the defendant in this case is Catherine Shore, the

19 driver of the other vehicle. The driver of the Young

20 vehicle, Barbara Young, was also a defendant

21 initially. And you should be advised that she is not

22 a defendant in this case and that the action against

23 her personally has been settled by the parties.

29

1   If, after hearing the evidence, you agree
2  that this collision was caused by the negligence of
3  Catherine Shore, then you will be asked to determine
4  an award of monetary damages that is sufficient to
5  compensate Mr. Young's Estate for the, not only the
6  medical bills that he incurred, but also any pain and
7  suffering, both physical and mental, that he may have
8  experienced during those six months that he survived
9  following the accident and prior to his death.
10      There will be, to assist you in trying to
11  sort this out, a number of witnesses called by both
12  parties. As I mentioned a few moments ago, you will
13  be hearing initially from Corporal Mason, who is the
14  police officer from New Castle County who first
15  arrived on-the-scene. He's the one that did all the
16  forensic investigation, the measurements, the
17  location of the skid marks, the location of the
18  vehicles, and so forth. And you will be hearing him
19  testify by video deposition.
20      You will also be hearing -- and that may be
21  immediately following Corporal Mason -- you may also
22  be hearing from the Newport police officer, Trooper
23  Brown, who also testified by video. Quite frankly,

30

1  the sequence of them testifying is going to be
2  determined by whether or not we can get the video
3  equipment to do him right after Corporal Mason. But
4  you will hear from both police officers before the
5  trial is over.
6      You will hear from the back seat passenger,
7  again, this is Mariann Kamm's brother who was in the
8  Catherine Shore vehicle, he is going to be testifying
9  not by video but by transcript. His presence, or
10  lack of availability to be here personally was not
11  known until the end of last week, and he is in Reno,
12  Nevada. And he will be testifying by a deposition
13  transcript which has already been taken by telephone
14  last Friday, Mr. Ferrara and I both asked him
15  questions. So you will hear someone reading his
16  answers as if they are Mr. Kamm.
17      And Mr. Kamm will, among other things -- and
18  I will alert you in advance, that Catherine Shore,
19  her friend Mariann Kamm and Raymond Kamm are all
20  going to testify that Catherine Shore had the green
21  light. This -- I did not mention this specifically
22  -- but this is a controlled intersection. There are
23  traffic lights for both sides. And they are the

31

1  lights that go over top, that hang over the top of
2  the intersection. Both of the passengers in
3  Catherine Shore's vehicle, as well as the defendant
4  Catherine Shore, are going to tell you that they had
5  the green light.
6      Barbara Young, who will be testifying later
7  in this case, who was driving her vehicle, has no
8  memory. Due to the accident, the first thing that
9  she remembers was someone cutting her clothes off.
10  And you'll hear her testimony that she has no recall
11  of the accident even occurring.
12      So what you're going to hear, in a nutshell,
13  in terms of who had the green light, and, of course,
14  you can't both have a green light, what you're going
15  to have to decide is who had the green light. And
16  the testimony that you're going to have to weigh and
17  decide, because they can't both be right, is whether
18  Catherine Shore, based on her testimony and her
19  passenger's testimony, had the green light.
20      Barbara Young is not going to be of any help
21  because she has no recall even of the accident. So
22  on behalf of the Estate, the person that you're going
23  to hear who's going to testify as to how the accident

32

1  happened or didn't happen, it could not have happened
2  according to the way the defendant says it is, an
3  accident reconstruction expert by the name of William
4  Sherkey. And he's an expert who is a former Delaware
5  State policeman, retired, and during his tenure as a
6  State policeman and since then as his retirement this
7  is now his full-time position, he is an accident
8  reconstruction expert.
9      And you will hear and see his diagrams as to
10  where the Catherine Shore vehicle was at the time,
11  based on the skid marks, the location and where they
12  began, and her testimony that she was only doing
13  30 miles an hour, you will see why it's an
14  impossibility that the accident could have happened
15  the way she said, and that she could have had a green
16  light when she went through.
17      A major factor in this case is the
18  Wilmington Trust building, its location and its
19  size. And the fact that it obstructs the view of
20  anybody riding along this road until they are
21  actually at this point already in the intersection,
22  no matter whether the Young vehicle was here, here or
23  here (indicating), you will see that the Young -- the

33

1  Shore vehicle and the application of skid marks at
2  this point in time, and the length of the skid marks,
3  and so forth, could not have been -- and I'll repeat,
4  this is the accident reconstruction expert said it
5  was impossible for this person to have applied their
6  brakes here in response to seeing a vehicle coming
7  from this road.
8        There's some physics involved, some math
9  involved, Mr. Sherkey's very good at this, and for
10  those of us who don't do that it can be a little
11  complicated, but I'm hoping that we're going to be
12  able to have him explain the feet per second based on
13  the miles per hour.
14        We have two things that are critical. One
15  is Catherine Shore's own testimony that she was doing
16  30 miles an hour. The other is the reaction time,
17  the place where you would have to perceive the car,
18  backing up from the point of the accident at 30 miles
19  an hour, where you would be when you first perceive
20  whatever the hazard is you are going to brake for,
21  and where you are when you react in order for the
22  brakes to start at a certain point.
23        Again, it's going to get a little technical.

34

1  There was something called an automatic braking
2  system as to the certain type of tracks, but there
3  are formulas, there are all kinds of equations that
4  these experts use to reconstruct, to go back from the
5  point of impact, based on the forensic evidence, the
6  location and the length of the skid marks, what kind
7  of cars that were involved, he will tell you if she
8  was doing 30, how fast she was doing after the skid
9  marks when she hit the car.
10        You're going to hear another very
11  interesting piece of testimony from the brother, her
12  back seat passenger, the brother of Mariann Kamm is
13  going to say that she was doing more like 40 to 50,
14  and she was accelerating prior to hitting the brakes.
15  If she was doing 40 to 50, then the point of
16  perception would have been even further back. But
17  I'm going to let Mr. Sherkey explain that.
18        So you're going to have conflicting
19  testimony, you're going to have three people who
20  claim to have eyewitnesses, after being at the Iron
21  Hill Brewery for three-and-a-half hours, they
22  remember, all three of them, that it was a green
23  light. And you're going to have Mr. Sherkey saying,

35

1  based on the forensic evidence, how it was impossible
2  for her to have applied her brakes where the skid
3  marks stopped -- started, it was impossible for her
4  to have done that in response to seeing the Young
5  vehicle, or any vehicle over here because of the
6  presence of this bank. And he will tell you that
7  whatever the hazard was, whether it was the stoplight
8  red, or whatever, she was stopping for something
9  other than a car over here (indicating).
10        To follow up on the witnesses, you will hear
11  from, tomorrow, Cathy Vitale, who is the daughter of
12  Donald Young. Again, she's going to testify, she
13  took care of Mr. Young and Mrs. Young after the
14  accident. She lives out in Arizona, but moved here
15  and stayed here for several months to assist. And
16  she'll provide testimony as to the injuries. You'll
17  hear from Mariann Shore (sic), Mr. Ferrara is going
18  to, I understand, call her, as well as Catherine
19  Shore as their witnesses.
20        That is a preview of what you're going to
21  see. I'm going to finish my opening comments at this
22  point in time, Mr. Ferrara's going to have some
23  opening words, after which we'll start the testimony.

36

1  And we may or may not get one in before the lunch
2  break. But after the witnesses are all finished,
3  both Mr. Ferrara and I will once again have an
4  opportunity to address you in what's called a closing
5  argument. And that is our opportunity to comment on
6  the evidence that you've heard. And after that, the
7  judge will give you instructions in the law, and you
8  will retire to deliberate.
9        I ask only one thing, that you render a fair
10  and equitable verdict, judgment, based on all the
11  evidence that you hear. Thank you.
12        And Mr. Ferrara will address you now.
13        THE COURT: Mr. Ferrara, you may give
14  defendant's opening statement in the case.
15        MR. FERRARA: Thank you, your Honor.
16        Ladies and gentlemen, good morning. My name
17  is Louis Ferrara, and I represent Catherine Shore.
18  And I suggest a little differently than my friend, I
19  think this is a very simple case and you're not going
20  to have a lot of trouble figuring it out. Barbara
21  Young ran the red light, Catherine Shore had the
22  green.
23        The police arrived -- and, again,

37

1  plaintiff's counsel misspoke, he told you the date,
2  the date was actually December the 13th of 2003, not
3  2004. So this accident happened more than three and
4  a half years ago by the time you sit here today.
5       Here's what happens: Catherine and Mariann
6  Kamm used to live in the same apartment complex,
7  they're acquaintances. It's hard to call them good
8  friends, they see each other a couple times a year.
9  It was Catherine -- it was Mariann's birthday, they
10 agreed to get together, not to go have drinks and
11 have dinner, to have dinner to celebrate Mariann's
12 birthday. The implication that they were having
13 drinks suggest they were doing a lot of drinking,
14 we'll talk about that in a minute.
15      They ended up at a place called the Iron
16 Hill Brewery down here in the Riverfront. Catherine
17 had never met Raymond before. Raymond Kamm is the
18 brother of Mariann Kamm, they met for the very first
19 time. They went to have dinner. They got there at
20 4:30, five o'clock. Catherine did the driving. She
21 decided to be the driver because she thought that
22 maybe the brother and sister not seeing each other in
23 a while, they'd want to celebrate her birthday a

38

1  little bit more than she did, and she wanted to make
2  sure that somebody was not drinking and driving, so
3  she took on the role as the driver.
4       The three of them got to the Iron Hill
5  Brewery, they got there at 4:30, five o'clock. A
6  fourth individual arrived sometime later, was not
7  involved in the accident, doesn't have anything to
8  add to what's going on. They're there while the
9  Shores are visiting their nephew. Mrs. Shore -- I'm
10 sorry -- the Youngs are visiting their nephew.
11 Mrs. Young told the police officer that she wasn't
12 terribly familiar with the area, and that comes into
13 play after the accident happens.
14      What happens is that Catherine was driving
15 on Justis Street, Mrs. Young is on James Street. And
16 Catherine enters -- if those of you who are familiar
17 with the intersection, you'll get a chance to see
18 more of this once the testimony comes down --
19 Catherine was only on another street for a short
20 period of time. She comes off of 95, off of 141, she
21 makes the left where the little skate park is and
22 heads toward the intersection that has the
23 Exxon station, the firehouse and the Wilmington Trust

39

1  Bank.
2       Now, immediately following this impact, or
3  as the impact is happening there's a scream in the
4  car from Mariann. Two of the witnesses say not that
5  they saw a car approaching the intersection, but they
6  saw a flash, a flash of lights approaching the
7  intersection. Catherine jams on her brakes, can't
8  avoid, the accident happens essentially in the middle
9  of the intersection, and the impact pushes the cars
10 off to the left.
11      Now, two police people arrive almost
12 immediately. One of them is a corporal by the name
13 of Thomas Mason. Everybody now seems to be on
14 vacation next week. Mason's on vacation next week,
15 Brown is on -- I mean, this week -- then Brown is on
16 vacation, and they can't be here. So we have them on
17 video.
18      But what Mason's going to tell you is, I
19 suggest, significant. Mason is going to tell you
20 that he was arriving in Newport to go to the police
21 station because he was going to work a special duty
22 job. He was not there to investigate this accident.
23 He happened to be the first person to arrive. And he

40

1  was following the Young vehicle.
2       Now, not directly behind the Young vehicle
3  because he didn't see the Young vehicle before the
4  impact, but he did take the same path that the Young
5  vehicle took. You will hear him tell you on the
6  video that he got there right at the time that the
7  cars stopped and the people were still in the
8  vehicle.
9       He will also tell you about a sense
10 impression that he had. He will tell you that he
11 believes he arrived within three to 15 seconds of the
12 accident happening. And he will also tell you that
13 his sense impression was that Barbara Young had the
14 red light.
15      Now, he was asked a lot of questions by both
16 lawyers, and he ended up with, well, it could have
17 been a minute before I arrived. But his immediate
18 sense impression was three to 15 seconds and the
19 light was red.
20      He never spoke to any of the witnesses
21 because he wasn't, he's not a Newport officer and he
22 wasn't investigating the accident. But he is an
23 accident reconstructionist. He has the

41

1  qualifications to put this all together, but he was
2  not asked to do that while all the cars were at the
3  scene and while he had the opportunity to do it. He
4  took some pictures, he took some measurements, and
5  interviewed no one.
6        Within a minute or two of the accident
7  Officer Henry Brown of the Newport Police Department
8  arrives. Same situation. When he gets there, the
9  Youngs are in their car, Catherine, who was injured,
10 she had problems with her hand, Mariann and Raymond
11 are still in the area of the, of the Shore Volkswagen
12 Passat.
13       Brown separates everybody, takes statements
14 from all three of them. These statements are taken
15 contemporaneously. These are not statements that
16 were taken last week. They're not statements that
17 were even taken last year, these statements were all
18 taken within several minutes of the accident
19 happening. They were all taken separately. And all
20 three individuals indicated that they had the green
21 light when a car came from their right.
22       They have different impressions of the car
23 from their right. Catherine says I saw a flash, I

42

1  saw -- I slammed on my brakes as soon as I can, I
2  couldn't avoid it. Mariann says I know that bank is
3  there, so I know that sometimes people coming this
4  way have a hard time seeing, so I'm leaning forward
5  in my seat to be on the extra lookout, I see the car,
6  I scream we have the green light, we get hit.
7        And Raymond, who we took the deposition of
8  last week, is somebody that nobody, at least none of
9  the lawyers has ever met, we did him on a telephone
10 deposition. You're not going to have a chance to
11 judge his demeanor because all you're going to hear
12 is written words being read by someone else. He says
13 that he could see the light, the light was green, he
14 saw a flash of light from over here, and Catherine
15 hit the brakes to avoid the accident.
16       Now, all of those statements were given that
17 night when it had just happened. A couple of days
18 later Officer Brown goes to the police station -- to
19 the hospital to talk to Barbara Young. And you'll
20 recall counsel said that she was injured, she's in
21 the hospital. He asks her what happened. She said
22 I'm not that familiar with the area, I don't know
23 what color my light was. So the question as to who

43

1  has the light seems to be fairly simple.
2        However, what happens is later on, years
3  later, a lawsuit gets filed, depositions are taken,
4  questions are asked of people who were there, of all
5  of the three people in the Shore vehicle. They're
6  not asked questions about are you sure what color the
7  light was, because they're all rock solid that the
8  light's green. They're asked questions like how fast
9  were you going? How far away were you when this
10 happened? How close were you when that happened?
11 I suggest, ladies and gentlemen, the answers are all
12 over the place.
13       We've got speeds from 25 to 30, distances
14 from 8 feet to further away than 8 feet. Even a
15 speed from Raymond Kamm the other day of 45 -- of 40
16 to 50 in this one block of travel. There's simply no
17 physical evidence that supports any of that. But the
18 reconstructionist grabs on to the higher numbers of
19 speed to put Catherine further away. The further
20 away Catherine gets from the intersection, the harder
21 it is to see somebody over here (indicating).
22       So they say, ah, taking that, we put her
23 back here, she couldn't see the car. Well, there are

44

1  a lot of problems with that that we'll talk about
2  tomorrow, but I'll just throw a couple out to you
3  now.
4        First of all, we're presuming that she's in
5  this lane. No one knows what lane she was in as
6  she's traveling down here. You'll hear me ask Mason
7  that question. Obviously if she's in this lane,
8  she's more visible. Nobody knows. We know what lane
9  she's in here, we just don't know whether she moved
10 into that lane.
11       Secondly, the slower Catherine is going, the
12 closer she can be, because he does a feet per second
13 analysis that you'll hear about. And basically the
14 easiest way for me to tell you that is it's almost
15 one and a half feet per second. So at 30 miles an
16 hour you're going 45 miles an hour -- at 30 miles an
17 hour you're going 45 feet per second, at 60 miles an
18 hour you're going 90 feet per second, that's, it's
19 real close to that. It's not exact, but that's a
20 good way for you to remember how it works.
21       What you're going to find is that he always
22 took the higher speed. She's asked to estimate her
23 speed. The accident happened December 13th of 2003.

45

1  It was a traumatic event. It was an unexpected
2  impact. She was injured. She had to be taken to the
3  hospital in an ambulance.
4          I believe it was February of this year -- of
5  last year when she was asked for the first time
6  questions about -- actually, that's not right, it was
7  September the 14th -- I apologize -- September the
8  14th, 2006, how fast do you think you were going as
9  you approached it, and how far away do you think you
10  were?
11          Are her numbers exact? No. She continues
12  to say, I can't make that decision, you're asking me
13  to tell you a number I can't tell you, I'm not good
14  at estimating, I'm not good at judging. But at some
15  point along the way she says 25 to 30. He takes the
16  30, he puts her so far back. At 25 feet, she's 67
17  feet closer, just to give you an idea of the
18  analysis.
19          There's no question in her mind or the minds
20  of our witnesses. She doesn't know whether she was
21  right here or right here. She doesn't know if she
22  was going 25, 22, 30 or 32. But what she does know
23  is she had the green light, and that's what both of

46

1  her people say.
2          Now, you heard two other things from
3  plaintiff's counsel that we need to talk about. One
4  of them is the fact that you heard that Barbara Young
5  was injured and that Barbara Young was in the
6  hospital for a couple of weeks. What you didn't hear
7  is that Barbara Young was a plaintiff. What you did
8  hear was that Barbara Young was a defendant. In
9  other words, the Estate of Donald Young sued both of
10  these people claiming that they both had the red
11  light.
12          Now, one of the things that plaintiff's
13  counsel said that I strongly agree with him on is
14  they both couldn't have had the green. Obviously
15  they both couldn't have had the red. Barbara Young
16  isn't here because Barbara Young settled her claim.
17  She was never a plaintiff, she was only a defendant.
18  And she settled her claim, and she's not here. Then
19  only one of them could have had the red and one of
20  them could have had the green.
21          Now, the other thing you were told was that
22  Mr. Young died from his injuries. That doesn't seem
23  to be what the testimony's going to be. What you're

47

1  going to hear about Donald Young is, first of all, he
2  had a lot of health problems before this accident
3  ever happened. The records give us some different
4  ages for him, but I believe he was born in 1922, so
5  that would make him, I think he had just turned 81
6  when this accident happened in 2003. He had cancer,
7  he had a hardening of the arteries in his brain. He
8  had, part of his body was paralyzed, he had a
9  hemiparesis. He had a stroke. He was confined to a
10  wheelchair. He was not in good shape.
11          He was in a hospital for a period of time.
12  And sometime in June, June the 5th of 2004, so
13  approximately six months after the happening of this
14  accident the Young family, Mrs. Young, her daughter,
15  I think that's the entirety of the family, so one of
16  the two of them or the two of them in combination
17  decided to take him off life support system, and he
18  passed away on that day June the 5th, 2004.
19          You were told by plaintiff's counsel that he
20  died as a result of his injuries. That's not what
21  the medical examiner says. The medical examiner's
22  report, which I'll introduce into evidence, gives his
23  cause of death as natural causes. You are not going

48

1  to hear blunt force trauma causing him to die in this
2  accident.
3          It's a pretty simple case, it's a very
4  common sense case, ladies and gentlemen. You've got
5  two people approaching an intersection, three people
6  in one car know what color the light was, one person
7  in the other car doesn't know what color the light
8  is, but she has a police officer quickly behind her
9  who believes it was red for her.
10          You have two people who are defendants, one
11  person who settles the case who isn't here, the other
12  person is still here to answer to the complaint of
13  them both having a red light, which we know they both
14  couldn't have done. And then you were told the cause
15  of death for Donald Young was the accident, but
16  that's not what the records indicate to us.
17          So I come back to what I said earlier, it's
18  a sympathetic case, we've got a dead person, so it's
19  certainly sympathetic. You're going to see some big
20  numbers, you're going to see a lot of bills, you're
21  going to see a lot of expenses. But, ladies and
22  gentlemen, what the judge is going to tell you is you
23  first have to decide negligence, who was at fault.

49

1    And, again, and you're going to hear me say
2  this a lot in my closing argument, because I'm going
3  to echo my friend, the plaintiff's counsel, they both
4  couldn't have had the green light, they both couldn't
5  have had the red light. This case is not gray, it's
6  black and white, one had the red, one had the green.
7  The plaintiff originally sued them both and said they
8  both had the red because perhaps Mr. Young didn't
9  know who had the red and who had the green. But our
10  common sense is going to help us figure that out.
11    And then the Court's going to tell you that
12  once you -- if you decide liability -- and I argue to
13  you that the evidence will not support that -- but if
14  you conclude that there's liability, then you have to
15  go to the issue of damages. Damages have to be
16  proven in a particular way. And one of the things
17  that has to happen with damages is there has to be a
18  connection between the incident itself and the
19  claimed damages. So in this case the leap is from
20  does accident cause death. Not according to the
21  medical examiner. And you'll have to listen to the
22  testimony and draw your own conclusions.
23    Now, I apologize that the first three things

50

1  that are probably going to happen in this case is
2  you're going to hear two videos and a read-in
3  deposition. The good news is they're not very long.
4  The videos, I think one of them is maybe 15 minutes
5  and the other one is maybe ten minutes. And the
6  read-in deposition shouldn't be any more than about
7  ten or 15 minutes. And at some point in time before
8  the day is out today we have to get started with the
9  live testimony. There doesn't seem to be any reason
10  that we should not conclude tomorrow.
11    Thank you very much.
12    THE COURT: Mr. Hudson, the plaintiff may
13  call their first witness by deposition.
14    MR. HUDSON: It will be by video.
15    THE COURT: And approximate playing time of
16  the deposition?
17    MR. HUDSON: I believe it's about 20 to 25
18  minutes.
19    THE COURT: Well, let's take that, and then
20  we'll take our lunch recess after this one bit of
21  evidence.
22    (Thomas F. Mason videotape deposition
23  played, 12:39 to 1:06 p.m.)

51

1    THE COURT: Members of the jury, we will
2  take our lunch recess at this time, come back in one
3  hour, or at five minutes after two. As I did say
4  earlier, during this recess don't discuss the case
5  with anyone or allow anyone to discuss the case with
6  you. And as you come and go from the courtroom in
7  and out of the courthouse please do what you can to
8  avoid, if you can, you getting on the elevators where
9  the lawyers or the parties are. Maybe just try to
10  take another elevator, if you can. And if you're
11  outside the building just to get some fresh air,
12  please don't stand right in front of the door. We're
13  just trying to eliminate any inadvertent contact you
14  might have with anybody involved in the case, so you
15  decide the case on 100 percent to what you hear in
16  the courtroom.
17    Please take out the jury.
18    (Jury leaves the courtroom at 1:06 p.m.)
19    THE COURT: Counsel, very briefly, I did
20  intend to make a record of the questions 3 and 4 of
21  the jointly agreed upon voir dire questions. I
22  declined to give 3 and 4 because I thought those
23  questions were subsumed by question 2.

52

1    Is there anything to take up before we
2  recess?
3    MR. FERRARA: Not from me, your Honor.
4    THE COURT: Then, we'll see you all at five
5  after two. Have a good lunch.
6    (Lunch recess, 1:07 to 2:17 p.m.)
7    THE COURT: Sorry to be a little delayed in
8  getting on the bench. Are we ready to bring in the
9  jury?
10    MR. HUDSON: We are, your Honor.
11    THE COURT: Please bring in the jury.
12    (Jury enters the courtroom at 2:19 p.m.)
13    THE COURT: Members of the jury, I hope you
14  had a nice lunch. We're ready to continue.
15    Mr. Hudson.
16    MR. HUDSON: Thank you, your Honor. The
17  next witness will be a videotape of Newport Police
18  Corporal Henry Brown.
19    THE COURT: And for the jury's information,
20  the approximate playing time of this tape?
21    MR. FERRARA: Your Honor, I think it's less
22  than 15 minutes.
23    THE COURT: All right. Thank you.

**53**

1    (Henry Brown videotape deposition played,
2    2:20 to 2:38 p.m.)
3         THE COURT: Mr. Hudson, the plaintiffs may
4    call their next witness.
5         MR. HUDSON: Thank you, your Honor. The
6    plaintiff would like to call as their next witness
7    Mrs. Barbara Young, who is out in the hall.
8         THE COURT: All right. Let's get
9    Mrs. Young.
10         ... BARBARA P. YOUNG,
11    having been duly sworn according to law, was examined
12    and testified as follows...
13         DIRECT EXAMINATION
14    BY MR. HUDSON:
15    Q.  Good afternoon, Mrs. Young.
16    A.  Good afternoon.
17    Q.  Mrs. Young, could you state your residence,
18    please, for the record.
19    A.  102 Clover Hill Road, Millington,
20    New Jersey.
21         THE COURT: Can you speak a little bit
22    closer to the microphone.
23    A.  I'm sorry. It's 07946.

**54**

B. Young - Direct

1    Q.  And what is your relationship to Mr. Donald
2    Young?
3    A.  I was his wife.
4    Q.  And how long were you married?
5    A.  Forty-three years, 44 years -- 43.
6    Q.  What was his occupation?
7    A.  He was a chemist.
8    Q.  Was he actively working at the time of the
9    accident?
10    A.  No, he was retired.
11    Q.  And approximately how long had he been
12    retired?
13    A.  Just short of 20 years.
14    Q.  Okay. What was Mr. Young's age at the time
15    of the accident?
16    A.  Eighty-one.
17    Q.  And how old are you?
18    A.  I'm 73.
19    Q.  Do you have any children?
20    A.  We have one daughter.
21    Q.  And what is her name?
22    A.  Catherine Vitale.
23    Q.  Mrs. Young, I'm going to ask you some

**55**

B. Young - Direct

1    questions about the accident that occurred on
2    December 13th. And I would like to start by asking
3    you what you were doing earlier that day, that is,
4    where you were going and what you were doing, to the
5    best of your recollection?
6    A.  We left our home in New Jersey to go to
7    Wilmington to visit Don's sister and his nephew. We
8    were going to celebrate an early Christmas with them.
9    Q.  And who was driving the vehicle?
10    A.  I was driving. I was driving.
11    Q.  And who was in your vehicle with you?
12    A.  My husband Don.
13    Q.  And where was he sitting?
14    A.  In the front passenger's seat.
15    Q.  Was this the typical routine that you would
16    drive and he would be a passenger?
17    A.  In recent years, yes.
18    Q.  Was there a reason why you drove instead of
19    Mr. Young?
20    A.  Yes. He had loss of motor control in his
21    legs, and he wasn't able to drive a car any longer.
22    Q.  And what was the reason for that loss of
23    motor control, if you know?

**56**

B. Young - Direct

1    A.  Medically it's called ataxia. And he just
2    -- his brain doesn't make his legs do what he wants
3    them to do, and so he had trouble walking, and he
4    couldn't use the pedals in the car.
5    Q.  Okay. So he could drive at that time, but
6    you chose to drive?
7    A.  No. I don't think he could, he was not able
8    to drive any longer.
9    Q.  You indicated that you were coming to
10    Delaware to visit a nephew?
11    A.  That's correct.
12    Q.  And approximately what time did you leave
13    New Jersey?
14    A.  We probably left around eleven o'clock in
15    the morning.
16    Q.  And how long a drive is it to your nephew's?
17    A.  A little more than two hours.
18    Q.  Is it a drive that you had done before?
19    A.  Yes.
20    Q.  And approximately how many times would you
21    estimate in the past?
22    A.  Well, we used to go down maybe three or four
23    times a year, and we'd been doing it for the 40 years

57

B. Young - Direct

1  that we'd been married, so it's quite a number of
2  years.
3      Q. The route that you took on this particular
4  date, was that the same route that you usually took?
5      A. Yes.
6      Q. Okay. Tell us what happened next. You left
7  New Jersey to go to your nephew's home. Did you, in
8  fact, arrive there?
9      A. Yes, we did.
10     Q. And do you recall approximately what time?
11     A. It was probably around one o'clock.
12     Q. What happened after that?
13     A. Oh, we visited with the relatives, and about
14  4 or 4:30, I guess it is, we went out to dinner. And
15  we had dinner, and we came back to their house and
16  visited a little longer. And at about nine o'clock
17  we left to go home.
18     Q. Okay. When you left to go home, were you
19  driving the car again?
20     A. Yes.
21     Q. And tell us what you recall after you left
22  your nephew's house.
23     A. I don't recall anything until I realized

58

B. Young - Direct

1  somebody, I heard scissors going, and I thought to
2  myself, somebody's cutting my clothes off.
3      Q. Okay. Do you now know when that was
4  relative to the accident?
5      A. Not really, but I would think shortly after
6  the accident had happened.
7      Q. Okay. There's been testimony by the police
8  officers as to the location of the accident, and it
9  was at the intersection of Justis and James Street in
10  Newport. And the evidence indicates that you were
11  involved in a collision with another vehicle driven
12  by Catherine Shore at that intersection. Do you have
13  any recollection at all of being in that accident?
14     A. No.
15     Q. Were you injured in the accident?
16     A. Yes.
17     Q. And what were your injuries?
18     A. I had a broken pelvis, broken ribs, a broken
19  wrist, and I believe there was some internal
20  bleeding.
21     Q. Were you hospitalized?
22     A. Yes, I was.
23     Q. And do you recall where?

59

B. Young - Direct

1      A. At Christiana Hospital.
2      Q. Was your husband injured in the accident?
3      A. Yes, he was.
4      Q. Can you describe his injuries?
5      A. I was told that he had a brain injury. And
6  I also was aware at some point that his tongue had
7  been cut very badly. And I don't know of any other
8  injuries that he had.
9      Q. Okay. Was he hospitalized?
10     A. Yes, he was.
11     Q. Do you know where he was taken?
12     A. Christiana Hospital.
13     Q. Okay. At some point in time after the
14  accident occurred do you recall seeing your husband
15  for the first time?
16     A. Yes, I do.
17     Q. And can you tell the jury where that was and
18  what the circumstances were?
19     A. It was in the Christiana Hospital, and I
20  don't know how many days after the accident had
21  occurred, but the hospital personnel put me on a
22  gurney and wheeled me down to see him, because I had
23  been asking for a few days, I guess, to do it. And

60

B. Young - Direct

1  he was, I believe, in intensive care at that time,
2  but I'm not sure if that's correct. And so, anyway,
3  they wheeled me down and we were lying in beds
4  looking at each other. And he didn't respond to
5  anything. I said, "Hello," and he just sort of
6  stared at me.
7      Q. Were his eyes open?
8      A. I can't recall whether they were or not.
9      Q. Did he indicate that he knew you were there?
10     A. No.
11     Q. Can you describe his movement, was he moving
12  his arms or legs?
13     A. One of his arms was, he was sort of shaking,
14  but it was not a voluntary movement, and I don't
15  think the other one he was moving at all. And his
16  legs, I think, were covered, and I didn't notice what
17  they were doing, if anything.
18     Q. Did he communicate with you in any way on
19  that date?
20     A. No.
21     Q. Was he aware of your presence, if you know?
22     A. I don't know, but I don't think so.
23     Q. Did you see him on any other occasion while

61

B. Young - Direct

1  he was at the New Castle County Hospital?

2  A. No.

3  Q. When was the next time that you saw him?

4  A. When he came back to New Jersey and went

5  into a rehab facility.

6  Q. Okay. I'm going to ask you some more

7  questions about his condition from that point

8  forward. But, first of all, let me go back in time

9  to prior to the accident, just prior to the accident,

10 that is, December 13th, that Saturday, could you tell

11 the jury what the state of your husband's health was

12 at that time?

13 A. He was mentally in all right shape. And he

14 had all of his mental faculties. He liked to read,

15 he liked to watch television. He was not able to

16 walk, basically, at all, although he could do a

17 little bit, but he needed help to walk. And so he

18 was pretty much confined to the wheelchair. He liked

19 to go out in the car, and whenever I went on errands

20 he would go out with me because he enjoyed being out. We

21 would on occasion go out to lunch with our friends.

22 We had tickets to an opera series, and we would go to

23 New York to the opera.

62

B. Young - Direct

1  Q. How recently had you been to the opera prior

2  to the accident, if you recall?

3  A. I can't give you an exact date, but we had a

4  series that began in September. And so we were there

5  September or October or November, or probably twice

6  in that period of time before the accident. And we

7  also had, the reason we were in Delaware on the 13th

8  was that the following week we were driving to

9  Arizona to spend Christmas with our daughter.

10 Q. How did you travel to Arizona when

11 you and your husband would visit with your daughter?

12 A. Well, we had, in the past we had flown. In

13 prior years we had flown. But we have a dog, and it

14 was very stressful on the dog, so we decided this

15 year -- that that year we would drive and it would be

16 easier for the dog. And also I thought it would be

17 easier with managing Don than having to get him on an

18 airplane and off.

19 Q. So the last time that you and your husband

20 visited your daughter in Arizona, you did so by

21 driving?

22 A. No. We flew the last time. But in 2003 our

23 plans were to drive, we were going to leave the next

63

B. Young - Direct

1  weekend after the 13th and drive to Arizona for

2  Christmas.

3  Q. Okay. Mr. Ferrara, in his opening

4  comments to the jury, stated that your husband prior

5  to the accident suffered from a number of different

6  medical problems, and one of them he mentioned was

7  cancer.

8  Did your husband ever have cancer?

9  A. Never, not at all.

10 Q. Did he ever have any other kinds of medical

11 issues? You mentioned the stroke which was a result

12 of his not being able to walk. Did he have any other

13 kinds of medical conditions as of the time prior to

14 the accident?

15 A. I don't think so. He had had broken

16 clavicles in the past, but they were well-healed.

17 But I think other than what I've said, I don't recall

18 anything that he had other than pretty much his

19 inability to walk.

20 Q. How were his mental faculties prior to the

21 accident?

22 A. I think they were fine. As I say, he liked

23 to do puzzles, he liked, he took care of the

64

B. Young - Direct

1  household finances for all the years we were married,

2  and I think that needs to have some mental capacity.

3  And he liked to read, watch television. And I think

4  mentally he was in quite good shape for an

5  81-year-old man.

6  Q. I'm going to show you a photograph and ask

7  you if you can identify that. Just tell me if you

8  identify the photograph.

9  A. Yes, I do.

10 Q. Okay. Is this a photograph of your husband?

11 A. Yes, it is.

12 Q. And are there other -- okay, let me just

13 stop there.

14 MR. HUDSON: I've shown this to Mr. Ferrara,

15 I don't think there's an objection.

16 MR. FERRARA: I have no objection.

17 MR. HUDSON: May I have it marked as

18 Plaintiff's 1?

19 THE COURT: Admitted as Plaintiff's Exhibit

20 No. 1.

21 THE CLERK: Plaintiff's Exhibit 1 so marked,

22 your Honor.

23 MR. HUDSON: Thank you.

65

## B. Young - Direct

1  BY MR. HUDSON:
2    Q.  I'm going to put this up on the overhead,
3  Mrs. Young, so that we can identify who is in the
4  photograph. While the machine's warming up, can you
5  tell me when this photograph was taken?
6    A.  It was Christmas 2002.
7    Q.  So about one year prior to your accident?
8    A.  One year prior, yes.
9    Q.  Okay. Can you tell me, is this gentleman in
10 the plaid shirt your husband?
11   A.  Yes, it is.
12   Q.  And the lady that's sitting next to him?
13   A.  That's me.
14   Q.  Okay. And who is the gentleman at the end
15 of the table?
16   A.  I can't -- oh, it's, it's a friend of Cathy,
17 of my daughter and her husband from California, his
18 name is Jerry Catts.
19   Q.  And where was this photograph taken?
20   A.  At my daughter's home in Arizona.
21   Q.  Would this have been on your last trip out
22 there prior to the accident?
23   A.  Yes.

66

## B. Young - Direct

1    Q.  And who is this lady at the front?
2    A.  That's my daughter Cathy.
3    Q.  And the lady with the red jacket?
4    A.  That's Jerry Catts' wife Linda.
5    Q.  Okay. Do you recall this particular
6  occasion, this dinner, do you recall being there?
7    A.  Yes, I do.
8    Q.  And how would you describe your husband's
9  health at that point?
10   A.  It was fine. I might mention that my
11 daughter has a two-story house, and in order for him
12 to go to bed he had to walk up the stairs, and he
13 was, with help, able to do that.
14   Q.  Okay. Let's go back now to the point after
15 the accident where I interrupted you. Your husband
16 had spent some time at Christiana Care Hospital
17 following the accident. Do you recall how long it
18 was that he was at the Christiana Care Hospital
19 before being transferred out?
20   A.  It was about a month.
21   Q.  A month?
22   A.  Yes.
23   Q.  And where did he go after he was discharged

67

## B. Young - Direct

1  from Christiana Care Hospital?
2    A.  He was taken by ambulance to a rehab
3  facility in Berkeley Heights, New Jersey called
4  Runnells Hospital.
5    Q.  And was that near where you lived?
6    A.  Yes. It's fairly close to our home.
7    Q.  Did you have occasion to see your husband
8  prior to that time, that is, after he was discharged
9  from Christiana until he was -- and while he was at
10 the...
11   A.  Yes. Yeah, I did see him at Runnells every
12 day.
13   Q.  ...Runnells. Okay.
14        Was there anyone else in the family that
15 visited your husband besides you while he was --
16   A.  Our daughter Cathy was staying with me.
17   Q.  Cathy Vitale?
18   A.  Yes.
19   Q.  Tell the jury, if you would, what progress,
20 if any, your husband made from the time that he was
21 hospitalized at Christiana through the time he was at
22 the Runnells Hospital?
23   A.  Well, as I said, when I saw him in Runnells

68

## B. Young - Direct

1  there was no response at all to my being there, it
2  was as if he didn't see me or didn't know me. When
3  he got to Runnells, at first I think he did respond a
4  little bit, sometimes when I came to see him he would
5  act like he knew who I was, and I think he might even
6  have tried to say hello. But most of the time he
7  slept, or if he wasn't sleeping he had his eyes
8  closed and just ignored us. He wasn't interested in
9  doing anything, he was just lying in bed. He didn't
10 watch television. We would turn it on while we were
11 there and he would just ignore it. And he didn't do
12 anything but lie in bed.
13   Q.  Okay. You said you visited him daily?
14   A.  Yes.
15   Q.  And approximately how much time would you
16 spend each day?
17   A.  If he was at all responsive we would stay as
18 long as he seemed to be interested in us, but
19 generally it was an hour or so daily.
20   Q.  Okay. When you say "if he was at all
21 responsive," can you explain what you mean by that?
22   A.  Well, if he would... He never smiled, and
23 he really didn't talk, but he would maybe follow us

B. Young - Direct

1   with his eyes or act like he understood what we were
2   saying. And I don't know how I can say that he
3   understood, but I knew that he seemed to be
4   understanding from time to time, but not very often.
5        Q.  Were there ever any occasions when based on
6   your personal observation he was experiencing pain or
7   indicating that he was experiencing pain?
8        MR. FERRARA: Your Honor, may we approach on
9   that?
10       THE COURT: Court reporter.
11       (The following took place at sidebar:)
12       THE COURT: Mr. Ferrara.
13       MR. FERRARA: He can't have her speculating
14  on whether he was in pain. One of the significant
15  problems that I think the plaintiff has in this case
16  has got to be whether this guy has suffered any
17  conscious pain and suffering. And absent somebody
18  that's going to be able to tell us that besides her
19  guessing, that can't come in.
20       MR. HUDSON: She's going to testify as to a
21  couple things, your Honor. One is that she was
22  trimming his fingernails one day and got a little
23  close to the quick and he said "ouch." There were a

B. Young - Direct

1   number of occasions that both she and the daughter
2   will testify to as to when there would be shifting of
3   his pillows or rolling him, or some type of movement
4   like that, he would grimace and he would contour his
5   face indicating that he was responding to the
6   stimulus.
7        THE COURT: Well, I'll allow specific
8   examples to be asked about such as you just
9   identified, but I do agree with Mr. Ferrara that the
10  witness oughtn't to generally testify that she
11  thought he was in pain. I think, under the
12  circumstances, it should just be based on
13  demonstrable instances.
14       MR. HUDSON: I'm only asking her personal
15  observations.
16       THE COURT: Then I think what I'll do is
17  just ask you to rephrase the question.
18       MR. HUDSON: I'm sorry. I thought I had
19  said, when I asked it based on her personal
20  observations with --
21       THE COURT: You may have said it. And
22  Mr. Ferrara may have been approaching out of an
23  excess of caution, but I think we all are on the same

B. Young - Direct

1   page.
2        MR. HUDSON: As long as I say it that way,
3   there's no problem if I just say based on your
4   personal observations?
5        MR. FERRARA: Yeah. I just don't want to
6   get into "I think," or that kind of thing.
7        THE COURT: I agree with you.
8        (Sidebar concluded.)
9   BY MR. HUDSON:
10       Q.  Mrs. Young, based on your personal
11  observations, that is, when you were there and when
12  you were physically present and watching your
13  husband, were there ever any occasions that you
14  observed where he indicated that he was in pain or
15  reacting to pain?
16       A.  I think when the nurses came in to change
17  his position, I think he felt very uncomfortable when
18  they moved him around. But other than that I don't
19  think he...
20       Q.  What did he do to indicate to you that he
21  was in pain?
22       A.  He would grimace and make a face. And,
23  actually, one time when I was there his fingernails

B. Young - Direct

1   or toenails were quite long, and I brought clippers
2   in, and I misjudged and I got his skin a little bit,
3   and he wasn't able to say it out loud, but he said,
4   "Sh," mouthed the word "ouch."
5        Q.  Okay. Did his condition ever change from
6   that point in time while he was at the Runnells
7   Hospital?
8        A.  Yes. He developed a urinary tract
9   infection, and he was taken to the hospital to have
10  that treated until it got under control. And he was
11  in the hospital for about a week at that time. And
12  then he was sent back to Runnells Hospital.
13       Q.  Did he continue to remain at the Runnells
14  Hospital until his death?
15       A.  No. He was, ended up being in the hospital
16  a total of five times. From the time he came from
17  Delaware he would spend a week or so in Runnells, and
18  he would develop another infection, and they would
19  take him off to the hospital to get it under control,
20  and then he would go back to Runnells. And about,
21  after the third time I said I wanted to try bringing
22  him home and see if maybe the home environment would
23  prevent him from getting another urinary tract

73

B. Young - Direct

1  infection. And unfortunately after he had been home
2  for a couple of days his feeding tube got clogged,
3  and I had to take him back to the hospital for that
4  to get a new one put in. And they admitted him
5  again. And the next time when they said that he was
6  well enough to leave, I said I wanted to bring him
7  home and put him in Hospice care.
8      Q.  Okay. Is that what you did?
9      A.  That's what I did.
10     Q.  And how long was he home at that point in
11 time from then?
12     A.  Probably like two-and-a-half weeks.
13     Q.  The records indicate that Mr. Young died on
14 June 5th of 2004?
15     A.  Yes.
16     Q.  Can you explain, were you present, could you
17 explain the circumstances of his death?
18     A.  Well, the Hospice people had instructed me
19 that I should cut off his, gradually reduce his
20 feeding until I could cut it off, not to just turn it
21 off. And so he gradually got less and less food to
22 eat. And I had medications to give him in case he
23 was in any pain. And all we could do was just wait

74

B. Young - Direct

1  until nature took its course and he was...
2      Q.  So was the decision to withdraw life support
3  at some point made by someone?
4      A.  Yes, I did that.
5      Q.  And you made that decision?
6      A.  Yes, I did.
7      Q.  And did you make that in consultation with
8  any of his medical care providers?
9      A.  Yes. I talked with the medical people at
10 Overlook Hospital in Summit, which is the last place
11 he was at. And I discussed it with our family, and
12 we all agreed that was the thing to do for him.
13     Q.  And what was your reason for doing that?
14     A.  I don't think he was ever going to get any
15 better.
16     Q.  Mrs. Young, I'm going to show you a document
17 and ask you if you've had a chance to read this prior
18 to today (indicating)?
19     A.  Yes, I have.
20     Q.  And is this a summary of the medical bills
21 that Mr. Young incurred after the accident for
22 injuries sustained in the accident?
23     A.  Yes, it is.

75

B. Young - Direct

1      MR. HUDSON: I'd like to introduce as an
2  exhibit.
3      MR. FERRARA: Your Honor, may we approach?
4      (The following took place at sidebar:)
5      MR. FERRARA: I saw these this morning. And
6  I don't object to the number, but how much of this is
7  Medicare/Medicaid that they don't have to pay back?
8      MR. HUDSON: I mean, I could go through the
9  numbers if you want, but I don't have that summarized
10 here.
11     MR. FERRARA: Well, I want to be able to ask
12 her that, because clearly she can only board what's
13 not. So how do you want to handle that, do you want
14 to wait and just not give a number until later?
15     MR. HUDSON: I can pull that up later, if
16 you want to mark this for identification.
17     THE COURT: Do you need to ask her about
18 these questions, and otherwise get for the jury the
19 figure?
20     MR. FERRARA: Well, I want to be able to ask
21 her at some point -- the problem I've got is the
22 number's huge. And I know that Medicare/Medicaid
23 paid a lot of it. She doesn't have to pay them back.

76

B. Young - Direct

1  So the question is how much of it is really
2  outstanding and how much isn't is something I'd like
3  to ask. I mean, I don't mind fishing around with her
4  right now, but I wanted to give Bruce a heads-up up
5  here that I was going to do it in case he had some...
6      THE COURT: Was this raised as an issue in
7  the pretrial stipulation?
8      MR. FERRARA: I only saw this for the first
9  time this morning, Judge.
10     MR. HUDSON: This was listed as an exhibit
11 in the pretrial stip.
12     MR. FERRARA: It's an exhibit, but the first
13 time I saw the number, and I don't know what the --
14     MR. HUDSON: The Medicare --
15     THE COURT: Well, maybe we could do this: I
16 hate to have the witness come back, but suppose we
17 were to take a recess after her direct examination,
18 do you think you could get the information right then
19 there in a recess, Mr. Hudson?
20     MR. HUDSON: I'll try.
21     MR. FERRARA: I have another idea. Why
22 don't, if I ask her the question wasn't some portion
23 of this paid by Medicare that you don't have to

77

## B. Young - Direct

1 reimburse, she's going to say yes to that --

2     THE COURT: Then you can stipulate to it.

3 Let's handle it that way. Good idea.

4     (Sidebar concluded.)

5     MR. HUDSON: I understand there's no

6 objection?

7     THE COURT: Yes. As discussed at sidebar,

8 no objection.

9     MR. HUDSON: Can I have this marked as

10 Plaintiff's Exhibit 2, please.

11     THE CLERK: Plaintiff's Exhibit 2 so marked,

12 your Honor.

13 BY MR. HUDSON:

14     Q. Mrs. Young, I'm going to ask you just to

15 read the total amount of that aloud into the record,

16 if you would.

17     A. $471,016.25.

18     Q. And was some portion of that covered by

19 Medicare?

20     A. Yes.

21     Q. And we will address that once we have that

22 total.

23     Mrs. Young, I'm going to show you two

78

## B. Young - Direct/Cross

1 notebooks of medical records and ask you if you can

2 identify these as the records of your husband's

3 treatment following the automobile accident?

4     A. Yes, they are.

5     MR. HUDSON: I offer these as Exhibit 3

6 and 4.

7     MR. FERRARA: Your Honor, with the

8 understanding that they are records and no reports,

9 which Mr. Hudson assured me, I have no objection.

10     THE COURT: All right. That's the standard

11 practice. They'll be admitted with that

12 understanding.

13     THE CLERK: Plaintiff's Exhibits 3 and 4 so

14 marked, your Honor.

15     MR. HUDSON: With that, your Honor, I have

16 no further questions.

17     THE COURT: Mr. Ferrara, you may

18 cross-examine.

19     MR. FERRARA: Thank you, your Honor.

20     CROSS-EXAMINATION

21 BY MR. FERRARA:

22     Q. Mrs. Young, good afternoon.

23     A. Good afternoon.

79

## B. Young - Cross

1     Q. You and I have met several times over the

2 last couple of years, have we not?

3     A. Well, at least once that I know of. I'm not

4 sure about several times.

5     Q. Okay. We took your deposition?

6     A. That is correct.

7     Q. We met with the Court at some point?

8     A. Oh, that's right, we did, yes.

9     Q. I guess you were more memorable than I was.

10     Let's talk about Mr. Young's health before

11 this accident. Now, you just agreed that those two

12 notebooks contained his medical records. And I

13 assume that I can, can find that you did not read all

14 those records, did you?

15     A. No, I did not.

16     Q. Okay. If the medical records indicated that

17 he had prostate cancer, you would agree with the

18 records?

19     A. Yes.

20     Q. And how about hardening of the arteries, or

21 maybe defined as arteriosclerosis in the medical

22 records, would you agree that if it's in there, he

23 had that problem?

80

## B. Young - Cross

1     A. I would.

2     Q. And we know that he had this hemiparesis,

3 which means that part of his body was in some fashion

4 paralyzed, for want of a better word. And you'd

5 agree that he had that problem with his lower

6 extremities, did he not?

7     A. Well, I wouldn't call it paralysis, but,

8 yes, he had a problem with his lower extremities.

9     Q. And one of the things you said was they

10 wouldn't function the way he wanted them to; is that

11 right?

12     A. Yes, that's correct.

13     Q. And although I was shown two photographs of,

14 one of which I understand they want to introduce

15 through your daughter, it shows him with a cane. Did

16 he walk with some kind of assisting device when he

17 did walk?

18     A. When he began to have this problem, yes, for

19 many years. When he was younger he was fine and he

20 didn't have that problem, but as he was having

21 trouble walking he had to use a cane.

22     Q. You testified in your deposition, and I

23 think you suggested it as well today, that you were

81

### B. Young - Cross

1  the driver and had been for some period of time
2  because of his inability to operate the pedals on the
3  vehicle?
4  　A. That's correct.
5  　Q. How long had that been the case before the
6  accident?
7  　A. I don't think I could pin it down to a time.
8  　Q. Was it --
9  　A. It would probably be a year.
10  　Q. All right. Now, you also just read into the
11  record one of the plaintiff's exhibits in this case,
12  a number of the medical bills, $471,016.25, if that's
13  right, I wrote it down, but I left my glasses over
14  there. Does that sound about right?
15  　A. I believe that's correct.
16  　Q. Can you tell us, if you know, how much of
17  that was paid by Medicare and Medicaid?
18  　A. I don't think I know, but I would say, I can
19  say it was quite a bit, but I don't know what the
20  numbers would be.
21  　Q. All right. Now, ultimately after Mr. Young
22  was in and out of the hospital, in and out of rehabs,
23  and I appreciate from the records that there were

82

### B. Young - Cross

1  times when you wanted him home, and ultimately you
2  indicated that you let nature take its course, that
3  was something that the doctors had indicated was
4  likely to happen following the instructions the
5  Hospice people had given you. Isn't that right?
6  　A. (Pause.)
7  　Q. If you did what Hospice told you, that's
8  what was going to happen?
9  　A. Yes.
10  　Q. All right. Now, have you ever seen the
11  death certificate in this case?
12  　A. Have I seen it?
13  　Q. Yes.
14  　A. Yes, I have.
15  　　MR. FERRARA: May I approach, your Honor?
16  　　THE COURT: Yes.
17  　Q. I'm handing you up a copy which I actually
18  got from Mr. Hudson. Have you seen that before?
19  　A. Yes, I have.
20  　Q. All right. Doesn't that list the cause of
21  death on the certificate?
22  　A. Excuse me?
23  　Q. Does it list --

83

### B. Young - Cross

1  　A. Oh, yes, it does.
2  　Q. What does it list the cause of death to be?
3  　A. It says, "Natural."
4  　Q. May I have that back, please.
5  　　MR. FERRARA: Your Honor, I'd like this to
6  be Defense Exhibit No. 1, please.
7  　　THE COURT: I assume no objection, admit it.
8  BY MR. FERRARA:
9  　Q. You said that you went in with, and I know
10  your daughter was here, I believe you told me earlier
11  seven weeks following the accident?
12  　A. Yes.
13  　Q. And she went back to Arizona?
14  　A. Yes, she did.
15  　Q. How long was Mr. Young in the hospital? It
16  looks like he was in the hospital approximately six
17  months?
18  　A. Yes, that's correct.
19  　Q. So most of that six months you dealt with
20  him in the hospital without your daughter being
21  present?
22  　A. That is correct.
23  　Q. Did you continue to visit him on a regular

84

### B. Young - Cross

1  daily basis?
2  　A. Yes, I did.
3  　Q. What I'd like you to try to do, and this may
4  be a difficult question for you to answer, but take
5  the whole six months, and of the six months of your
6  daily visits can you give us a percentage of time
7  that you believed he was responsive to any activity
8  that was going on around him? Was it 50 percent of
9  the time? Was it more, or less?
10  　A. No, it was considerably less. I would say
11  5 percent of the time.
12  　Q. Okay. Let's talk about the accident itself.
13  You were visiting your nephew and, I guess, your
14  sister-in-law?
15  　A. That's correct, yes.
16  　Q. And you came down early in the day, in the
17  morning, I think you said you left New Jersey at 11,
18  you got here at about one, and ultimately you went to
19  dinner?
20  　A. That's correct.
21  　Q. With more than one carload of people, as I
22  recall your testimony. Is that fair? There were
23  several people in more than one car?

85

B. Young - Cross

1    A. I think there were about six people, and it
2    was too many. Most cars hold five people nowadays.
3        Q. So you took at least two cars?
4    A. That's correct.
5        Q. And you went to dinner somewhere in the
6    Wilmington area?
7    A. Not too far from where they live.
8        Q. Your testimony earlier was that you had a
9    glass of wine with dinner. Do you remember that
10   testimony?
11   A. Yes, I do.
12       Q. Just one?
13   A. Just one.
14       Q. It wasn't affecting your ability to drive,
15   was it?
16   A. No.
17       Q. All right. You came back to the house, you
18   dropped off whomever, or said good-bye to whomever
19   you needed to say good-bye to, and you started to
20   head to New Jersey to go home?
21   A. Well, not immediately after we did that --
22       Q. No. I understand. It was nine o'clock by
23   the time you started to drive, or close to it, right?

86

B. Young - Cross

1    A. After dinner we visited for a while longer
2    before we left, probably an hour or more before we
3    left to go home.
4        Q. Now, one of the things that you and I talked
5    about earlier was that Mr. Young did not always wear
6    his seat belt immediately, right?
7    A. That's correct.
8        Q. Are you telling me by that that eventually
9    he'd get it on, but oftentimes it would be after you
10   were driving for a while?
11   A. Yes.
12       Q. Were there times he never put it on?
13   A. Possibly.
14       Q. All right. On this particular occasion, do
15   you recall any discussion with him or a conversation
16   with him with regard to putting on his seat belt?
17   A. I don't recall, no.
18       Q. When he would not wear his seat belt, would
19   you encourage him to wear it?
20   A. No.
21       Q. So it didn't matter one way or the other?
22   A. He didn't take the criticism very well, it
23   was easier not to cause a scene.

87

B. Young - Cross

1        Q. All right. And the last thing you remember
2    about the accident itself is leaving your nephew's?
3    A. Yes.
4        Q. You don't even remember getting to James and
5    Justis Street, let alone what color the light was?
6    A. That is correct.
7        Q. Now, when all of this started -- and by that
8    I mean the litigation of this -- you ended up being
9    sued as a defendant, were you not?
10   A. Yes.
11       Q. All right. And I'm sure the jury
12   understands which side's plaintiff and which side's
13   defendant, but let's see if I can make it a little
14   bit clearer. The party bringing the claim is the
15   plaintiff, the party that is claimed to be at fault
16   is the defendant. And you understand that, right?
17   A. Yes, I do.
18       Q. And you got a copy of the complaint that the
19   executor of the Estate or the administrator of the
20   Estate filed alleging that you ran the red light,
21   right?
22   A. I got a copy of the complaint, I can't
23   attest to whether it said that or not.

88

B. Young - Cross

1        MR. HUDSON: Your Honor, may we approach?
2        THE COURT: Yes.
3        (The following took place at sidebar:)
4        THE COURT: Mr. Hudson.
5        MR. HUDSON: The question is one of
6    relevance in terms of where we're going. I thought
7    we had an agreement earlier in terms of how we would
8    handle this with the jury. Since she's not being
9    represented, she has settled out of the case, that
10   that would be a statement made to the jury that she
11   was previously a defendant and settled, and that
12   would handle the issue of the confusion on the part
13   of the jury. Now he's opening this whole issue up
14   again. Mr. Pedicone is her attorney, maybe he should
15   be part of this conference, but I think this is
16   contrary to what we agreed in chambers earlier today.
17       THE COURT: Mr. Ferrara.
18       MR. FERRARA: I think this is exactly what
19   we agreed to. I thought the idea was we're letting
20   her out of this suit, we're letting the jury know
21   she's out of this suit, and because she settled,
22   well, you let me tell the jury that in the opening,
23   and I did, but clearly you're going to say in your

89

B. Young - Cross

1  charge what the lawyers say in the opening is not
2  evidence. And I need to have somebody to say it so
3  it's evidence so that I don't look like a ninny when
4  the jury considers that you just told them it can't
5  consider that. All I'm going to say to her is you
6  got sued, you settled, and I may identify Pedicone,
7  and that's it.
8       MR. HUDSON: She's already testified to that
9  in front of the jury.
10      THE COURT: She's already testified to that.
11 With respect to statements made in the opening, if
12 it's converted to a stipulation, then the jury can be
13 instructed that the parties have stipulated that she
14 settled the case, and as a result no further proof is
15 necessary. I think this is starting to go beyond
16 what was agreed upon.
17      MR. FERRARA: All I'm going to ask her,
18 again, is you got sued, they claim you ran the light,
19 you settled the claim, end of story. And that's what
20 I thought we had agreed to. I'm certainly not trying
21 to extend it, I was trying to cover the fact that I
22 mentioned it in my opening.
23      THE COURT: I think that's within the rule.

90

B. Young - Cross

1  But of what was agreed upon, Mr. Hudson, any
2  objection?
3       MR. HUDSON: She's already stated that,
4  your Honor. If he's not going to go any further than
5  that, then --
6       THE COURT: I'll let you ask one more time,
7  permission granted.
8       (Sidebar concluded.)
9  BY MR. FERRARA:
10      Q. Let me ask that question again, ma'am. Do
11 you recall that one of the allegations in the
12 complaint against you was that you ran the light?
13      A. No, I don't.
14      Q. Okay. But clearly there are allegations
15 that you were negligent, you were at fault in causing
16 the accident?
17      A. I suspect so.
18      Q. Okay. And originally you were a party to
19 this lawsuit. And your side of the lawsuit settled
20 out, did they not?
21      A. Yes, it did.
22      Q. Can you tell us approximately when that
23 happened?

91

B. Young - Cross

1       A. I think it might have been about November of
2  2003.
3       Q. Well, the accident didn't happen until
4  December --
5       A. Oh, I'm sorry, November of 2005. Excuse me.
6       Q. November of 2005?
7       A. Yes.
8       Q. Can you be any more precise than that?
9       A. I don't think I can.
10      MR. FERRARA: Thank you. I don't have
11 anything else about that, your Honor.
12      THE COURT: All right.
13      Q. All right. Now, in fact -- let me ask you
14 one last question -- do you remember Officer Brown --
15 were you in here, by the way, when we played the
16 Officer Brown video deposition?
17      A. No.
18      Q. Do you remember speaking with him?
19      A. Yes.
20      Q. He came to the hospital to talk to you?
21      A. Yes, he did.
22      Q. Did he only speak to you the one time to try
23 to find out what had occurred?

92

B. Young - Cross

1       A. I believe, yes.
2       MR. FERRARA: Thank you, ma'am. I don't
3  have any other questions.
4       THE COURT: Redirect examination,
5  Mr. Hudson?
6       MR. HUDSON: Nothing further, your Honor.
7       THE COURT: Then, you may step down. Is
8  Ms. Young to be excused from further testimony in
9  this trial, Mr. Hudson?
10      MR. HUDSON: She's excused.
11      THE COURT: Mr. Ferrara, any reason why we
12 can't excuse this witness?
13      MR. FERRARA: No, your Honor.
14      THE COURT: You are excused from further
15 testimony in the trial. You may step down.
16      MS. YOUNG: Thank you, your Honor.
17      THE BAILIFF: Your Honor, may I approach?
18      THE COURT: Yes.
19      (Bailiff confers with judge.)
20      THE COURT: May I see counsel at sidebar on
21 scheduling quickly, without the court reporter.
22      (A sidebar, without reporter, was held.)
23      THE COURT: We will take a ten-minute

93

1  stretch break before hearing from the next witness.
2      Please take out the jury.
3      (Jury leaves the courtroom at 3:21 p.m.)
4      THE COURT: We're in recess for about ten
5  minutes.
6      (Recess taken, 3:25 to 3:43 p.m.)
7      THE COURT: Please bring in the jury.
8      MR. FERRARA: Your Honor, this is going to
9  be a read-in. You'll do the usual explanation to
10  'em?
11      THE COURT: I'll let you do the explanation
12  of when it was taken and who is reading it. I
13  usually let the lawyers explain it.
14      MR. HUDSON: Your Honor, this is going to be
15  the read-in deposition, and Bill Erhart's going to be
16  playing the role of the witness, if you want to
17  explain that to the jury.
18      THE COURT: For some reason I was thinking
19  it was a defense witness coming out of order. I
20  don't know why I was thinking that, maybe because
21  your associate was right behind you.
22      MR. FERRARA: Well, it is. I took the
23  deposition, but Bruce wants to put it in now, and I

94

1  don't have a problem.
2      THE COURT: So it will be you're asking the
3  questions of Mr. Erhart?
4      MR. HUDSON: We both are.
5      THE COURT: You both. All right. I'll
6  explain it to the jury.
7      MR. FERRARA: Mr. Collins is actually going
8  to be asking the questions instead of me.
9      MR. ERHART: And, your Honor, if it please
10  the Court, there's some unusual language.
11      (Jury enters the courtroom at 3:44 p.m.)
12      THE COURT: Members of the jury, the next
13  evidence you'll hear will be the reading in of a
14  deposition that was taken, or noticed, as they say,
15  by Mr. Ferrara, but Mr. Hudson is, as he's allowed
16  to, using it in his case. So Mr. Erhart will be
17  answering the questions of the witness. And I guess
18  the first person leading off that's -- Mr. Erhart,
19  you should take the stand -- will be Mr. Ferrara, I
20  guess you are the one that began, or is it
21  Mr. Collins?
22      MR. FERRARA: Mr. Collins is going to ask
23  the questions.

95

1      THE COURT: All right. Tell the jury what
2  day the deposition was, please.
3      MS. COLLINS: This deposition took place on
4  June 15th, 2007, at about 11:23 a.m. It's the
5  deposition of Raymond Kamm. He was sworn in on oath,
6  was examined and testified as follows:
7      (Previously transcribed Raymond Kamm
8  deposition read to the jury from 3:46 to 4:09 p.m.)
9      THE COURT: Mr. Hudson, your next witness.
10      MR. HUDSON: Thank you, your Honor. I'd
11  like to call Ms. Cathy Vitale, I believe who's out in
12  the hallway.
13      ... CATHY VITALE,
14  having been duly sworn according to law, was examined
15  and testified as follows...
16      DIRECT EXAMINATION
17  BY MR. HUDSON:
18      Q.  Good afternoon, Ms. Vitale.
19      A.  Hi.
20      Q.  Could you state for the record your
21  residence. Where do you live?
22      A.  4416 East Red Range Way, Cave Creek, Arizona
23  85331.

96

C. Vitale - Direct

1      Q.  And are you related to Mr. Donald Young?
2      A.  Yes.
3      Q.  And what is your relationship?
4      A.  I'm his daughter.
5      Q.  He's your father.
6      We are here to discuss the automobile
7  accident that he was in on December 13th of 2003 and
8  any observations that you may have had before and
9  after the accident of your father. So if I could,
10  let's start with before the accident occurred. You
11  lived in Arizona for how long a period of time?
12      A.  I've been there for about five -- at that
13  time, three years.
14      Q.  Okay. I'm going to ask you to pull the mike
15  a little bit closer, it's for amplification, or also
16  you can lean a little bit further, okay, so that we
17  can all hear you.
18      You lived there for how many years prior to
19  the accident?
20      A.  Three, three years.
21      Q.  Okay. And where did you live prior to that?
22      A.  California, Los Angeles.
23      Q.  What I'm leading up to is how often you had

97

## C. Vitale - Direct

1 occasion to be in your father's company prior to the
2 accident during those previous years?
3    A. Usually a minimum of twice a year, sometimes
4 more.
5    Q. And would that be your father visiting you
6 or you visiting your father, or a combination?
7    A. A combination.
8    Q. Can you remember the last time that you were
9 with your father before the accident occurred?
10    A. We had met during the summer, went on a
11 trip.
12    Q. And how long were you with him at that time?
13    A. Three or four days.
14    Q. And where was that?
15    A. In Nevada.
16    Q. Okay. And was this a social visit that he
17 came out to visit with you?
18    A. Mm-hmm, yeah, we met.
19    Q. Okay. Can you describe his physical
20 condition, his health, when he was out visiting with
21 you that previous summer?
22    A. He was in good spirits. He, other than he
23 was a lot of the time in the wheelchair, but other

99

## C. Vitale - Direct

1 that he was with you?
2    A. I'd say most of the time he was in the
3 wheelchair.
4    Q. What was the reason he had the problems with
5 his leg, if you know?
6    A. I don't know how many years prior, if it was
7 ten, or it was probably ten-plus years, he had had a
8 stroke, and then I think some subsequent mini strokes
9 after that that caused him weakening in his lower
10 extremities, as well.
11    Q. Besides his lower extremities, was there any
12 other part of his body that was affected, to your
13 knowledge, based on your observations?
14    A. Sometimes he did things a little slower,
15 talked maybe a little bit slower.
16    Q. How were his cognitive facilities otherwise?
17    A. He was fine, he was fine. He still liked to
18 -- he always liked puns and making jokes, and he was
19 fine that way. He was up on current events and could
20 carry on a conversation no matter what it was,
21 whoever was with us. And he was...
22    Q. How would you describe his general mood
23 during the last time that you were together?

98

## C. Vitale - Direct

1 than that he could eat, talk, go out, do things. We
2 had -- it didn't stop us from doing anything.
3    Q. Do you recall how he traveled to come out to
4 see you that last summer?
5    A. Airline.
6    Q. When you say you would go out to do things,
7 can you be more specific, what types of activities?
8    A. Well, depending on the time of the year,
9 when they would come out to visit us at Christmastime
10 we usually, because the weather was so nice in
11 Arizona, tried to do a lot of outdoor things that
12 they didn't get to do back east because the weather
13 was cold back there. So we would go to Sedona, we
14 would go to the Biosphere, Kartchner Caverns,
15 museums, go places for walks, and things. We did
16 parks, so we could go outside to botanical gardens,
17 those kind of things.
18    Q. Did he have any health issues?
19    A. Well, he was, he had had some previous
20 health issues that caused him to have some weakness
21 in his legs, so he wasn't able to walk most of the
22 time.
23    Q. How did he ambulate during that last summer

100

## C. Vitale - Direct

1    A. He was generally a happy guy, yeah.
2    Q. I'm going to show you a photograph and ask
3 you if you can just identify it, tell me, is that
4 your father?
5    A. That's my dad.
6    Q. And do you recall the occasion when this was
7 taken?
8    A. That was his 80th birthday.
9    Q. And how long before the accident was that?
10    A. The year before, I think it was 2002.
11    MR. HUDSON: I'd like to mark this as,
12 introduce this as plaintiff's next exhibit.
13    MR. FERRARA: No objection, your Honor.
14    THE CLERK: Plaintiff's Exhibit 5 so marked,
15 your Honor.
16 BY MR. HUDSON:
17    Q. And did you say that this was your father's
18 80th birthday?
19    A. Mm-hmm.
20    Q. And it was how long before the accident
21 occurred?
22    A. Let's see. It was July of 2002, so I guess
23 that's a year and a half.

101

C. Vitale - Direct

1    Q.  And is that you there with his birthday
2  cake?
3    A.  Yes, yes, it is.
4    Q.  Where was this party?  Where did this party
5  take place?
6    A.  In Las Vegas, Nevada.
7    Q.  And that was on one of the occasions when
8  they came out to visit with you?
9    A.  Mm-hmm.  And my aunt and uncle also joined
10  us for this occasion as a surprise, we surprised him.
11   Q.  Prior to the last time that you saw him,
12  which was the summer before the accident, and up
13  until the time of the accident did your father have
14  any health issues that you were made aware of either
15  by him or by your mother that he didn't have when you
16  saw him the last time?
17   A.  (Pause.)
18   Q.  Were there any new --
19   A.  No, nothing new, no.
20   Q.  Do you know if your father ever had any
21  prostate problems at anytime prior to the accident?
22   A.  It's a long time ago, I would state it had
23  to be at least 10, maybe, between 10 and 20 years ago

102

C. Vitale - Direct

1  he had an enlarged prostate, and I went to the
2  hospital for.
3    Q.  After that was he ever treated surgically?
4    A.  He had some surgery when he was in the
5  hospital, and that was the end of it, he was fine
6  after that.
7    Q.  Approximately how many years prior would you
8  say that was?
9    A.  I couldn't be precise.  It was over ten
10  years ago.
11   Q.  More than ten years ago?
12   A.  Mm-hmm.
13   Q.  Okay.  Let me take you up to now the
14  accident itself.  At some point in time you were
15  notified that your father had been in an accident?
16   A.  Correct.
17   Q.  And where were you at that time?
18   A.  I had just arrived home from a trip to
19  California.
20   Q.  I'm sorry.  Can you --
21   A.  I had just arrived home from a trip to
22  California, and I was in Arizona at the time.
23   Q.  When did you see your father for the first

103

C. Vitale - Direct

1  time after the accident?
2    A.  Monday, the 15th, in the afternoon,
3  December 15th, in the afternoon.
4    Q.  Can you tell us where and what your father's
5  condition was that you observed?
6    A.  My father was at Christiana Hospital in the
7  Critical Care Unit.  When I went in there I didn't
8  know what to expect, because I hadn't gotten many
9  details of what all his injuries were, or whatever.
10  But when I went in there he was in a room with all
11  these machines, and tubes in him, and he was laying
12  in bed, and he was bruised in the upper body.  I
13  didn't take the covers down to see anything more.
14  His face was swollen like a balloon and bruised.
15  They told me he had a broken collarbone, as well.
16        And he had this cut on his tongue, it was
17  vertical from the front to the back.  But they said
18  they didn't know how it happened, they'd never seen
19  anything like it before.  And his mouth was open, and
20  his tongue was swollen about that much (indicating).
21  And they had a respirator or some breathing tube or
22  something down there.  And then they told me that he
23  had internal bleeding in the brain and brain

104

C. Vitale - Direct

1  swelling, as well.
2    Q.  Okay.  Did you have occasion after that
3  initial visit at the hospital to continue seeing him?
4    A.  Yes.
5    Q.  Okay.  Did you return to Arizona after that
6  visit, or did you remain in this area?
7    A.  I remained in Delaware until the day before
8  Christmas, and then when I had realized I was going
9  to be back east to care for my parents for some time,
10  I had to go home for one day and take care of some
11  affairs at home and get some more clothes and be
12  prepared to stay indefinitely.  But other than that
13  one day that I just flew home and came right back,
14  Christmas day, I was at their bedside.
15   Q.  After going back for that brief visit back
16  to your home in Arizona, you then came back here.
17  How long did you remain back east?
18   A.  I was here back east a total of seven weeks.
19   Q.  Seven weeks.
20        And during those seven weeks did you have,
21  did you see your father on a continuing basis?
22   A.  I saw my father every day for the two weeks
23  that he was at Christiana.  Then my mother, who was

C. Vitale - Direct

1  there at the same time, was transferred up to
2  New Jersey. And then I had to go up and be with her,
3  as well. So then I commuted every other day to see
4  my dad for the next two weeks after that until we
5  were able to transfer him up to a facility in
6  New Jersey. So logistically it was a little easier
7  for me after that.
8      Q. After the transfer to the facility in
9  New Jersey, how often did you see your father?
10     A. Oh, every day, and sometimes twice.
11     Q. And approximately how much time would you
12  say you spent each day when you visited?
13     A. I'm trying to say an hour or two each time.
14     Q. Can you tell us, you've told us what his
15  condition was the first day you saw him, tell us what
16  his condition was after that during the next several
17  months and prior to his death. Did he improve? or
18  did he deteriorate? or did he remain the same?
19     A. No. He didn't really improve at the
20  hospital very much. He was still in some pain there.
21  They were giving him injections for -- because when
22  he moved or they tried to move him, and whatever, he
23  would, you know, wince in pain, and whatever. I do

106

C. Vitale - Direct

1  not know if it was from laying there so long, or
2  whatever. But, no, he got to a point where there
3  didn't seem to be any change. And so they said that
4  we should take him to another facility, a care
5  facility and see what happens, or hopefully, you
6  know, he'd get better. But he didn't. I mean, after
7  that, then he kept coming down with infections at the
8  care facility. And he was in and out of the hospital
9  five times for long stays at the hospital. And then
10  he didn't -- he had to have a tracheotomy, and so he
11  couldn't eat.
12     Q. Were you able to communicate with your
13  father during this period after he was discharged
14  from Christiana and up until the point that he died
15  in June?
16     A. Well, I talked to him all the time, but most
17  of the time he just laid there, his eyes were closed
18  most -- sometimes he'd open them, but he didn't make
19  eye contact with you. There was one time when I felt
20  that maybe he understood something I had said, they
21  had him sitting up in the hospital and I asked him if
22  he wanted his glasses on to watch TV. And he didn't
23  speak, because he never spoke again, but he kind of

C. Vitale - Direct

1  nodded and made some indication to me that he maybe
2  understood that. So I put 'em on, and then they
3  fell, his eyes closed again. But that was the only
4  time I really felt like he, there was any kind of
5  response.
6      And then by the time -- that was early on
7  after because it was -- that was in the first week
8  after he had been transferred back up to New Jersey,
9  it was two weeks after that. When I left and I went
10  to say good-bye, I don't even think he understood
11  that I was leaving.
12     Q. Did you have any reason to believe that he
13  was aware of your presence on any occasions, beside
14  what you've just told us?
15     A. There was one other time when he was at the
16  care facility that his eyes stayed open a long time.
17  He didn't respond to anything, but I was having my
18  usual one-sided conversation with him, and I thought
19  maybe they were just open a long time, so I thought
20  or hoped he was listening to me or heard me, or
21  something. But he never did anything, he just laid
22  there. It was my dad's body but not my dad anymore.
23  And when they would come -- well...

108

C. Vitale - Direct

1      Q. Let me ask a question about your father's
2  death. Your mother has testified earlier that there
3  was a decision made to terminate the life support.
4      Did you participate in that decision?
5      A. Yes.
6      Q. And can you tell us, based on what you were
7  aware of, what your reasoning was based on to
8  terminate life support?
9      A. My dad never wanted to be like that, and I
10  knew that. And, you know, he told me that and had...
11  And that wasn't the way -- I mean, he liked to do
12  things and go places, and this just wasn't any kind
13  of life for him, or my mom or me, it was just, it
14  just wasn't. And it was, it's a hard thing to do.
15  I mean, in my heart it still kills me, but
16  emotionally or mentally it was the right thing to do
17  for him because it wasn't fair. He wasn't going to
18  get better, they said. And he was just wasting away.
19  Excuse me.
20     MR. HUDSON: Thank you. I have no further
21  questions, your Honor.
22     MR. FERRARA: I don't have any questions,
23  your Honor.

109

1  THE COURT: There are no questions for you
2  from Mr. Ferrara, so you may step down. I assume
3  she's to be excused from further testimony in the
4  trial, Mr. Hudson?
5  MR. HUDSON: She's excused.
6  THE COURT: Ma'am, you are excused from
7  further testimony in the trial.
8  MS. YOUNG: Thank you.
9  MR. HUDSON: Could we approach regarding
10 scheduling?
11 (A sidebar, without reporter, was held.)
12 THE COURT: Members of the jury, this does
13 conclude our evidence for today. We're going to
14 resume the trial tomorrow at ten o'clock. And we're
15 on schedule, if not a little ahead of schedule,
16 actually, in the case. So have a good evening. And
17 when you go out home this beautiful, it may be a
18 little warm afternoon, and you see your neighbors,
19 coworkers, family, etc., some people may be
20 interested to know you're on a jury, what's it like
21 being a juror, they may ask what's the case about.
22 But please withhold all temptation, resist all
23 temptation to talk about the case at all. You should

110

1  get the case for deliberation tomorrow. Please take
2  out the jury.
3  (Jury leaves the courtroom at 4:30 p.m.)
4  THE COURT: As discussed at sidebar, let's,
5  us, counsel, meet at 9:45 tomorrow to go over jury
6  instructions. But let me just make the following
7  brief comments about what I've noticed so far.
8  Will you please bring over a disk,
9  Mr. Hudson, unless you have one already.
10 MR. HUDSON: I beg your pardon?
11 THE COURT: Can you bring over a disk in
12 case there are any changes so that we can just make
13 them in the courthouse? Or else you could E-mail
14 them to us, just so we could, you know, make any
15 last-minute changes in chambers.
16 MR. HUDSON: Actually...
17 THE COURT: Let's, of course, make sure the
18 cover page reads "Jury Instructions" rather than
19 "Plaintiff's Proposed Jury Instructions." I notice
20 that we have an expert testimony instruction, but we
21 don't have the page that usually follows that that
22 says all expert's opinions must be to a reasonable
23 degree of medical or scientific probability. So

111

1  we'll need that sentence.
2  Mr. Ferrara mentioned he was particularly
3  interested in a proximate cause instruction, and I
4  see Mr. Hudson has included one. Interestingly, I
5  think it comes from the case of Russell vs. K-Mart,
6  recently approved this language -- I have to
7  double-check it -- from the Delaware Supreme Court,
8  is not the pattern instruction, but in the last case
9  I had last week, for what it's worth, I opted, for
10 various reasons, to use the Russell vs. K-Mart
11 proximate cause instruction rather than our pattern.
12 While I'm not ruling on it one way or the other, just
13 I'm mentioning that.
14 Damages, personal injury, I think that's
15 sufficient, but we'll hear about it tomorrow. We'll
16 also need a verdict page, but that shouldn't be hard.
17 Other than that, we're in recess until
18 tomorrow at 9:45. Have a good evening.
19 MR. FERRARA: Your Honor, before we do that,
20 we were talking before, you decided to send the jury
21 out, about how we were going to handle the Medicare
22 number. And my suggestion is whatever the number
23 turns out to be is the number we give. And I don't

112

1  see that that's a problem.
2  THE COURT: Why don't you propose an
3  instruction, it could be just one or two pages.
4  MR. FERRARA: Well, I think it's going to
5  fit into the instruction that's already in there.
6  I'm just saying --
7  THE COURT: Of course.
8  MR. FERRARA: That number, instead of the
9  $471,000, whatever the number is. And we'll
10 stipulate to that once Mr. Hudson tells me what the
11 Medicaid situation is.
12 THE COURT: Well, if you both could work to
13 come to whatever joint agreement you can as to all of
14 the instructions, I'll appreciate it. It sounds like
15 probably you can do that.
16 MR. HUDSON: I guess what I'm still trying
17 to find out is what is the jury to be told that that
18 number is, that's what I'm asking?
19 MR. FERRARA: The unpaid amount of medical
20 bills are X, whatever that number is.
21 MR. HUDSON: After, after credit for the
22 amount that was paid by Medicare?
23 MR. FERRARA: Right.

1    THE COURT:  All right.  On that note, we're
2    in recess till 9:45.  Have a good evening, everyone.
3    (Court adjourned at 4:33 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

R E P O R T E R   C E R T I F I C A T E   P A G E

STATE OF DELAWARE:

NEW CASTLE COUNTY:

        I, Thomas E. Maurer, RPR, Official Court

Reporter of the Superior Court, State of Delaware, do

hereby certify that the foregoing is an accurate

transcript of the proceedings had, as reported by me

in the Superior Court of the State of Delaware, in

and for New Castle County, in the case therein

stated, as the same remains of record in the Office

of the Prothonotary at Wilmington, Delaware, and that

I am neither counsel nor kin to any party or

participant in said action, nor interested in the

outcome thereof.

        This certification shall be considered null

and void if this transcript is disassembled in any

manner by any party without authorization of the

signatory below.

        WITNESS my hand this 10th day of October,

2007.                    _____

                         Thomas E. Maurer, RPR

                         Official Court Reporter

                         Delaware Cert. No. 155-PS