**EXHIBIT G**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

ANGELO CUONZO, ESQ.,           )
ADMINISTRATOR PENDENTE         )
LITE FOR THE ESTATE OF         )
DONALD A. YOUNG,               )
                               )
        Plaintiff,             )
                               )
    v.                         )   C.A. No. 05C-12-099 RRC
                               )
CATHERINE L. SHORE             )
and BARBARA P. YOUNG,          )
                               )
        Defendants.            )

BEFORE:  THE HONORABLE RICHARD R. COOCH,
                and a Jury

APPEARANCES:

        BRUCE L. HUDSON, ESQ.
           Attorney for Plaintiff

        LOUIS B. FERRARA, ESQ.
        FERRARA, HALEY, BEVIS & COLLINS
           Attorney for Defendant Catherine L. Shore

                - - - - -
        JUNE 19 & 20, 2007
        JURY TRIAL PROCEEDINGS
                - - - -

        THOMAS E. MAURER, RPR
        SUPERIOR COURT OFFICIAL REPORTER
        NEW CASTLE COUNTY COURTHOUSE
        500 N. KING STREET, SUITE 2609
        WILMINGTON, DELAWARE  19801-3725
             (302) 255-0566

---

**2**

### I N D E X   T O   T E S T I M O N Y

PLAINTIFF'S WITNESSES:                          PAGE

WILLIAM H. SHERKEY

    Direct examination by Mr. Hudson.........19
    Voir dire by Mr. Ferrara.................26
    Cross-examination by Mr. Ferrara.........61

DEFENDANT'S WITNESSES:                          PAGE

MARIANN KAMM

    Direct examination by Mr. Ferrara........73
    Cross-examination by Mr. Hudson..........85
    Redirect examination by Mr. Ferrara......97
    Recross examination by Mr. Hudson........97

CATHERINE L. SHORE

    Direct examination by Mr. Ferrara.......102
    Cross-examination by Mr. Hudson.........113
    Redirect examination by Mr. Ferrara.....126

            CLOSING ARGUMENTS

                                PAGE
        By Mr. Hudson...........149
        By Mr. Ferrara..........170
        By Mr. Hudson...........176

        E X H I B I T   I N D E X

PLAINTIFF'S EXHIBIT:                            PAGE

    No. 6......William Sherkey CV..........28
    (Other plaintiff's exhibits marked
     and not announced by the clerk)........71

---

**3**

1                                    June 19, 2007

2                                    Courtroom 6C

3                                    9:56 a.m.

4  PRESENT:

5       As noted.

6       THE COURT:  Good morning, everybody.  Sorry

7  to be a little delayed in getting on the bench.

8       We're going to try to hold a prayer

9  conference right now, if we can.  Are we prepared to

10 do that?  Or...

11      MR. HUDSON:  Yes, your Honor.

12      THE COURT:  Let's go as far as we can on

13 that, then.  Mr. Hudson.

14      Okay.  I've been handed -- why don't you

15 just describe it.

16      MR. HUDSON:  We provided a disk to the

17 clerk.  And also, as compared to the ones that, the

18 draft that was presented yesterday, the changes in

19 this one are page 9, which, in accordance with

20 your Honor's request, was added stating that the

21 expert opinion must be to a reasonable probability.

22      (Pause.)

23      THE COURT:  Anything else?

---

**4**

1       MR. HUDSON:  Yes, your Honor.  I'm sorry, I

2  just want to make sure.  The next was page 12, is the

3  pattern jury instruction when there is a settling

4  codefendant.  And, again, given the information

5  that's been provided to the jury that Barbara Young

6  did settle as a codefendant, this is the pattern

7  instruction used for that purpose.

8       THE COURT:  I see there's a verdict sheet.

9       MR. HUDSON:  Yes, sir.  The verdict sheet

10 is, again, the pattern -- before we get to the

11 verdict sheet, there's also page 19 was the proximate

12 cause.  We understand that your Honor would prefer to

13 use this version, so we substituted this for the one

14 that was originally --

15      THE COURT:  Actually, I think this was the

16 original submitted proximate cause instruction.

17      MR. HUDSON:  Okay.  I'm sorry, your Honor.

18 Then, I guess we just added the footnote.

19      THE COURT:  I usually do delete references

20 for the jury's benefit.

21      MR. HUDSON:  So the only other change, then,

22 was the verdict sheet, which is the pattern verdict

23 sheet when there is codefendants.

5

1    THE COURT: All right. Mr. Ferrara, your,
2    defendant's comments on the jury instructions.
3        MR. FERRARA: Your Honor, I don't have any
4    problem with anything that's on there.
5        THE COURT: All right. The only thing,
6    then, I'm going to add in, which I have learned to do
7    after 15 years on the bench, I'm going to add in a
8    sentence to the effect, The Court will not be able to
9    supply you with transcripts of witnesses' testimony
10   at trial, you must rely on your collective
11   recollection of all the testimony, etc. Both counsel
12   nod in agreement.
13       I see Mr. Sherkey is present. Any reason
14   why we can't bring in the jury and continue the case?
15       MR. FERRARA: Your Honor, well, Mr. Hudson
16   just gave me some photographs he said he wants to use
17   with Mr. Sherkey. And again, some of these are
18   photographs that have the Young vehicle with the roof
19   ripped off on it. I thought the Court's ruling was
20   that they couldn't use Young vehicle photos because
21   they hadn't identified them.
22       THE COURT: That was my ruling.
23       MR. FERRARA: So I don't have any problem

6

1    with any others, but I have problems with all the
2    ones that have the Young vehicle in it.
3        MR. HUDSON: Your Honor, when I proffered
4    these initially, the request was for use during the
5    opening before there had been any testimony and it
6    would have been premature without Mr. Sherkey to tell
7    the Court what Mr. Sherkey was going to use them for.
8        These are photographs that he has relied on.
9    Some of them contain pictures of the plaintiff's
10   vehicle, but those are ones -- all of these were
11   taken by the accident reconstruction team, with the
12   exception of one, the 5-by-7 or 3-by-5 which he took
13   afterwards to show the intersection in daytime.
14       These show skid marks, they show the
15   location of the vehicles, the precise location of the
16   vehicles afterwards. There is an issue as to which
17   lane she was in, which is an important consideration,
18   where the skid marks were, which is an important
19   consideration and a basis for his opinion. Without
20   these the jury is going to be blind as to which lane
21   she was in based on any forensic evidence.
22       My request would be actually for your Honor
23   to review these first before making a ruling. But my

7

1    request would then be that they be admissible for the
2    purpose that Mr. Sherkey is going to use them for,
3    which is to show the location of the vehicles after
4    the accident and the skid marks that were present,
5    and that a curative or cautionary instruction that
6    this vehicle -- and, again, there's only one that
7    shows the total --
8        THE COURT: Well, I will look at them. And,
9    two, I do agree that from plaintiff's perspective
10   it's important to, very important to show the
11   location of the vehicle, but I did rule yesterday, as
12   Mr. Ferrara pointed out, that because these
13   photographs of the vehicle hadn't been identified,
14   that they wouldn't be used.
15       (Judge Cooch views photographs.)
16       THE COURT: Does Mr. Sherkey have a diagram?
17   I would imagine he does as part of his report.
18       MR. HUDSON: There was a diagram that was
19   used in opening that was prepared by a surveyor that
20   he's going to refer to. But the basis for his, his
21   information that he's going to show on the diagram
22   are those photographs.
23       MR. FERRARA: Your Honor, it seems to me

8

1    that he can say that he reviewed photographs that
2    showed skid marks in the lane that he says that
3    they're in. But that doesn't necessitate putting in
4    the pictures that have the Young vehicle.
5        THE COURT: You're not going to challenge
6    his testimony about the location of the vehicles, are
7    you, Mr. Ferrara?
8        MR. FERRARA: No.
9        THE COURT: All right. Well --
10       MR. HUDSON: Is Mr. Ferrara going to
11   challenge or argue that she was in the center lane as
12   opposed to the right lane?
13       THE COURT: Well, the only thing I was
14   asking Mr. Ferrara about whether he's going to
15   challenge was the final resting place?
16       MR. FERRARA: No, I'm not.
17       MR. HUDSON: That is one element that it
18   shows. The other is the skid marks in these
19   photographs leading up to the vehicle and where
20   they're located in the accident scene.
21       MR. FERRARA: Your Honor, there's testimony
22   already from Mason where he saw the skid marks.
23   There are photographs that show where the skid marks

9

1 are. And I'm sure Mr. Sherkey's going to testify
2 where the skid marks are. My client has testified
3 that she thought she was in the left lane. The fact
4 that she thought she was in the left lane, her
5 opinion's not changed by the pictures, and I can't
6 now have her change her testimony. She testified
7 under oath in the deposition that she was in the left
8 lane, I'm stuck with that position, and I'm going to
9 continue to maintain that position. I do not intend
10 to make a big deal about it, because as far as I'm
11 concerned it really doesn't make that much
12 difference.
13      MR. HUDSON: Your Honor, may I make a
14 request? Rather than Mr. Ferrara or myself telling
15 your Honor the importance of these, Mr. Sherkey is
16 here and --
17      THE COURT: Well, I understand they're
18 important, but I did make a ruling yesterday that
19 because photographs of the so severely damaged
20 vehicle, Ms. Young's car, hadn't been identified for
21 use in the pretrial stipulation, that that ought to
22 and did bar their use at trial, not just during
23 opening statements.

10

1      I'm going to, I am going to take a brief
2 recess, I'm going to stay on the bench, I'm just
3 going to ask that the two of you to confer to see if
4 there's, given my inclination, anything that might be
5 jointly agreed upon, rather than making suggestions
6 through me. So I'm going to turn on the white noise,
7 just ask that you do consult and see if there is some
8 possibility of resolution other than my final ruling.
9      MR. FERRARA: Your Honor, can we get the
10 pictures back so I can...
11      THE COURT: Yes (hands pictures back).
12      (Counsel confer.)
13      MR. FERRARA: Judge, we've agreed on a
14 couple. There's one picture, this one here, they
15 don't have numbers on them, but this one here has
16 the -- oh, yes, they do.
17      MR. HUDSON: It's exhibit that's been marked
18 for identification.
19      MR. FERRARA: This is D. And you can see
20 that the Young car is just right here. What they
21 want to show is all over here (indicating). We've
22 agreed he's going to just cut that out. The one we
23 can't agree on is E, which I'll hand back up to you,

11

1 because E's got a pretty clear picture of the Young
2 vehicle right in the middle of the picture. But
3 without that we've agreed to two...
4      MR. HUDSON: We've agreed to Exhibit B,
5 F, A.
6      MR. FERRARA: And D modified.
7      THE COURT: So the only picture at issue is
8 Exhibit for Identification E?
9      MR. HUDSON: Well, let me, Mr. Ferrara says
10 we agree to this. I don't think this shows enough of
11 the plaintiff's vehicle to be of a concern in terms
12 of rear damage. It is, again, being offered for
13 location purposes.
14      THE COURT: So do I understand that both D
15 and E are at issue?
16      MR. FERRARA: Well, I thought Mr. Hudson
17 said he didn't have a problem cutting the car out. I
18 misunderstood what he said.
19      MR. HUDSON: No problem with cutting the car
20 out there if you use the other one, also.
21      MR. FERRARA: Well, I didn't hear that part.
22 I'm sorry.
23      THE COURT: Well, I go back to the pretrial

12

1 stipulation where the exhibits were noted to be by
2 plaintiff, quote, Photographs of accident scene and
3 defendant Shore's vehicle, unquote. Which I, as I
4 went through my thinking process yesterday came to
5 understand that the implication was there would not
6 be photographs introduced of defendant Young's
7 vehicle, even though it's a photograph of the
8 accident scene, because that car was not specifically
9 identified like defendant Shore's vehicle was.
10 Mr. Ferrara has asserted prejudice, and for that
11 reason I didn't allow it in.
12      So I, with respect to Exhibit D, I will
13 allow it to come in if it's cropped to a manner
14 satisfactory to Mr. Ferrara. And I will not allow
15 Exhibit E to come in because it does -- it's
16 impossible to crop out -- show the position of the
17 Young vehicle. So that's the Court's ruling.
18      And just to refresh our recollection with
19 respect to the motion in limine that I had denied,
20 Mr. Sherkey is allowed to testify to it, but I think
21 I did say, and you'll have to refresh my
22 recollection, Mr. Ferrara, I think I struck the
23 language related to possibility?

13

1  MR. FERRARA: Well, you thought you might,
2  and then you ended up not --
3  THE COURT: That's right, that's right,
4  because of the... So no adjustments to the report.
5  Are we ready to bring in the jury?
6  MR. FERRARA: Well, we are, your Honor. I
7  don't want to hold them off any longer, but we were
8  apparently unable to -- Mr. -- the way we left it
9  with the bills was that Mr. Hudson was going to try
10 to compute what, what was paid by Medicare. But he
11 was unable to do that. So we're going to have to
12 deal with that at some point in time before we charge
13 the jury.
14 MR. HUDSON: That's not quite right,
15 your Honor. What I told Mr. Ferrara was, upon
16 reflection last night, the only statute that I'm
17 aware of that requires a disclosure of Medicare
18 payments is in Title 18, and that has to do only with
19 medical negligence cases. It was familiar when he
20 was talking to it, but the only time I've ever come
21 across it is in medical negligence cases. And that
22 is Section 6862 of Title 18 having to do with
23 collateral --

14

1  THE COURT: Wait a minute. Is this a legal
2  issue that wasn't raised in the pretrial stipulation?
3  MR. HUDSON: I asked yesterday about what it
4  is that Mr. Ferrara wants to do with any Medicare
5  payments that have been made, and he wants them
6  disclosed to the jury. That would be, of course,
7  contrary to the collateral source rule, unless
8  there's an exception. The only exception I'm aware
9  of to the collateral source rule in terms of
10 collateral payments, and in this case from public
11 agencies, is Section 6862 of Title 18.
12 I have the statute here in front of me if
13 your Honor would like to read that.
14 THE COURT: Tell me the cite again.
15 MR. HUDSON: 18 Delaware Code Section 6862.
16 And that clearly states, and I'll read the first
17 sentence, "In any medical negligence action for
18 damages because of property damage or bodily injury,"
19 and it goes on to say that any public payments shall
20 be revealed to the jury. And then there's a jury
21 instruction that goes to that that says that the jury
22 shall be informed that that money must be paid back
23 to the public agency, in this case, Medicare. But,

15

1  again, that, to my knowledge, is the only requirement
2  in the Delaware Code that there be any disclosure of
3  any collateral source payments.
4  I've asked Mr. Ferrara to cite me what it is
5  he is relying on in stating that the jury is to be
6  informed, and so far I haven't gotten any response.
7  I will add, in addition to that, your Honor,
8  that maybe this whole thing may be moot. Mr. Cuonzo,
9  who is the executer of the Estate, is here and can
10 inform the Court, and he has checked that there were
11 Medicare payments in the amount of, I think,
12 12,000-some dollars, it was a small amount. But he's
13 here for questioning if there's any issue on that,
14 you can put that on the record.
15 THE COURT: Well, we'll take this up at a
16 later time, but I'm going to analyze this in the
17 context of the pretrial stipulation and is it, in
18 effect, Medicare evidence, defense evidence that the
19 defense would want to get in, Mr. Ferrara?
20 MR. FERRARA: Your Honor, what I wanted to
21 do is have disclosed how much was paid by Medicare.
22 They indicated that there were bills. I indicated I
23 wouldn't oppose them as long as I knew what the

16

1  Medicare payment was. And I thought yesterday at
2  sidebar we said that we were going to figure that
3  number out last night and report it this morning.
4  What I was told this morning was that he doesn't
5  think I'm right about it, and give me the cite.
6  so I've been sitting here the whole time, I haven't
7  had time to go get the information. But my
8  understanding is that if it's a federally paid source
9  of funds, that it's not covered by the collateral
10 source rule.
11 THE COURT: Well, it's going to have to be,
12 if we get to it, there's going to have to be some
13 sort of legal authority cited to me far more than
14 what I have right now. But I'm going to look again
15 at the pretrial stipulation and see to what extent --
16 and also whether the sidebar we had yesterday -- this
17 approach has been waived.
18 MR. HUDSON: Your Honor, may I also add that
19 there is no money to be repaid back. The statute
20 says that the jury is to be told that any moneys that
21 had been paid by Medicare is to be repaid. That has
22 already been paid back. Mrs. Young has already paid
23 back the 12,000. So Mr. Cuonzo can --

17

1　THE COURT: My point about the pretrial
2　stipulation is these kinds of issues should not be
3　popping up right in the middle of the trial, and
4　that's why the Courts look at the pretrial
5　stipulation to govern the course of the trial.
6　　Let's bring in the jury.
7　MR. HUDSON: Could we excise this before
8　Mr. Sherkey takes the stand?
9　THE COURT: Yes. Do we have some scissors
10　here?
11　THE BAILIFF: Your Honor, she's gonna get
12　some, but for right now...
13　(Bailiff confers with judge.)
14　THE COURT: Well, if we're not going to --
15　why don't we do this: why don't we just have Officer
16　Sherkey testify, we certainly won't publish it to the
17　jury, I don't think the jury's going to be able -- or
18　are you gonna, I guess you're going to have him put
19　it up on the screen. Let's crop it off. How long
20　will that take? Let's just fold it over for right
21　now so it can go on the screen.
22　　Please bring in the jury.
23　THE BAILIFF: Yes, your Honor.

18

1　MR. HUDSON: Your Honor, just to make sure,
2　we've been sequestering witnesses, I'm not sure these
3　people are, either of these witnesses are going to be
4　called?
5　(Mr. Ferrara confers with a gallery member,
6　a female, who leaves the courtroom.)
7　(Jury enters the courtroom at 10:19 a.m.)
8　THE COURT: I'm sorry for our little delay
9　in getting started, members of the jury, we're ready
10　to begin, though. Before we do, let me ask you all
11　collectively if during the overnight recess any of
12　you discussed the case or has anyone allowed anyone
13　to discuss the case with you? Please indicate your
14　answer by either shaking your head no or nodding yes,
15　whichever is the case. All jurors are indicating in
16　the negative, so we may continue.
17　Mr. Hudson, the plaintiff may call its next
18　witness.
19　MR. HUDSON: Thank you, your Honor. The
20　plaintiff would like to call Mr. William Sherkey.
21　　... WILLIAM H. SHERKEY,
22　having been duly sworn according to law, was examined
23　and testified as follows...

19

Sherkey - Direct

1　DIRECT EXAMINATION
2　BY MR. HUDSON:
3　Q. Good morning, Mr. Sherkey.
4　A. Good morning.
5　Q. Mr. Sherkey, would you state your occupation
6　and your professional address for the jury.
7　A. Yes. It's Sherkey & Associates
8　Incorporated, 1 Balmoral Court, Wilmington, Delaware.
9　It's a motor vehicle accident reconstruction
10　consulting business.
11　Q. Have you, Mr. Sherkey, at my request been
12　asked to review materials and documents in connection
13　with a motor vehicle accident that happened on
14　September 13th of 2003 for the purpose of determining
15　the cause and reconstructing the accident?
16　A. Yes, sir.
17　Q. Okay. And I'm going to ask you have you
18　reached an opinion in that case?
19　A. I have.
20　Q. I'm going to ask you to tell us that opinion
21　in a second, but first let me ask you some questions
22　about your background and your qualifications to
23　render such an expert opinion.

20

Sherkey - Direct

1　First off, tell us what an accident
2　reconstruction consultant does.
3　A. Basically it's someone that looks into
4　specific information about an accident event. An
5　accident reconstructionist looks at all the
6　informational inputs available for a particular
7　accident being examined. Those informational inputs
8　could be photographs, they could be statements, they
9　could be sworn testimony, they could be measurements,
10　they could be lots of things pertaining to that
11　particular accident. Looking at all of those inputs,
12　their relationships to one another, and the outcome
13　being a determination of how and why the particular
14　accident being studied occurred.
15　Q. Okay. Let me ask you about your experience
16　starting with your present position. You're with an
17　association known as Sherkey & Associates; is that
18　correct?
19　A. I am.
20　Q. And how long have you been involved in that
21　capacity?
22　A. For approximately 17 and one-half years.
23　Q. Okay. During that period of time do you

21

Sherkey - Direct

1  have any idea how many accident reconstruction cases
2  that you've been involved in for purposes of
3  determining the cause?
4      A.  I think my resume says about 1175,
5  approximately.  The number's higher than that now,
6  but approximately.
7      Q.  What was your work experience prior to
8  January 1990?
9      A.  Prior to January 1990 I was a Delaware State
10  Police officer for 20 years, retiring in January '90.
11  During my tenure with the Delaware State Police I was
12  schooled and attended classes dealing in the
13  investigation or advanced stages of investigating
14  motor vehicle crashes and accident reconstruction and
15  analysis.
16          After receiving that training I came back to
17  Delaware State Police and became a sort of an
18  in-house consultant for severe motor vehicle crashes
19  wherein the accidents were obviously severe in nature
20  and/or involved deaths.
21          While doing that by myself in-house, there
22  came a point in time where basically I was working
23  all over the state, up and down the state, mostly in

23

Sherkey - Direct

1  changes in colonels, and I believe it was from
2  Colonel Cochran to Colonel Simpson, or vice versa, I
3  don't really recall, but the next colonel in examined
4  the program and extended it.
5          In 1983 the program became a permanent
6  subunit within the division called the FAIR Program.
7  In 1985 that unit was expanded statewide.  There was
8  a unit placed at Troop 3 in Dover and a unit at
9  Troop 7 in Lewes, as it stands today.  And the units
10  are charged with investigating all serious motor
11  vehicle accidents that are likely to become
12  fatalities, all fatalities, departmental accidents,
13  and assisting road troopers in determinations of
14  different things in accidents that the average road
15  trooper cannot particularly figure out, like maybe
16  speeds at impact, or things like that.
17      Q.  Okay.  When did you retire from the State
18  Police?
19      A.  January of 1990.  So about 11 of my 20 years
20  was spent doing motor vehicle accident investigation
21  and reconstruction.
22      Q.  Okay.  Have you had any experience giving
23  instruction in accident reconstruction?

22

Sherkey - Direct

1  New Castle County, that Major Sam Nickerson of the
2  Delaware State Police staff asked me about starting
3  an accident reconstruction program or having a unit
4  on-call that could go out and respond to accidents
5  and do what I did.  I said I thought it was a good
6  idea because the work load was becoming severe.  And
7  I was asked to write SOP, standard operating
8  procedure, for that unit as to how it would operate,
9  how many men were involved, what kind of equipment
10  was needed, etc.
11          I did that.  They used some federal moneys
12  to get equipment, and things like that.  And we
13  started a pilot program in 1982, I believe it was,
14  and they called the program FAIR Unit, FAIR, the
15  acronym standing for fatal accident investigation and
16  reconstruction.
17          During the pilot program, if you will, in
18  New Castle County, after about six months the program
19  was evaluated by the colonel, traffic lieutenants,
20  troop commanders, some of the deputies attorney
21  general, to look at the quality of information that
22  was coming in, was it worthy, was it useful, should
23  we keep it, disband it, or whatever.  There was a

24

Sherkey - Direct

1      A.  I have at various levels.  We had some unit
2  training courses that we put on at the academy for
3  officers, it was an advanced training mode, so to
4  speak.  I've been an adjunct instructor at several
5  different locations in Maryland, Delaware.  I've even
6  taught the concept of conservation linear momentum to
7  a couple high school physics classes in New Castle
8  County.
9      Q.  Do you own any certifications?
10      A.  I do.
11      Q.  And in what and by whom?
12      A.  I'm basically a charter member of the
13  I double A RS, the International Association of
14  Accident Reconstruction Specialists.  I was a charter
15  member of that organization, I believe, as of 1981.
16  I'm still a member today.  I did do, I was elected to
17  a two-year term on the board of directors for that
18  organization, I believe that was in '96 or '98.
19          I'm also a member of NAPARS, an acronym
20  N-A-P-A-R-S, standing for the National Association of
21  Professional Accident Reconstruction Specialists.
22          I'm also nationally certified, registration
23  No. 291, with a governing body identified as ACTAR,

25

Sherkey - Direct

1 A-C-T-A-R, which is the Accreditation Commission for
2 Traffic Accident Reconstruction. Basically, that
3 organization certifies individuals through testing
4 and through production of documents that allow
5 someone to practice, so to speak, accident
6 reconstruction. It's a governing body that requires
7 an eight-hour exam be taken and a pass/fail
8 certification given.
9     Q. Have you testified as an accident
10 reconstruction expert in prior cases in court?
11     A. I have on many occasions.
12     Q. Can you tell us which courts, which states?
13     A. It's in my resume. But off the top of my
14 head, the Superior Court in the state of Delaware;
15 Federal Court in Pennsylvania and Delaware; the
16 Magistrates Courts, Courts of Common Pleas in
17 Pennsylvania and Delaware, Family Courts, etc.
18     Q. And are you continuing to take education in
19 the area of accident reconstruction?
20     A. I do. I attend seminars on a regular basis,
21 which is a requirement of ACTAR. Basically we have
22 to attend seminars to stay present and up-to-date on
23 the latest testing on what's going on in the

26

Sherkey - Voir Dire

1 professional field of accident reconstruction. It's
2 a mandate that we obtain 80 CEU credit hours within a
3 five-year period in order to renew our certification.
4     MR. HUDSON: Your Honor, I'd like to offer
5 Mr. Sherkey as an expert witness on the subject of
6 accident reconstruction.
7     THE COURT: Mr. Ferrara.
8     MR. FERRARA: I'd like to ask him a couple
9 questions, your Honor.
10     THE COURT: Fair enough.
11     __VOIR DIRE__
12 BY MR. FERRARA:
13     Q. Mr. Sherkey, the primary science involved in
14 accident reconstructions are engineering and physics,
15 are they not?
16     A. You could say that. Physics is a function
17 of engineering, too. I'm not an engineer and do not
18 purport to be.
19     Q. You don't have a degree in either
20 engineering or physics, do you?
21     A. Absolutely not.
22     Q. Okay. But what you did was you took some
23 police accident investigation classes and formed --

27

Sherkey - Direct

1 or was it where you were involved initially in
2 forming the FAIR Team, and then when you retired you
3 took your training that you had as a State Police
4 accident investigator and then offered it to the
5 public in cases like this, is that pretty much what
6 happened?
7     A. Well, that's a severe generality. It
8 doesn't really talk about the training and all that I
9 did have, but in general, yes.
10     Q. Okay. And none of the training that you
11 have, as we just agreed, offered you a degree in the
12 areas that we discussed, either engineering or
13 physics?
14     A. No. And there's certifications for accident
15 reconstruction which overloads those fields. But,
16 no, not in physics or engineering, that's correct.
17     MR. FERRARA: Thank you. I don't have any
18 other questions, your Honor.
19     THE COURT: Anything further? Any objection
20 to the --
21     MR. FERRARA: I have no position one way or
22 the other.
23     THE COURT: All right. The testimony stands

28

Sherkey - Direct

1 for what it stands for. And you may continue with
2 questions of Mr. Sherkey.
3     MR. HUDSON: Thank you, your Honor.
4 BY MR. HUDSON:
5     Q. Mr. Sherkey, I'm showing you a document.
6 Is this a copy of your resume?
7     A. It is.
8     MR. HUDSON: I'd like to offer this as
9 plaintiff's next exhibit.
10     MR. FERRARA: No objection, your Honor.
11     THE COURT: Please admit it.
12 BY MR. HUDSON:
13     Q. Mr. Sherkey, I'd like to now go back to the
14 details of your opinion, and first would you tell me
15 what your opinion is, and then you'll have an
16 opportunity to tell the jury the detail and what you
17 based the opinion on.
18     Let me first ask you, before you tell us the
19 opinion, did you review any materials or documents
20 prior to arriving at an opinion?
21     A. I did.
22     Q. Can you tell the jury what you reviewed?
23     A. I reviewed the police accident report, which

29
Sherkey - Direct

1 is the basic Uniform Collision Report for the State
2 of Delaware that reported the accident. I looked at
3 photographs of the accident scene taken by the New
4 Castle County Police. Photographs of the damaged
5 Shore VW Passat. Legal documents, specifically
6 defendant's answers to plaintiff's interrogatories.
7 A deposition transcript of testimony given by
8 Catherine Shore on September 14th of 2006. A
9 deposition transcript of testimony given by Mariann
10 Kamm on September 14th of 2006. And recently added
11 transcripts that I just received two days ago of
12 additional depositions... one of those being the
13 deposition of a Raymond Kamm which was taken on
14 June 15th of 2007. A deposition of a Henry J. Brown
15 taken on June 12th of 2007. And the deposition of a
16 Catherine Shore -- I already did that one. There was
17 one other...
18     Q. Did you also read the transcript of
19 Trooper -- or I'm sorry -- Corporal Mason of New
20 Castle County?
21     A. Yes, Corporal Mason. And that would have
22 been on June 12th, 2007.
23     Q. And you indicated that you had reviewed the

30
Sherkey - Direct

1 report, the accident reports that were done by the
2 police. Did you also have occasion to review or
3 examine any photographs that were taken by the police
4 in connection with your investigation?
5     A. Yes. I believe I mentioned that, sir, yes,
6 sir.
7     Q. And do you have some of those photographs
8 with you today --
9     A. I do.
10     Q. -- specific ones. We'll get to those in a
11 second.
12         Let me now ask you, based on your review and
13 your investigation, what is your opinion in terms of
14 the reconstruction of this accident and how it
15 happened?
16     A. Well, basically in this case it all starts
17 with skid marks which were documented by the police.
18 It's my understanding that Corporal Mason of the New
19 Castle County Police identified and measured 34 feet
20 of skid marks leading into the point of impact that
21 were made by the Shore VW. And before a driver can
22 apply a brake and skid they have to perceive a
23 hazard, then react to it.

31
Sherkey - Direct

1     Based on the location where Ms. Shore would
2 have perceived a hazard in order to react where she
3 did, in order to skid where she did, it's my opinion
4 that she was not perceiving the Young vehicle
5 approaching the intersection because she could not
6 see it. Her sight line was blocked by the Wilmington
7 Trust Bank that sits on the corner in Newport.
8     Q. Okay. What is the basis for that opinion,
9 what information did you base that on that the
10 accident, she could not -- when she applied her
11 brakes, that it was not in response to seeing the
12 Young vehicle?
13     A. No, it wasn't, it was obviously in response
14 to something, and I don't know what that something
15 was, there was a reason, obviously, because she made
16 a brake application and she skidded. What that
17 perceived hazard we'll say was, I don't know.
18     Q. What was the information that you based that
19 on? is my first question to you.
20     A. Well, the location of the skid marks leading
21 into the point of impact and a time-distance analysis
22 that I did that allowed me to plot the position of
23 her vehicle on the Young vehicle at different speeds

32
Sherkey - Direct

1 on a scaled diagram and the resultant sight lines
2 which go through the bank building to show that her
3 vision would have been blocked.
4     Q. Was there a speed that Ms. Shore has
5 testified to that you're aware of that she said she
6 was driving prior to the impact?
7     A. Yes. It's my understanding in sworn
8 testimony that Ms. Shore said she was traveling at
9 approximately 30 miles per hour, which is my
10 understanding is the posted speed limit for that
11 area.
12     Q. And was that a factor in your conclusion
13 that when she hit her brakes, was that speed a factor
14 in terms of the perception and the reaction time?
15     A. Absolutely, yes.
16     Q. Now, have you at my request had a diagram of
17 the accident scene prepared?
18     A. I did.
19     Q. Okay. And have you, would you like to
20 explain that and have you show your findings on
21 those, would they be helpful in demonstrating to the
22 jury your findings and your opinion?
23     A. I believe they would, yes.

33

Sherkey - Direct

1    Q.  Okay.  I have mounted on foam board exhibits
2  which have been premarked for identification as
3  Plaintiff's H, I and J.  And, Mr. Sherkey, I've set
4  up the easel here for viewing by the jury in what I
5  hope is a convenient spot.  If you would like, you
6  can come down and use the pointer to each of these
7  exhibits and explain, if you would, to the jury what
8  each exhibit represents.
9    A.  Okay.
10       THE COURT:  You may step down.
11       THE WITNESS:  Thank you, sir.
12       (Witness at easel in front of jury.)
13       THE WITNESS:  I'll refer to Exhibit H first,
14  if I could.
15       MR. HUDSON:  Okay.  Can everyone see that?
16  You may want to stand where I am just so it won't
17  block their view.
18       THE WITNESS:  Sorry.
19  BY MR. HUDSON:
20    Q.  Okay.  Go ahead.
21    A.  Exhibit H is a scaled diagram of the
22  accident intersection which would be here.  And this
23  being Justis Street, this being James Street, of

34

Sherkey - Direct

1  course, the Wilmington Trust Bank in Newport.  This
2  would be Marshall Street over here, which would be
3  one block forward from the base of the ramp entering
4  Newport from 41 north.
5       It's my understanding that the, that
6  Ms. Shore was on Marshall Street, had exited 41 to
7  make a left onto Justis Street and was proceeding
8  straight towards the accident intersection just prior
9  to the accident (indicating).  The diagram was done
10  by a professional certified land surveyor that mapped
11  the entire site for me, Justis Street being the
12  approach direction for the Shore VW and James Street
13  being the approach direction for the Young
14  Oldsmobile.
15       What I've done on this diagram is included
16  an area right here that I identified with a little
17  target called "impact area."  And that area was
18  derived from basically extending the center line of
19  the thru-lane on James Street southbound to an
20  intercept point with the center line of the westbound
21  lane of Justis Street, and where those two points
22  intersect is the area of impact.
23       I then placed to scale 34 feet of skid marks

35

Sherkey - Direct

1  coming into the impact, which is documented in the
2  police report by Corporal Mason who said that those
3  skid marks ran up to the point of impact.  It's also
4  my understanding that he measured those skid marks
5  and measured them to be 34 feet in length, therefore,
6  I can place the skid marks in there.  There's a
7  slight gap between the target and intercept point and
8  the end of the skid mark, and that would be the front
9  overhang of the bumper on the Shore VW, the distance
10  from the bumper face to the center line of the front
11  axle, if you will.
12       Then, basically where the skid marks start
13  is where the analysis really begins.  Because before
14  any driver can apply a brake, steer, whatever, slow
15  down, they have to perceive something that causes
16  them to do that and to react by choosing a reaction,
17  which would be to hit the brakes, steer, whatever.
18  In this particular case it's my understanding that
19  Ms. Shore has said that she did apply her brakes
20  fairly hard.  I also understand that Corporal Mason
21  identified skid marks at the scene, and, again, their
22  length was 34 feet.
23       Centering those marks --

36

Sherkey - Direct

1    Q.  Just may I interrupt you just a second.
2  What you're showing here with the two solid lines are
3  these 34 feet of skid marks that Corporal Mason
4  identified in his report?
5    A.  Absolutely.  And they're identified as such
6  right here.
7    Q.  And in terms of the location of these at the
8  accident scene, can you tell the jury what, how you
9  were able to locate and pinpoint those to that point?
10    A.  Well, I have photographs to guide me to show
11  that they were there, plus Corporal Mason's own
12  testimony in his dimensions that he measured.  So
13  that allowed me to place them on the diagram up to
14  the point of impact by his descriptor in his report.
15       So what I've done, then, is started where
16  the skid marks start and work backwards.  It's my
17  understanding that Ms. Shore has testified or is
18  documented as testifying that she was doing 30 miles
19  an hour.  A vehicle moving at 30 miles an hour is
20  also moving at a velocity of 43.98 feet per second.
21       So, using 43.98 feet per second as a base, I
22  can then look at driver perception reaction time.
23  It's documented in the literature, as well as it's

37

Sherkey - Direct

1 being taught to most reconstructionists, and
2 generally accepted in the accident reconstruction
3 community, that a driver, average driver perception
4 reaction time is approximately one-and-a-half
5 seconds, three-quarters of a second for perception,
6 three-quarters of a second for reaction. At
7 nighttime that increases to approximately two
8 seconds, one second for perception, one second for
9 reaction.
10      For purposes of the diagram I used two
11 seconds because it's a nighttime accident. If you
12 use one-and-a-half seconds, the position moves
13 slightly forward, there's not that much difference.
14      So now I can take two seconds at 43.98 feet
15 per second, or 44 feet per second, round it off, and
16 I can place the Shore VW at this point here, which
17 says Shore vehicle at driver perception, speed 30
18 miles an hour, distance is 113 feet to impact, and
19 time to impact is 2.78 seconds.
20      The extra .78 second is the time that it
21 would take the Shore VW to skid 25 feet to impact
22 from a speed of 30. At the point of impact, with
23 that deceleration, her vehicle would be traveling at

39

Sherkey - Direct

1 the brake is applied where the vehicle starts to
2 skid. So it's one second for perception, one second
3 for reaction and then skid. And that's probably
4 shown better on the next diagram that I did.
5      Q. Thank you.
6          (Indicating.) I'll put up as Exhibit I for
7 Identification. And can you tell us what difference
8 there is between the Exhibit H we were just looking
9 at and the one that we're now looking at, Exhibit I?
10     A. These diagrams build on one another. The
11 second set under I, everything is the same, with the
12 addition of a couple things. Number one, I've shown
13 the Shore vehicle, the start of its skid, and I've
14 shown it at impact sitting on skid marks. At that
15 particular location it's identified at the start of
16 skid, as Shore VW start of skid, speed is 30 miles an
17 hour, distance to impact is 25 feet, and the time to
18 impact is .78 second. I've changed and I've added a
19 vehicle to show the Young vehicle at impact, right
20 over the point of impact a little target that I've
21 named there.
22     Q. How was the point of impact determined?
23     A. I think I just described that a minute ago.

38

Sherkey - Direct

1 about 14 miles an hour. So there's a time there that
2 you, while the car's skidding it uses more time. So
3 it's two seconds of perception and reaction plus .78
4 seconds to skid to impact is the total time of 2.78
5 seconds. And that's diagrammed here (indicating).
6      That would be perception point. Then the
7 reaction point occurs one second later --
8      Q. I'm sorry. Could you define perception
9 point again? What does that mean in accident
10 reconstruction?
11     A. Basically it's that point in time or
12 distance that a driver would perceive something that
13 would cause them to react by doing something --
14 steering, slowing down, whatever. So it's a period
15 of time where they perceive, I usually refer to it as
16 a hazard or something that causes them to change the
17 motion of the car, the direction of the car that
18 they're operating.
19     And then immediately after that there's a
20 reaction period that they actually institute the
21 maneuver chosen, such as slow down, steer, skid,
22 brake hard, or whatever. Once that reaction is put
23 into process, foot off the gas onto the brake, now

40

Sherkey - Direct

1 But, again, basically it's an intercept point of two
2 lines, one being the midline of the approach lane for
3 the Young vehicle, and the other the midline, the
4 approach lane for the Shore VW. Where those two
5 points intercept or connect would be the impact area.
6      Q. Okay.
7      A. Then what I did was I placed the Young
8 vehicle in time and distance on James Street at 30
9 miles an hour because that's the speed limit. I
10 don't know how fast the Young vehicle was traveling.
11 With the information I have I cannot calculate a
12 speed for that vehicle, so I don't know what that is.
13     Using 30 miles an hour being the speed
14 limit... I want to explain one other concept, too.
15 And that is both vehicles in a collision sequence are
16 always the same amount of time away from impact
17 while moving at their own independent velocity or
18 speed. And that's true because they meet at a common
19 point we call impact, they get there at the same
20 time, just different speeds. And that's why I can
21 place the Young Oldsmobile at 30 miles an hour at
22 2.78 seconds before impact, the same time for the
23 Shore vehicle, 2.78, 2.78.

41

Sherkey - Direct

1    So at 30 miles an hour, 43.98 feet per
2  second and 2.78 seconds of time the Young vehicle
3  would be right here on James Street approaching the
4  intersection at 30 miles an hour. And that's notated
5  here. Young vehicle, 2.78 seconds before impact, the
6  distance for her is 122 feet, the speed is 30 miles
7  an hour (indicating).
8    So now knowing that, I can connect the line
9  from the driver's seat of the Shore VW to an arrow
10  point to the center of gravity, the dot in the car of
11  the Young vehicle on its approach, and you can see
12  the line goes right through the bank, which means
13  Ms. Shore at 30 miles an hour at the start of her
14  perception cannot see the Young vehicle, it can't be
15  seen, it's blocked.
16    And that, again, I stress, all starts with
17  the location of the skid marks is 34 feet until
18  impact. Then I can back the car up based on her
19  testimony of 30 miles an hour and place it here. And
20  then I can look at the relationship and show that you
21  just can't see the car coming.
22    Q.  Okay. How about if the Young vehicle was
23  not doing 30 miles an hour, how about if it was

42

Sherkey - Direct

1  driving faster or slower, did you take that into
2  consideration in your analysis?
3    A.  I did.
4    Q.  Have you shown that on any of these?
5    A.  No, I believe that's the next board.
6    Q.  Is there anything else on this one that you
7  wanted to show before (indicating)?
8    A.  I don't believe so. Everything's pretty
9  well labeled. So I think it pretty well identifies
10  it.
11    Q.  Okay. I'm now showing you Plaintiff's for
12  Identification J (indicating on easel).
13    A.  Exhibit J basically is the same thing, with
14  the addition of two more locations. What I did was I
15  arbitrarily picked 15 miles an hour, a much slower
16  speed than 30, and a higher speed of 50 miles an hour
17  and applied it to the movement of the Young vehicle,
18  and plotted where that position would be in time and
19  distance based on, again, 2.78 seconds of movement.
20    Based on the velocity at 15 miles an hour,
21  which I believe was 21.99 feet per second, in 2.78
22  seconds of time the Young vehicle would be here. And
23  that position is identified with these, with this

43

Sherkey - Direct

1  lettering over here which states, "Young vehicle 2.78
2  seconds before impact." Distance to impact is now 61
3  feet, and the speed is 15 miles an hour, which by the
4  sign it's not calculated. And then keeping the Shore
5  vehicle at the same location, drawing a straight line
6  as a sight line which is identified to that vehicle
7  where you can see that the sight line still goes
8  through the bank. So at that point you can't see the
9  Young vehicle approaching on James Street.
10    Moving up the board, which goes off the
11  board because of the size of the paper --
12    Q.  I'm sorry. Is this the same that you had on
13  the previous one at 30 miles an hour?
14    A.  This is 30 miles an hour. I haven't changed
15  that, it stays the same.
16    Up here at the top would be the Shore VW --
17  or, no, the Young Oldsmobile -- I'm sorry -- coming
18  down James Street, but at the speed of 50 miles an
19  hour, 20 over the speed limit. Again, that's an
20  assigned speed, it's not a calculated speed. That
21  identification is at the top, it says Young vehicle
22  2.78 seconds before impact, the distance now is 203.7
23  feet to impact, speed is 50. Because at 50 miles an

44

Sherkey - Direct

1  hour the vehicle's moving at 73.3 feet per second, so
2  it's faster. So it's farther back in the same time
3  frame because it's faster. Again, keeping the Shore
4  VW at the same point, drawing a sight line to connect
5  the two points, it goes right through the bank, you
6  can't see it, so you just can't see the vehicle at
7  those speeds.
8    Q.  And each of these sight lines is based on
9  the testimony in Ms. Shore's deposition that she was
10  doing 30 miles per hour; is that correct?
11    A.  Yes, absolutely.
12    Q.  And that's how you positioned her car at
13  this particular (indicating) --
14    A.  Absolutely, based on her testimony.
15    Q.  If -- and I will tell you that there has
16  been testimony, and you've read it, I believe, one of
17  the passengers in Ms. Shore's vehicle, Mr. Raymond
18  Kamm, who was a back seat passenger, he estimated her
19  speed at being 40 to 50 miles per hour. If, without
20  actually doing the computations, if she was doing
21  faster, if she was driving faster than 30 miles per
22  hour, where would, at the same point in time, where
23  would she have been relative to where you've shown

45

Sherkey - Direct

1  her at 30 miles per hour?
2      A.  Well, basically she would be farther back on
3  Justis Street, not an extreme distance, but my recall
4  is it would been, for 40 miles an hour it would have
5  been somewhere around this lane line arrow, and at 50
6  miles an hour it would have been a little bit farther
7  back.  I do recall that at 50 miles an hour the
8  location of the car would have been 108 feet,
9  108-and-a-half feet from Marshall Street, which would
10  put it right about up in here.  So at that point the
11  line would still go through the bank.
12      Q.  Okay.  That's based on their speed at 40 to
13  50 miles an hour?
14      A.  Correct.
15      Q.  And at that point in time how would that
16  have affected, that is, if she was driving faster
17  than 30 miles per hour, how would that have affected
18  her line of sight to the Young vehicle?
19      A.  Well, basically it would still have to go
20  through the bank, the line of sight would pass
21  through the bank, but it's all relative to the
22  movement of the Young vehicle, also, so.  But
23  basically it would be through the bank.

46

Sherkey - Direct

1      Q.  Okay.  The Young vehicle would still be
2  either here at 15, here at 30, or here at 50?
3      A.  Well, it would, or somewhere in between,
4  based on the timing, like, 40 or 50 on this side,
5  because you have to balance the two sides based on
6  the times.
7      Q.  Okay.  Is there anything else that you would
8  like to use this diagram for to explain your analysis
9  to the jury?
10      A.  I think it pretty well covers it.
11      Q.  Okay.  You may return to your seat.
12          (Mr. Sherkey returns to witness stand.)
13      Q.  I'm sorry, Mr. Sherkey, there is one other,
14  there are a couple of other things that I would like
15  to ask you to point to.  I was premature to ask you
16  to sit down.
17      A.  Okay.
18          (Witness at easel in front of jury.)
19      Q.  You've read Mr. Raymond Kamm's trial
20  deposition which was read to the jury, you had read
21  that also, correct?
22      A.  I have.
23      Q.  And do you recall him testifying that when

47

Sherkey - Direct

1  he first saw the Young car he was 100 to 200 -- his
2  car, this silver car was 100 to 200 feet from the
3  intersection?
4      A.  I recall that, yes.
5      Q.  Okay.  Could you explain to the jury, if
6  that was the case, whether he in fact could have seen
7  the Young vehicle if he was 100 to 200 feet from the
8  intersection?
9      A.  Well, 100 feet, that would not be true.
10  Because at this point, at the perception point that
11  I've diagrammed based on 30 miles an hour, that
12  location, as I said, is 113 feet, so it's only a
13  difference of 13 feet.  So 100 feet doesn't get it.
14  100 feet would be a little bit farther back, but the
15  line is such, it's still --
16      Q.  I'm sorry.  This is 113 feet (indicating)?
17      A.  This position at perception start is 113
18  feet that's documented.
19      Q.  And he testified that when he saw the Young
20  vehicle for the first time, their car was, the Shore
21  vehicle was 100 to 200 feet back?
22      A.  Correct.
23      Q.  Okay.  So relative to what you've shown here

48

Sherkey - Direct

1  at 113 feet, if it's 100 feet, it would be just a
2  little bit ahead of this?
3      A.  13 feet forward, that's all.
4      Q.  Okay.  Could he have seen the Young vehicle
5  at that point if she was doing -- if the Young
6  vehicle was traveling between 15 and 50 miles an
7  hour?
8      A.  No.
9      Q.  And, by the way, if the Young vehicle was
10  doing more than 50, is it safe to assume it would be
11  off the chart up here somewhere?
12      A.  It would be way up there, sure.
13      Q.  And also still not visible from here because
14  of the line of sight being blocked by the bank?
15      A.  Right.
16      Q.  If the Shore vehicle was as Mr. Kamm, her
17  passenger, said was 200 feet from this intersection
18  when he saw, checked over here and saw that the road
19  was clear, where would the car, Shore vehicle have
20  been on the diagram?
21      A.  Do you want me to plot it to scale?
22      Q.  Could you do that?
23      A.  Yeah.  I can do it, sure.  (Indicating.)

49

Sherkey - Direct

1    Q. And, Mr. Sherkey, before you do that, I
2  think I misspoke when I was quoting what Mr. Kamm
3  said in his deposition and in his testimony to the
4  Court yesterday. He said when he first looked over
5  to see if there were any oncoming cars, the roadway
6  was clear, there were no cars on the roadway and he
7  was 100 to 200 feet back when he looked. So my
8  question is not whether he saw the Young vehicle, but
9  whether he could see whether there were any vehicles
10  coming when he was 100 feet or 200 feet?
11    A. Understood.
12    Q. So now you're going to show us where he
13  would have been.
14    A. Do you want to use "J" for that? It doesn't
15  matter to me.
16    Q. Why don't you just mark an "R" on there with
17  a circle for Raymond.
18    A. (Indicating on diagram.)
19    Q. Okay. What you have put there in red ink is
20  the letter R. And would you write "200" beside that
21  so we can identify it?
22    A. (Indicating on diagram.)
23    Q. Okay. So the question is then, again, would

50

Sherkey - Direct

1  Mr. Kamm have had a view of the roadway that the
2  Young vehicle was traveling on if he was 200 feet
3  back from the intersection, as he testified?
4    A. Not really, because the angle, because the
5  vehicle would be back farther, 200 feet. What I did
6  over here first with the light pencil line I did was
7  identified the beginning of the intersection. An
8  intersection is identified by the area within or
9  embraced within the prolongation or the extension of
10  the curb line, the lateral curb lines. So when I
11  took my triangle and I connected the curb line here
12  to this one, and then drew that little pencil line,
13  that would be the entry point of the intersection,
14  allow a curb line extended. So from that point back
15  100 feet, like I said, would be 13 feet forward of
16  this position already shown.
17      200 feet back would be here with the red dot
18  with "R" for Raymond, I assume, and 200 feet, the
19  notation that that dot would be 200 feet. So from
20  that point if you can visualize a diagonal line going
21  up through here, the bank would still block his view
22  of traffic on James Street.
23    Q. Okay. Now, you've read the deposition

51

Sherkey - Direct

1  testimony of Catherine Shore?
2    A. I have.
3    Q. And do you recall her testimony in her
4  deposition as to how far away the Young vehicle was
5  from the point of impact when she first saw it, when
6  Catherine Shore first saw the Young car?
7    A. My recall, I think, was about 8 feet.
8    Q. And do you recall how far away she testified
9  she was, Catherine Shore, from the point of impact at
10  that time that she saw the Young vehicle?
11    A. My recall is approximately three to five car
12  lengths, which she based on the length of her car,
13  the VW.
14    Q. Okay. Now, if her testimony is accurate
15  that when she first saw the Young vehicle it was
16  8 feet coming down James Street, 8 feet from the
17  point of impact, and if the Catherine Shore vehicle,
18  as she said, was three to five car lengths back up on
19  Justis Street and she was doing 30 miles per hour,
20  would the collision have occurred?
21    A. I did calculations for that, and, no, it
22  would not have.
23    Q. And can you tell us why not?

52

Sherkey - Direct

1    A. Well, because if the Young Oldsmobile is
2  8 feet prior to impact when it's observed, then in
3  order for that car to clear impact it has to cover
4  that 8 feet, so it has to cover the length of the
5  car, and basically the width of the front end of the
6  Passat, the VW Passat, so that no part of that
7  touches the car as it goes by. My recall is that
8  8 feet is 8 feet. The length of the Shore VW is
9  15.33 feet, and the width of the VW Passat is 5.75.
10  So if you add all that together you get about 30 feet
11  of distance.
12      So at 30 miles an hour at 43.98 feet per
13  second the Young Oldsmobile would cover 30 feet in
14  less than a second. I could work it out. But, I
15  mean, it's 30 feet divided by 43.98 feet per second,
16  so it gets through there in about a half a second,
17  .5 to .6 second. And, of course, the Shore VW would
18  not have reached there yet.
19    Q. I think those are the only -- let me just
20  check one other thing. (Pause.)
21      One last comment. As I understand it, one
22  of the witnesses that Mr. Ferrara is expected to call
23  in this case is the other passenger, Mariann Kamm,

53

Sherkey - Direct

1  who was the front seat passenger in Ms. Shore's
2  vehicle. And have you read her deposition testimony?
3     A. I have.
4     Q. And do you recall her testifying that three
5  seconds lapsed between the time that she saw the
6  Young vehicle and the impact?
7     A. I do. And I recall that because my analysis
8  has the initial timing at the start of the event at
9  2.78 seconds, which is almost three seconds.
10    Q. And where would that have placed the Shore
11 vehicle three seconds from impact, if that was
12 accurate?
13    A. Well, it's 2.78 here, so it would be just
14 slightly behind here, probably to about 8 to 10 feet.
15 I could work it out for you, it's no problem, but
16 it's slightly behind that, so. It's not significant.
17    Q. And at that point in time would she have had
18 a line of sight of the Young vehicle if her car was
19 approximately the same place as shown here, as you've
20 already calculated?
21    A. No. Because if you move the car back 8 to
22 10 feet, you're still basically on the same sight
23 line. It's skewed a little bit, but it's basically

54

Sherkey - Direct

1  the same thing.
2     Q. Thank you. I think I'm finished with the
3  exhibit, if you could return to your seat.
4        (Witness re-takes the stand.)
5     Q. Mr. Sherkey, we've talked about some
6  photographs that you've reviewed. Do you have
7  photographs with you that would assist the jury in
8  your explanation as to where the skid marks were and
9  how you formed your opinion as to where Ms. Shore's
10 vehicle was prior to the impact?
11    A. I do.
12    Q. Would you like me to show those to the jury
13 as you explain these?
14    A. (Indicating.)
15    Q. And with help we can give you the
16 assistance.
17    A. That's just, it has nothing to do by the
18 placement of the skid mark or the location of impact.
19    Q. Okay. I'm going to put up Plaintiff's
20 Exhibit for Identification F.
21       Mr. Sherkey, if you want to use your pointer
22 from there on the overhead behind you so that the
23 jury can follow along, could you explain what this

55

Sherkey - Direct

1  photo is of and how this helped you in your analysis?
2     A. It's sort of abstract, because in this
3  photograph it was taken in the vicinity of, I'll call
4  it the corner where the bank is, but obviously in the
5  road. The photograph looks like it's been zoomed in
6  a little bit, too, to pick up the post-impact tire
7  marks. But basically we see the Shore VW at final
8  rest after the accident here. And before that we see
9  fresh tire marks that were made by the Shore VW or
10 the Young Oldsmobile.
11       But the alignment of this is such -- and I
12 think one of the other photographs will show it
13 better -- but this shows the post-impact or the
14 departure marks made by the vehicles leaving the
15 point of maximum engagement toward where they came to
16 final rest. And if you follow this in a straight
17 line, if you will, this way, which would be the
18 direction that the VW was traveling prior to impact,
19 it's obvious, in conjunction with the other
20 photographs, that these marks are aligned with the
21 right-hand thru-lane, or right-hand westbound lane of
22 Justis Street, not the left lane.
23    Q. Okay. Can you just for orientation purposes

56

Sherkey - Direct

1  show us where Justis Street is that the Shore vehicle
2  was driving on and James Street that the -- just
3  orient us from direction in the photograph.
4     A. The best way would be to do it with the two
5  lower corners, the lower left corner here being
6  Justis Street westbound going towards Stanton, if you
7  will, out of Newport this way (indicating).
8     Q. And which lane is that?
9     A. That would be lower left, upper right
10 corner, if you will.
11    Q. I'm sorry. Which lane of the --
12    A. That would be the right lane, I'm sorry. It
13 would be the right-hand lane of Justis Street
14 westbound. And then from the lower right corner
15 moving up across the frame diagonally, this would be
16 James Street southbound coming through the
17 intersection going that way, and this would be the
18 left lane or the straight lane or the thru-lane for
19 James Street. There's two lanes there, one is
20 straight, and one's for right turns.
21    Q. And is the point of impact located in that
22 photograph?
23    A. The area of impact would be right here.

Sherkey - Direct

1   Because what you have here is a tire scrub that's a
2   striated mark, you'll see the mark has diagonal lines
3   in it. And that's significant because that can only
4   be made by a tire or tires that are rolling and
5   sliding sideways at the same time. If the wheels
6   were locked it would be a solid smear. The fact that
7   they're arched or curved indicates there's a rotation
8   on the part of the vehicle that made them, and in
9   this case both vehicles rotated.
10      These marks appear to be leading up to the
11  Shore VW, but you lose them in here because of sand
12  and other things there. So I could merely state that
13  the impact has occurred and the vehicles are starting
14  to, or are being influenced by the force of one
15  against the other, so that the vehicles depart the
16  collision the way the Shore VW is shown in this
17  photograph. And these marks definitely indicate a
18  collision has occurred.
19      Q. Thank you.
20          There is a lower photograph on this same
21  exhibit. Can you tell the jury what this shows?
22      A. Well, it's just a close-up of the tire mark.
23  You can see the striated tire mark here, one of them.

59
Sherkey - Direct

1   in the right lane and he identified them and he
2   measured them, they're straight, obviously. And
3   these marks go straight through the intersection to
4   the right of the final rest position of the Shore VW.
5       Had the Shore VW been in the lane over here
6   to the left, which has been referred to in the record
7   as the left lane and the center lane, then obviously
8   the Shore VW can't make the marks here and end up
9   there. All the evidence would have to be over here,
10  and then the Shore VW would have to be farther to the
11  left had she been in the left lane or the center
12  lane, or whatever they called it, it's been given two
13  identifiers.
14      Q. Thank you.
15          I'm sorry, this is a duplicate of the --
16      A. Yeah. I was just going to say that looks
17  like a duplicate.
18      Q. (Indicating photograph on ELMO.)
19      A. This view basically shows the Shore VW at
20  final rest near the center of the intersection or
21  slightly to the left of it if you're looking at it
22  from Justis Street towards Stanton, if you will. The
23  significance is with the car being in the middle of

58
Sherkey - Direct

1   And it appears to lead up to not specifically or
2   necessarily this tire on the Shore VW, it could be
3   one at the front or one on the other side at the
4   back, I just can't see it. It just shows it's closer
5   to the final resting position of the Shore VW, that's
6   all.
7       Q. Thank you.
8           I'm going to show you Exhibit A, starting
9   with the top photograph (indicating on ELMO).
10      A. This photograph shows the tire marks, I
11  believe, that were identified by Corporal Mason that
12  he saw and measured. It's important to note, too, if
13  you will, that the roadway geography at the
14  intersection hasn't really changed, however, the
15  markings have. You're going to notice on the scale
16  diagram that the pedestrian crosswalk lines are solid
17  white in the on-scene photographs, since the time
18  of the accident they've changed them into little,
19  I'll call them parallel bars that make a crosswalk.
20          But the crosswalk is extended across a
21  lateral curb line of the intersection, and the skid
22  marks go to the right of the final resting point of
23  the Shore VW here. So Corporal Mason saw the marks

60
Sherkey - Direct

1   the intersection, it's at least blocking the
2   left-hand lane or the left thru-lane that traffic
3   would track through going towards Stanton on Justis
4   Street west.
5       The tire marks we just looked at are over
6   here at this edge. Therefore, in order for that
7   vehicle to stop there and the tire marks to be made
8   over here, the impact has to occur in the right lane
9   of Justis Street westbound, not in the center lane.
10  Again, if it was in the center lane or the left lane,
11  it's been referenced two different ways by different
12  people in the record, but this car should have ended
13  up farther to the left, if that were true. And the
14  tire marks would not be there, they'd be moved over
15  one lane to the left, if you will.
16      Q. Thank you.
17          And in summary, Mr. Sherkey, if, based on
18  the tire marks, the location of the tire marks --
19  skid marks, and the configuration of the accident
20  scene, the location of the Wilmington Trust Bank, and
21  Catherine Shore's testimony that she was driving
22  30 miles per hour, is it your opinion that it was
23  impossible for Catherine Shore to have made those

61
Sherkey - Direct/Cross

1  skid marks in reaction to seeing the Young vehicle
2  traveling down James Street?
3      A. Yes, that's correct.
4      Q. Okay. And it is your testimony -- is it
5  your testimony that those skid marks were made by the
6  Shore vehicle in reaction to some perceived hazard?
7      A. It appears they were, they were identified
8  by Corporal Mason both in his report and in
9  testimony.
10      Q. Have your opinions that you've expressed
11  today all been given with reasonable probability?
12      A. They have, yes.
13      MR. HUDSON: Thank you. I have no further
14  questions, Mr. Sherkey.
15      THE COURT: Mr. Ferrara, you may
16  cross-examine.
17      MR. FERRARA: Thank you, your Honor.
18          CROSS-EXAMINATION
19  BY MR. FERRARA:
20      Q. Mr. Sherkey, you're familiar that Corporal
21  Mason of the Newport -- the Newark Police -- the New
22  Castle County Police Department is a
23  reconstructionist, is he not?

62
Sherkey - Cross

1      A. Yes, he is at present day, that's correct.
2      Q. And you relied in forming the opinions you
3  did on a lot of the information that he gathered
4  because he was right there on-the-scene?
5      A. Correct.
6      Q. Do you have any additional information with
7  regard to the path of travel of the Young vehicle
8  into the intersection than Corporal Mason had?
9      A. No.
10      Q. Now, you, before you became associated with
11  Sherkey & Associates, investigated accidents for the
12  Delaware State Police for a number of years, did you
13  not?
14      A. I did.
15      Q. You were not asked to reconstruct this
16  accident, were you?
17      A. That's a generalized term. No, not really.
18  I was basically asked to look at it and evaluate the
19  accident.
20      Q. The one thing that you and I can absolutely
21  agree on, based on your experience, is that two
22  things that are the most difficult for people to be
23  accurate about are speed and distance?

63
Sherkey - Cross

1      A. Agreed.
2      Q. In your experience, isn't that fair?
3      A. I agree.
4      Q. And in this particular case what you know is
5  that there was an accident that happened on December
6  the 13th of 2003, we know that, right?
7      A. Correct.
8      Q. And nobody asked anybody how fast they were
9  going or how far they were or when they first saw
10  something until two and a half years later, isn't
11  that about right?
12      A. (Pause.)
13      Q. The deposition you referred to of Catherine
14  Shore, the first one you talked about took place
15  September the 14th, 2006, a lot closer to three
16  years?
17      A. That's correct, yeah. I was just trying to
18  think about Corporal Mason's report and any comments
19  he made I'd have to look at that, but I would
20  generally agree with your statement.
21      Q. Well, Corporal Mason testified that he
22  didn't interview anybody. And you don't have any
23  indication otherwise, right?

64
Sherkey - Cross

1      A. No recall of that, no.
2      Q. And you know that Brown interviewed all
3  three occ -- actually, Brown interviewed everybody,
4  but he didn't ask anybody in the Shore vehicle about
5  speed or how far or where they were when they
6  perceived something?
7      A. I don't believe so.
8      Q. Okay. So what we have is three people in
9  the Shore vehicle were interviewed on-the-spot, all
10  of whom were consistent in saying that they had the
11  green light, none of whom were asked about speed and
12  distance, fair?
13      A. At the scene, fair, yes.
14      Q. By the time they are asked about it, they
15  all give different numbers about speed and about
16  distance, right?
17      A. Yes.
18      Q. All right. Now, you're not surprised at
19  that, based on your experience as a police officer
20  before you did the reconstruction work for the
21  company you're with now, fair?
22      A. Fair.
23      Q. Okay. Now, I think everybody has a pretty

Sherkey - Cross

1  good grip of this, but the faster that Catherine
2  Shore is going, the further away she is on perception
3  of the other vehicle, correct?
4     A. Correct.
5     Q. Now, you said 30. Actually, she said that
6  she estimated 30, didn't she?
7     A. Well, I'd have to go in her deposition. But
8  I can tell you that she sticks on 30. And I can cite
9  that if you give me a few minutes to do that.
10    Q. Well, you don't need to do that. If she
11 said that, we'll, I'll ask you the next question.
12    A. I'm pretty sure she was doing 30, and she's
13 driving, so I would expect she would know.
14    Q. Mariann Kamm said they were going 25, right?
15    A. Sure.
16    Q. That puts her how many feet closer?
17    A. Well, I could tell you in just a minute.
18 Not much closer, but I could tell you what it would
19 be.
20    Q. Well, roughly at 30 -- at 25 she's going
21 what, 37 feet per second, 36 and high change?
22    A. 36.65 feet per second.
23    Q. As opposed to 47.98?

Sherkey - Cross

1     A. 43.98.
2     Q. 43.98.
3        Okay. Now, what's the requirement in the
4  state of Delaware with regard to how far your
5  headlights have to illuminate?
6     A. I don't recall what the manual says, but
7  I've done a lot of night visibility studies and I can
8  tell you what that zone is. And illuminate is
9  another, is another term I guess you could say that's
10 up for argument because people have a tendency to mix
11 that with the word shine. And that depends on your
12 position. If you're a driver and you have your
13 headlights and you're on low beam, I can tell you
14 that they will illuminate a darker object at a range
15 of about 150 feet.
16    Q. Okay. All I'm asking you, I'm not asking
17 you what Mrs. Shore could see, what I'm asking you is
18 we have no evidence in this case that Mrs. Young was
19 operating her vehicle without her headlights on,
20 right?
21    A. No, there's nothing about that.
22    Q. And at least two of the people that talked,
23 that were in the Shore vehicle testified that they

Sherkey - Cross

1  saw a flash, right?
2     A. Yes.
3     Q. Do you know whether that was the flash of
4  the headlights that obviously would have preceded the
5  Shore -- the Young vehicle by some considerable
6  distance?
7     A. No. I believe that was an adjective used
8  by, one says flying, one says flash. Flash meaning,
9  my interpretation of that would be the suddenness of
10 the event, or the sudden movement or encroachment,
11 however you want to say that.
12    Q. And that's your interpretation. It could
13 also obviously mean the light?
14    A. I suppose it could.
15    Q. Okay. And clearly you can see the lights of
16 a vehicle if it was coming across before you saw the
17 vehicle itself?
18    A. Not necessarily, no.
19    Q. Is it something that you could have seen --
20 I appreciate there's a lot of things are not
21 necessarily -- but you could well have seen the
22 lights before you even saw the vehicle as a
23 possibility, right?

Sherkey - Cross

1     A. I don't know that because I didn't test it.
2  It's a pretty well lighted area, so I would think
3  with the amount of illumination there, with
4  headlights coming in they would be disguised to some
5  degree.
6     Q. Big intersection, right?
7     A. Yes.
8     Q. Three lanes in each direction?
9     A. Two lanes --
10    Q. No. Three lanes on Justis, two on James?
11    A. Correct.
12    Q. And there's certain things that we know for
13 sure. What you've done is you've taken the speeds
14 that were given to you by three different people
15 three years later, two and a half years later, but
16 what we know for sure is that --
17    A. It wasn't three people, it was Ms. Shore,
18 the driver, 30 miles an hour.
19    Q. So you just did the calculations for Raymond
20 Kamm, you considered that --
21    A. No. It was a calculation based on he said
22 they were 100 to 200 feet from the intersection.
23 Raymond Kamm gave speeds, too, but I don't think they

## 69

Sherkey - Cross

1  were brought up in my testimony. But my whole
2  analysis is based on 30 miles an hour.
3      Q.  Okay. And if she's going slower she's
4  closer, if she's going faster she's further away?
5      A.  Yes. But you also have to reflect when you
6  say that, whatever speed you want to use at the start
7  of skid for the slower speed, then you have to
8  decelerate her into impact for over 34 feet of skid
9  marks. And when you do that, if you make her slower,
10  she's going so slow at impact that it doesn't reflect
11  the amount of damage done to her car.
12      Q.  You got three different speeds and three
13  different distances from the people that were in the
14  Shore vehicle, right?
15      A.  In testimony on-the-record, yes. In my
16  analysis I used 30 because she was driving the car.
17      Q.  I know that. That's all I'm asking you.
18      A.  I just don't want to be mischaracterized.
19      Q.  Let's try that again. You got three
20  different speeds and three different distances from
21  the people in the Shore vehicle. How did that
22  mischaracterize anything that you said?
23      A.  I just don't want that confused with my

## 70

Sherkey - Cross

1  analysis based on 30 miles an hour, which was what
2  the driver said.
3      Q.  Okay. Did you get three different speeds
4  and three different distances from people in -- from
5  the three people in the Shore vehicle?
6      A.  Yes.
7      Q.  But the one thing that they're all
8  completely consistent about is that they saw the car,
9  or a flash, or something, had the green light, and
10  Catherine hit her brakes as hard as she could to
11  avoid the collision?
12      A.  Yes. But that's what's unique about this
13  case because they can't see the car, and that's what
14  my analysis showed, they cannot see the car.
15      Q.  That's based on your taking the 30 miles an
16  hour?
17      A.  Well, that's what Mrs. Shore said she was
18  driving. I mean, she should know, she's driving.
19      Q.  Well, you and I agreed earlier that two and
20  a half years after the fact people may not be
21  accurate about how fast or how far they were going,
22  fair?
23      A.  Yeah, sure.

## 71

1      MR. FERRARA:  Okay. Thank you. I don't
2  have anything else.
3      THE COURT:  Mr. Hudson, redirect
4  examination?
5      MR. HUDSON:  Your Honor, I have no redirect.
6  I would like to offer into evidence the exhibits that
7  were used in Mr. Sherkey's direct. That would be the
8  photographs, the three photographs, and the diagrams
9  that he used, the three diagrams.
10      THE COURT:  Mr. Ferrara.
11      MR. FERRARA:  I have no objection to the
12  diagrams or the photographs.
13      THE COURT:  All right. They'll be admitted
14  as the next plaintiff's exhibits. Do I understand
15  you have no further questions of the witness?
16      MR. HUDSON:  Nothing.
17      THE COURT:  Then, you may step down,
18  Mr. Sherkey. And I assume he's excused from further
19  testimony in this trial?
20      MR. FERRARA:  He is for me, your Honor.
21      THE COURT:  You are excused from further
22  testimony in the trial.
23      MR. SHERKEY:  Thank you, sir.

## 72

1      THE COURT:  Can I see counsel at sidebar on
2  scheduling.
3      (A sidebar, without reporter, was held.)
4      THE COURT:  Members of the jury, we're
5  going to take our morning stretch break now for about
6  15 minutes, so please take out the jury.
7      (Jury leaves the courtroom at 11:28 a.m.)
8      THE COURT:  We are in recess.
9      (Recess taken, 11:29 to 11:52 a.m.)
10      THE COURT:  Mr. Hudson, will you be prepared
11  to rest when the jury comes back?
12      MR. HUDSON:  That's correct, your Honor.
13      THE COURT:  And no further documents to
14  enter?
15      MR. HUDSON:  There was a photo, but
16  Mr. Sherkey left with it, so we'll...
17      THE COURT:  All right. Well, as we said at
18  sidebar off-the-record, Mr. Ferrara advised that he
19  had motions that he wished to file, I suggested he
20  just identify those motions now, we'll argue them at
21  a later time.
22      MR. FERRARA:  Identify them now?
23      THE COURT:  Yes. Just say what you'll be

73

1  moving on.
2         MR. FERRARA: I'm going to move for a
3  directed verdict on damages.
4         THE COURT: All right. We'll argue that
5  later. Please bring in the jury.
6         (Jury enters the courtroom at 11:54 a.m.)
7         THE COURT: Mr. Hudson.
8         MR. HUDSON: Your Honor, the plaintiff
9  rests.
10        THE COURT: The plaintiff rests his case.
11        Mr. Ferrara.
12        MR. FERRARA: Your Honor, I would like to
13 call the first of my two witnesses, Mariann Kamm.
14            ... MARIANN KAMM,
15 having been duly sworn according to law, was examined
16 and testified as follows...
17            DIRECT EXAMINATION
18 BY MR. FERRARA:
19    Q.   Mariann, I want to direct your attention to
20 an accident that happened on December the 13th, 2003,
21 but before we talk about that I'd like you to let the
22 jury know a little bit about yourself. What kind of
23 work do you do? Where do you live? How are you

74

M. Kamm - Direct

1  employed? What is it that you do?
2     A.   I'm a hearing officer for the State of
3  Delaware. I hear the appeals of people that have
4  been receiving Social Security disability and the
5  State is determining they're no longer eligible under
6  the Social Security law.
7     Q.   So you review those cases?
8     A.   Correct.
9     Q.   How long have you been doing that?
10    A.   Five years.
11    Q.   All right. Where do you currently reside?
12    A.   Smyrna, Delaware.
13    Q.   Where did you live back in December of 2003?
14    A.   In Newport, Delaware.
15    Q.   All right. Are you familiar with the
16 intersection of James and Justis Street?
17    A.   Yes.
18    Q.   All right. I'm going to let Catherine tell
19 us how the evening got started with your trip, but
20 you went to, at some point in time you went to the
21 Iron Hill Brewery?
22    A.   Correct.
23    Q.   All right. Did Catherine drive?

75

M. Kamm - Direct

1     A.   Yes.
2     Q.   Did she consume any alcohol?
3     A.   Before we left?
4     Q.   At anytime that evening.
5     A.   Yes.
6     Q.   What did she have, if you know?
7     A.   At dinner she had one glass of wine, I
8  believe.
9     Q.   When you left the Iron Hill Brewery -- the
10 Iron Hill Brewery, by the way, is down by the
11 Riverfront, the waterfront here in Wilmington?
12    A.   Yes.
13    Q.   Where were you headed?
14    A.   We were going home.
15    Q.   Home where?
16    A.   To my house in the subdivision of Glenville
17 in Newport, Delaware.
18    Q.   Who was in the car with you?
19    A.   Catherine, myself, and my brother Raymond.
20    Q.   Where was everyone located?
21    A.   Catherine was driving, I was a passenger,
22 and my brother was in the back seat behind me.
23    Q.   He was directly behind you?

76

M. Kamm - Direct

1     A.   Correct.
2     Q.   All right. If I asked you this, I
3  apologize. How familiar with the intersection of
4  James and Justis Street were you at the time the
5  accident happened?
6     A.   I was very familiar with it because I went
7  home that way every evening from work.
8     Q.   Where was work at the time?
9     A.   The Department of Labor up on Philadelphia
10 Pike.
11    Q.   Did you take the route that you took that
12 night, 95 to 141?
13    A.   Yes.
14    Q.   All right. What I'd like you to do is tell
15 the jury the route you took coming home from the
16 Riverfront that night, the Iron Hill Brewery, and
17 tell us what, take us right up into the accident and
18 tell us what happened.
19    A.   Okay. We got on 95 south, and then we had
20 to get on 141 towards Newport. And then you go down
21 the off-ramp there, and there's a light there, and
22 then at the next block there's another light, and you
23 take a left there. And then at the intersection

77

M. Kamm - Direct

1  where the accident happened there's a light there.
2  So that's the route that we followed that night.
3      Q.  All right.  When you came off the ramp off
4  of 141 and you got to the first light, is that where
5  the little skateboard roller-skating thing is?
6      A.  Yes.  That's on the left, yes.
7      Q.  That's on your left?
8      A.  Mm-hmm.
9      Q.  And did you make a left?
10     A.  Not at that light, at the next light, which
11  is, like, I knew it as Route 4.  I think it's called
12  Justis Street.  I'm not sure.  But I knew it as
13  Route 4 because it takes you into Newport.
14     Q.  So you went past the light that had the
15  skate park to the next light?
16     A.  Right.
17     Q.  And is the next street, which you believe to
18  be Justis/Route 4, is that a one-way street?
19     A.  It is.
20     Q.  How is it one way, which direction?
21     A.  Towards Newport.  You have to --
22     Q.  Well, how about a left or right?
23     A.  Oh, you have to turn left onto it.

78

M. Kamm - Direct

1      Q.  And is that what Catherine did?
2      A.  Yes.
3      Q.  All right.  Now, let's assume it is Justis
4  Street.  From the route you called Route 4, from that
5  intersection where you made the left onto Justis
6  Street how far down the road did the accident take
7  place?
8      A.  It wasn't very far.  I don't -- it's like
9  maybe a block, maybe 25 feet, or something.
10     Q.  Well, was it one block or more than one
11  block?
12     A.  It was one block, because you turn left at
13  the light and then in the next intersection there's a
14  light there.
15     Q.  And that's where the accident happened?
16     A.  Yes.
17     Q.  Okay.  When I tell you and ask you how far
18  it was, I don't expect you to know how many feet it
19  was, I'm asking you in blocks, it was the very next
20  intersection?
21     A.  Oh, right, yes.
22     Q.  Okay.  So tell us what happened, tell us
23  what actually occurred.

79

M. Kamm - Direct

1      A.  Okay.  Catherine was accelerating because
2  the light was green.  I remember looking up and
3  seeing the light, and then I remembered that I looked
4  forward because there's a bank there, and so you kind
5  of -- it's a weird intersection.  And so I remember I
6  looked, I leaned forward and I looked, and there was
7  a car coming through, which would have been their red
8  light 'cause our light was green.  So she was
9  accelerating through the intersection, and then it
10  was "crash."
11     Q.  All right.  Let me back you up a little bit,
12  you kind of got, you got a little ahead of me.
13         You come down the 141 ramp?
14     A.  Mm-hmm.
15     Q.  Did you get to the light at the bottom of
16  the hill there?  Or was that light for you green or
17  red, if you remember?
18     A.  I don't remember.
19     Q.  All right.  How about the next light where
20  you had to turn?
21     A.  I don't remember if that was green.
22     Q.  But you made a left?
23     A.  We went left, right, because it's a one-way,

80

M. Kamm - Direct

1  you can't go any other way.
2      Q.  Other than your car at that point, was there
3  any other traffic?
4      A.  I have no idea.  I don't remember, really.
5      Q.  All right.  What lane did you turn into?
6      A.  I don't have a specific recollection of
7  which lane we were in.
8      Q.  But at this point you're accelerating up to
9  the next intersection?
10     A.  Yes.
11     Q.  All right.  From once you made the turn onto
12  Justis Street or Route 4, were you able to observe
13  the light?
14     A.  Yeah.  It was green.
15     Q.  Were you able to observe it the whole time?
16     A.  Pretty much, yeah.
17     Q.  Were you paying attention to it?
18     A.  I was, because I was leery of that
19  intersection because that bank is in the way.  So
20  when you approach that light, I always was in the
21  habit of leaning forward because I needed to see, you
22  know, the traffic coming from off of 141 from the
23  other direction.

81

M. Kamm - Direct

1    Q. At anytime after you made the turn onto
2 Route 4 onto Justis Street, recognizing they're the
3 same road, was your light any color other than green?
4    A. No.
5    Q. Any doubt in your mind about the color of
6 the light?
7    A. None.
8    Q. Did you talk to the police officer after the
9 accident happened?
10    A. You know, it was that, it was so traumatic
11 after the accident, I have -- I don't have a specific
12 memory of talking to the cop that -- there was a
13 million emergency personnel there immediately because
14 it happened right in front of a fire station. So it
15 was just, it was chaos, immediately there was, you
16 know, emergency personnel everywhere.
17    Q. All right. Well, then I'm not going to ask
18 you about your statement to the police officer.
19 Okay. So you're approaching the light, the light's
20 green. Now, slow down and tell me what happens.
21    A. What I remember is that we were going,
22 accelerating through the light, and I remember doing
23 this, to look around, and then I screamed. And it

82

M. Kamm - Direct

1 was just impact, it was just, it was violent, it was
2 horrifying. And then I remember, the next thing that
3 I remember is my brother in the back seat saying,
4 "Mar, get out of the car, get out of the car," you
5 know, and smell of the air bags deploying, and
6 everything.
7    And then I remember opening the door, and
8 the first thing I saw was the front of the car and
9 how it was so smashed. And I thought to myself, how,
10 how did I open that door, you know, the car was so
11 twisted up. And then I remember looking down the
12 street and I saw this dog running down the street,
13 and I was like, you know, I was confused, I didn't
14 understand what that meant.
15    And then I remember leaning in the car and
16 saying, "Cat, get out, get out of the car, get out of
17 the car." And then I looked over and saw the other
18 vehicle.
19    And then my brother was there and he was
20 saying, "Are you okay, are you okay?" And then I was
21 really concerned about Catherine because she wasn't
22 getting out of that car. And there was, immediately
23 there was emergency people there.

83

M. Kamm - Direct

1    Q. Did she leave the scene in an ambulance?
2    A. She did.
3    Q. Was she injured?
4    A. She was.
5    Q. Do you remember how?
6    A. Yeah. She broke her hand in several places,
7 I believe. She had to have physical therapy, she had
8 to -- she had a lot of pain for a long time because
9 of her injuries.
10    Q. What was your speed as you were approaching
11 the light?
12    A. I don't -- I have no idea what the speed
13 was. But it couldn't have been very fast because it
14 was such a short intersection, I mean, it was just,
15 like, a block.
16    Q. Do you remember giving your deposition
17 testimony in the case?
18    A. Yeah.
19    Q. Do you remember a guess, saying that you
20 guessed your speed?
21    A. Yes. I did guess, at that time, about 25
22 miles an hour.
23    Q. In your opinion, you weren't going faster

84

M. Kamm - Direct

1 than that?
2    A. There's no way we could have been, because
3 it was such a short distance between from turning
4 left to getting to the light.
5    Q. Now, just tell us very briefly what happens
6 next. How did you leave the scene?
7    A. My brother had his cell phone, and he called
8 our parents who were staying at my house in Glenville
9 because they were watching my daughter. And so he
10 called them, and then my dad came down and picked up
11 me and my brother. And, of course, they were really
12 concerned about our injuries. By that point I was
13 starting to feel the, you know, my neck. And my
14 brother, his knee hurt. And so we, my parents were
15 concerned about that.
16    Q. You said that you don't have a specific
17 recollection of talking to the police officer that
18 night. Did you talk to -- do you remember talking
19 about this in a deposition in this case September the
20 14th of 2006, and is that when you estimated the
21 speed, guesstimated the speed of 25?
22    A. Yeah.
23    Q. Nearly three years later?

85

M. Kamm - Direct/Cross

1    A. Yes, at the deposition.
2         MR. FERRARA: I don't have any other
3    questions. Thank you.
4         THE COURT: Mr. Hudson, you may
5    cross-examine.
6         MR. HUDSON: Thank you.
7         CROSS-EXAMINATION
8    BY MR. HUDSON:
9    Q. Mr. Ferrara asked you when you testified in
10   your deposition how fast you were going, he said is
11   that when you guessed, and then he used the word just
12   now "guesstimated." I'm going to refer you to
13   page -- I'm going to refer to page 13 of your
14   testimony. Did you ever say you were guessing in
15   your testimony when you had your deposition taken?
16   A. Yes, I think I did.
17   Q. Okay. Let me read the question to you on
18   line 21, page 13. And this was, I believe
19   Mr. Ferrara was asking the question. "And before the
20   collision occurred can you tell me approximately how
21   far Ms. Shore's car was going?" And your answer:
22   "Well, she was accelerating because the light was
23   green, and so maybe she was going 25 miles per hour."

86

M. Kamm - Cross

1         I don't believe you ever said I was guessing
2    or guesstimating, did you?
3    A. I think maybe if you read further down in
4    there that I said that that would be my best guess.
5    Q. Well --
6    A. 'Cause I would have no way of knowing that.
7    Q. You're saying now it's a guess?
8    A. Yes. It was a guess then, and it is a guess
9    today.
10   Q. Let me back up a little bit prior to the
11   accident in terms of what you all were doing earlier
12   in the evening. And let's go back to the occasion
13   for going to the Iron Hill Brewery. The occasion was
14   to have a celebration of your birthday, correct?
15   A. Yes.
16   Q. And the people that were invited were
17   Ms. Shore, correct?
18   A. Yes.
19   Q. And your brother?
20   A. Yes.
21   Q. And that your brother was living out in Reno
22   at the time?
23   A. Yes.

87

M. Kamm - Cross

1    Q. And you hadn't seen him for a while?
2    A. Yes, several years.
3    Q. Right. And so this was going to be sort of
4    a double celebration having your birthday and also
5    being reunited and seeing your brother after some
6    period of time?
7    A. Yes. It was a very happy occasion.
8    Q. And there was also another friend, whose
9    name I don't know, but who was also going to be
10   joining you at dinner, correct?
11   A. Yes. Angie Palmer.
12   Q. And had you been to the Iron Hill Brewery
13   before?
14   A. I think I had been there maybe once or twice
15   prior to that.
16   Q. Whose idea was it to go there?
17   A. It was mine.
18   Q. And this is a microbrewery, they brew the
19   beer, and so forth, there at the restaurant?
20   A. Yeah. I don't know, I've never had their
21   beer there. But it's a really good restaurant, they
22   have really good food there.
23   Q. And had you had drinks there before?

88

M. Kamm - Cross

1    A. Probably, maybe.
2    Q. On this particular occasion you got there on
3    a Saturday afternoon around five o'clock. Isn't that
4    correct?
5    A. I think it was a little later than five,
6    maybe around 5:30-ish.
7    Q. Pardon me?
8    A. Maybe around 5:30-ish. I think it was a
9    little later than 5 p.m. I don't remember
10   specifically.
11   Q. Okay. Your deposition was taken back in
12   September of last year, about nine months earlier; is
13   that correct?
14   A. Yes.
15   Q. Do you remember that?
16   A. Mm-hmm.
17   Q. Okay. Would your memory as to these events,
18   dates, times, speeds, and all of that stuff, when
19   would you say that was fresher, when your deposition
20   was taken nine months ago, or today nine months after
21   your deposition?
22   A. It was definitely fresher at the deposition.
23   But even more fresh at the scene of the accident when

89

M. Kamm - Cross

1 I spoke --

2 Q. Okay. So let me tell you what you said when
3 the question was asked when you got to the Iron Hill
4 Brewery. You didn't say 5:30 then, you said --
5 question on line 22 of page 7: And about what time
6 did you get there?
7 ANSWER: It's hard to remember, but I
8 believe we got there around five, maybe 4:30,
9 anything like that, something like that, it was early
10 in the evening.
11 Does that refresh your recollection as to
12 what you said?
13 A. Yes.
14 Q. Okay. So you get there sometime around
15 five, let's just use that as a ballpark figure, and
16 you're there with Ms. Shore. Did she come and pick
17 you up, or did you pick her up? How did you arrive
18 there?
19 A. Catherine came to my house to pick us up.
20 Q. And she drove you and your brother to the
21 Iron Hill Brewery, and you arrived roughly around
22 five o'clock?
23 A. Correct.

90

M. Kamm - Cross

1 Q. And was your plan to have drinks and dinner
2 there that night?
3 A. The plan was to celebrate my birthday and to
4 get together with friends and family and have dinner.
5 Q. And did that include drinks?
6 A. Yeah. We ordered some, a glass of wine at
7 dinner.
8 Q. Okay. My question of you is before you
9 ordered, and so forth, when you went there did you go
10 there with the intention of drinking?
11 A. Oh. No. Alcohol is not a real big part of
12 our lives. And, in fact, the whole reason why
13 Catherine was driving that night was --
14 Q. Okay. Let me read you your answer to that
15 question, that same question when you were asked that
16 last September, page 6 going into page 7:
17 QUESTION: Can you tell me how it was that
18 you all got together into the Passat and bundled down
19 to the Iron Hill Brewery?
20 ANSWER: Well, my brother hadn't seen my new
21 house that I had bought in Glenville, so he came up,
22 he drove up from my parents' house in Dover, and we
23 were hanging out at my house, and then Catherine

91

M. Kamm - Cross

1 drove over to pick us up so that we could go down to
2 Iron Hill. The whole point of it was is that
3 Catherine volunteered to drive that evening since it
4 was, me and my brother hadn't seen each other for,
5 like, several years. So I was really looking forward
6 to seeing him, and it was my birthday coming up, and
7 so she volunteered to be the designated driver
8 because my brother and I were going to have a few
9 drinks.
10 A. Okay.
11 Q. Okay. Does that refresh your recollection
12 as to whether you and your brother planned to drink
13 when you got to the Iron Hill Brewery?
14 A. Yeah.
15 Q. So you got there around five o'clock. And
16 then do you recall, did you have dinner right away,
17 or did you have drinks beforehand?
18 A. No. We were waiting for Angie Palmer to
19 show up.
20 Q. And then and your brother had drinks when
21 you got there, correct?
22 A. I remember that we got seated, and we were
23 waiting for Angie, and she was late, like she always

92

M. Kamm - Cross

1 is. And I think that we ordered a glass of wine at
2 that point.
3 Q. Okay. And as far as you can recall now, you
4 had another glass of wine at dinner, did you not?
5 A. It was probably the same glass of wine.
6 Q. Okay. What time did you have dinner, do you
7 recall?
8 A. You know, maybe an hour later.
9 Q. And after dinner, then you and Catherine
10 went upstairs and played pool. Isn't that correct?
11 A. And Angie.
12 Q. Pardon me?
13 A. And Angie, the three of us.
14 Q. And the three of you went upstairs to play
15 pool?
16 A. Yes.
17 Q. And while you were doing that, you had some
18 more drinks for a couple of hours that you spent up
19 there, correct?
20 A. Correct, yes.
21 Q. And your brother didn't accompany you up
22 there, but instead he went downstairs to try to pick
23 up chicks, as you put it?

M. Kamm - Cross

1    A. Yes. It was hilarious, I was teasing him
2    about it.
3    Q. And is there any way today that you know how
4    many drinks your brother may have had while he was
5    down at the bar trying to pick up chicks, as you put
6    it?
7    A. No, no, I have no idea.
8    Q. Okay. And would you agree that you had at
9    least three drinks that night?
10    A. Yeah.
11    Q. Now, let's go up to the, after you left the
12    Iron Hill you were again driving in the front seat of
13    the car and your brother was in the back seat; is
14    that correct?
15    A. Yes.
16    Q. And Ms. Shore was driving?
17    A. Yes.
18    Q. Okay. Have you read your brother's
19    testimony that he gave by deposition that was read to
20    the jury yesterday?
21    A. No, I have not read it.
22    Q. I will represent to you that he said that
23    prior to the accident you and Ms. Shore were engaged

M. Kamm - Cross

1    in conversation and he was leaning up from the back
2    seat, and he was also engaged, it was a three-way
3    conversation. Do you recall that?
4    A. Not specifically, no.
5    Q. You don't remember whether or not the three
6    of you were engaged in conversation prior to the --
7    A. Well, my instinct is that, sure, we were
8    talking, we were visiting, or whatever.
9    Q. Okay. But if that's what your brother said,
10    you have no reason to disagree with the fact that he
11    said you were, you and Ms. Shore were talking and he
12    was engaged in a conversation by leaning up and
13    talking with you, do you have any reason to disagree
14    with that?
15    A. I have no memory of that at all.
16    Q. Okay. I understand you also don't remember
17    which lane that Ms. Shore had turned onto on Justis
18    Street, correct?
19    A. Yeah, not specifically, no.
20    Q. And you do recall, though, that once she
21    turned onto Justis Street she was accelerating, and
22    as I believe you just testified with Mr. Ferrara she
23    was accelerating through the intersection and then

M. Kamm - Cross

1    there was a crash, correct?
2    A. Right. She was accelerating because the
3    light was green.
4    Q. I didn't ask you what color the light was,
5    I'm asking you to just verify that you've told us
6    already that she was accelerating, and then she was
7    accelerating through the intersection.
8    A. Okay.
9    Q. Now, you at some point were asked previously
10    under oath when you first saw the Young vehicle. Do
11    you remember that?
12    A. In the deposition?
13    Q. Yes.
14    A. Okay. Yes.
15    Q. Do you remember what your answer was?
16    A. In the intersection, I believe.
17    Q. You were asked the question: How long was
18    it before the impact occurred when you first saw the
19    Young vehicle? And what was your answer?
20    A. I think I said seconds.
21    Q. And more precisely you were asked how many
22    seconds, and you answered it was three seconds from
23    the time that you first saw the Young vehicle before

M. Kamm - Cross

1    the impact occurred?
2    A. Yeah.
3    Q. Would you like me to read that back to you?
4    A. Sure.
5    Q. Okay. QUESTION: When you say seconds, to
6    use that, that might mean 15 seconds, ten seconds,
7    five seconds. Your answer: Three seconds.
8        And that was on page 14, line 21 through 23.
9        Does that refresh your recollection?
10    A. Yes.
11    Q. And then you followed that up, and the next
12    question: Can you give me your best estimate? Why
13    don't you first just go ahead and tell us in your own
14    words how the collision occurred. Your answer:
15    Catherine was accelerating to go through the green
16    light.
17        Again, that's consistent with what you've
18    already told us that entering your intersection she
19    was accelerating, correct?
20    A. Yes.
21    Q. Your relationship with Ms. Shore, you had
22    been friends since, for about five years, for the
23    last five years, correct?

97

1   A.  Yes.

2   Q.  When you have drunk in the past or since, in

3  terms of your alcohol tolerance, is your perception

4  or your reaction time, or anything like that,

5  affected after you've had three drinks?

6   A.  Maybe.

7       MR. HUDSON:  I have no further questions,

8  your Honor.

9       THE COURT:  Redirect examination.

10          REDIRECT EXAMINATION

11  BY MR. FERRARA:

12   Q.  Does it affect your ability to distinguish

13  colors?

14   A.  No.

15       MR. FERRARA:  Thank you.

16          RECROSS-EXAMINATION

17  BY MR. HUDSON:

18   Q.  Does it affect your memory?

19   A.  Not in this case.

20   Q.  If you had three drinks, you -- well, I

21  guess if you didn't remember something --

22   A.  No --

23   Q.  -- you wouldn't be able to tell me, because

98

M. Kamm - Recross

1  if you didn't remember you wouldn't be able to say

2  it?

3   A.  What was the question?

4   Q.  Okay.  Has anybody ever told you that you've

5  done something that you didn't remember after you had

6  been drinking?

7   A.  No.

8   Q.  No?

9   A.  Of course not.

10       MR. HUDSON:  No further questions.

11       THE COURT:  Mr. Ferrara.

12       MR. FERRARA:  I have nothing else,

13  your Honor.

14       THE COURT:  You may step down.

15       MS. KAMM:  Thank you.

16       MR. FERRARA:  And, your Honor, as far as I'm

17  concerned, she may be excused.

18       THE COURT:  Mr. Hudson, any objection to

19  this witness being excused for the rest of the trial?

20       MR. HUDSON:  No objection.

21       THE COURT:  Members of the jury, we're going

22  to have to take our lunch recess now.  We're going to

23  come back in an hour and ten minutes, or at 1:30.  So

99

1  please take out the jury.  We'll see you at 1:30.

2       Have a good lunch.

3       (Jury leaves the courtroom at 12:22 p.m.)

4       THE COURT:  Mr. Ferrara, I don't want to

5  argue the motion now because I don't have time, but I

6  would like to hear the gist of your motion for

7  judgment as a matter of law on the damages issue.

8       MR. FERRARA:  Your Honor, they've got to

9  have medical testimony to link up causation here, and

10  they don't.  I'll hand you a case that you can take

11  with you if you'd like to look at it over the break.

12  And I'll hand Mr. Hudson a copy, as well.  It's a

13  recent, relatively recent Supreme Court opinion in

14  the case of Money vs. Mansville.  And it specifically

15  talks about if something is outside the common

16  knowledge of the jury, you got to have an expert in

17  this medical area to link it.

18       Here, they've offered nobody, they have

19  nobody to show that cause of death was caused by the

20  accident.  They have nobody to -- the typical

21  causation stuff you're used to seeing in a personal

22  injury case, some doctor comes in and says is it

23  causally related to the accident, they say yes or no,

100

1  within reasonable medical probability.  There's been

2  none of that here, there's been no medical witness to

3  testify, and I think that's a fatal defect as to

4  damages.

5       THE COURT:  I'm going to argue it again.

6  But your tentative response, Mr. Hudson, just so I

7  can be thinking about it.

8       MR. HUDSON:  Well, I will advise the Court

9  that when Mr. Ferrara last week asked me for my

10  permission or consent to do a vid -- I'm sorry -- a

11  telephone deposition of Raymond Kamm last Friday, he

12  was asking me Wednesday, I said I would agree to

13  that.  As your Honor may recall, I didn't attend the

14  motion (sic) because I was in a deposition downstate

15  on Wednesday.  I said I would agree to that if you

16  will agree to a telephone deposition of Dr. Patel,

17  who was the hospitalist who was basically in care of

18  Mr. Young at his death.  And he said I didn't need to

19  call him, that I could rely on the medical records.

20  So that's a reason that Dr. Patel was not testifying

21  by telephone deposition or otherwise.  That I was led

22  to believe that there would not be an issue in terms

23  of the cause of death or the medical records being

101

1 present. And we have, of course, introduced the
2 medical records and the medical bills, which I submit
3 are sufficient.
4         MR. FERRARA: Your Honor, he asked me if I
5 would agree to Dr. Patel's telephone deposition, I
6 said I would. He then asked me if I was going to
7 oppose the admission of the records, I said I wasn't.
8 He said, in that case, I don't need to call Patel.
9 It's a big difference between not needing Patel to
10 put in the records and to have somebody come in and
11 testify about causation and on the issue of proximate
12 cause of the injuries and the death. I certainly
13 wouldn't have -- every time we've talked I've said,
14 every time we've come up at sidebar and talked about
15 an issue I said we still have an issue of causation.
16 I've never abandoned the causation issue in this
17 case.
18         THE COURT: Hypothetically, if I were to
19 grant your motion, what's left of the case?
20         MR. FERRARA: Who ran the red light. Which
21 is really not unimportant. Because, as you know,
22 this case has a, the liability in this case has an
23 impact on the Federal Court case.

102

1         THE COURT: We'll argue it later. But
2 that's given me a better idea of what the case is
3 about. See you at 1:30.
4         (Lunch recess taken, 12:25 to 1:43 p.m.)
5         THE COURT: Counsel, I suggest we finish
6 with the testimony and then take up the various legal
7 issues that are outstanding.
8         MR. FERRARA: I just have one witness,
9 your Honor, Catherine Shore.
10         THE COURT: All right. Please bring in the
11 jury.
12         (Jury enters the courtroom at 1:41 p.m.)
13         THE COURT: Mr. Ferrara, the defense may
14 call their next witness.
15         MR. FERRARA: Thank you, your Honor.
16 I'd like to call Catherine Shore, please.
17         ... CATHERINE L. SHORE,
18 having been duly sworn according to law, was examined
19 and testified as follows...
20         DIRECT EXAMINATION
21 BY MR. FERRARA:
22     Q. Catherine, I'd like you to tell the jury a
23 little bit about yourself. First of all, how old are

103

C. Shore - Direct

1 you, and where do you work and what do you do?
2     A. I am 47 years old. I work for Cardiac
3 Diagnostics and Cardiology Consultants. I am the
4 echo technical director of seven diagnostic centers.
5     Q. And what is it that you actually do?
6     A. Cardiac sonography. And working with
7 equipment, and managing people and the labs itself.
8     Q. Are you a local person? I know you lived in
9 Missouri for a little while, but what's your
10 residential background?
11     A. Yes. I've lived here most of my life.
12 I lived in Missouri for about five years, but my
13 family is here.
14     Q. Did you go to school here?
15     A. Yes, I did.
16     Q. Where did you go to school?
17     A. I graduated from Archmere Academy, and had
18 three years of additional training and became a
19 registered diagnostic cardiac sonographer.
20     Q. All right. You mentioned that you are a
21 cardiac stenographer for seven --
22     A. Sonographer.
23     Q. Say it again.

104

C. Shore - Direct

1     A. Sonographer.
2     Q. Sonographer, right.
3         -- for seven facilities. Is one of them a
4 facility that takes you through Newport?
5     A. Yes.
6     Q. How familiar before December the 13th of
7 2003 were you with the intersections of James and
8 Justis Street?
9     A. Familiar with it. I frequent that
10 intersection several times a month.
11     Q. Is that on the way from one location, job
12 location to another?
13     A. Exactly, yes.
14     Q. All right. Tell us how it is that you
15 happened to get together with, with your friend
16 Mariann Kamm and her brother that night. And before
17 you tell me that in detail, had you ever met Raymond
18 Kamm before?
19     A. No. I've never met Raymond.
20     Q. Did you ever talk to him since?
21     A. No. I've never spoken to him since. I've
22 not seen him, nothing.
23     Q. So the only time you ever had any