**EXHIBIT G**

C. Shore - Direct

1 interaction with him was this night?

2   A. Yes.

3   Q. Tell the jury what your relationship was

4 with Mariann Kamm prior to that night.

5   A. Mariann, we have a nice relationship, it's

6 very casual, we speak to each other I would say once

7 or twice a month. Weeks could go by without

8 speaking. When our lives were able we were able to

9 get together, we would meet for dinner, possibly a

10 movie. She has a young child. She's busy, I'm busy.

11 That type of thing, so.

12   Q. How did you two meet in the first place?

13   A. Actually, we lived in the same complex at

14 the Paladan Club in North Wilmington.

15   Q. That was then?

16   A. Yes.

17   Q. Okay. Now, by the time this accident occurs

18 she's living in a place called Glenville?

19   A. Yes.

20   Q. Is that in the area of Newport?

21   A. Yes.

22   Q. How did it happen that you were getting

23 together that night?

C. Shore - Direct

1   A. She had called me, told me that she was

2 having a birthday party, and she invited me to come.

3 Her brother was going to be there and another friend.

4 And so I said that would be great, I'll go, I'll

5 drive.

6   Q. So you volunteered to be the driver?

7   A. Yes, I did.

8   Q. Okay. You mentioned the other friend, and

9 she said her name earlier, Angie somebody?

10   A. Somebody, yes.

11   Q. Is that somebody you met before?

12   A. Once or twice before, yeah.

13   Q. All right. So what was the -- -tell us,

14 rather than what was the plan, tell us what you did.

15   A. From what point?

16   Q. From the time that you go pick her up.

17   A. I go pick her up, it was still daylight, so

18 I'm estimating it was about four o'clock in the

19 afternoon, because we wanted to have an early dinner.

20 We drove to the Iron Hill Brewery. We sat, we had to

21 wait for another friend, and so it was just -- I

22 don't know how late she was. I ordered a glass of

23 wine with dinner. We sat, we chatted, it was very

C. Shore - Direct

1 relaxed. I believe we had hors d'oeuvres, or

2 something. After dinner we thought, well, why don't

3 we go upstairs and play some pool. And we played

4 some pool and then decided it was time to go home.

5 Got into the car, drove 95 to 141 --

6   Q. Let me stop you here. I don't need to have

7 you take me through the whole route. But other than

8 the glass of wine with dinner, did you consume any

9 other alcoholic beverages?

10   A. I did not.

11   Q. When did you consume the drink, that

12 approximately, in relation to the time that you had

13 actually got in the car and started to drive?

14   A. I'm going to estimate 5:30 or six, I would

15 say.

16   Q. Was which, was the drink?

17   A. Yes.

18   Q. And what time did you leave?

19   A. 8:30.

20   Q. So three to -- two and a half to three hours

21 later?

22   A. Yes.

23   Q. By the time you were driving your car, you

C. Shore - Direct

1 were taking Mariann and Raymond home?

2   A. Right.

3   Q. At the time you were driving your car, were

4 you feeling any effects at all of the alcohol that

5 you had had earlier?

6   A. Not at all, not at all. I had a soda, I had

7 water, I was feeling fine.

8   Q. Okay. Now, what I'd like you to do now is

9 tell us the route you took, and I want you to walk us

10 right through after the impact, tell us everything

11 that happened, including the impact, up until the car

12 came to a stop after the impact.

13   A. Okay. I proceeded 95 southbound, got off at

14 141, came down the ramp. There was a light there,

15 and I do not recall whether I stopped at that light

16 or not. I proceeded on to the next light, stopped,

17 and then turned left onto Justis Street going

18 westbound. Looked up, the light was green. I kept

19 looking at the light, it was still green, I was

20 accelerating to go through the light because

21 obviously it was staying green. To my right I saw a

22 flash, Mariann started screaming, and the impact was

23 tremendous and quick. But it happened in an instant.

109

## C. Shore - Direct

1  But I saw, from my side I saw it, and the light was
2  constantly green, there was no doubt about it.
3     Q.  The light at this intersection is probably
4  pretty obvious, we've got some pictures, and it's not
5  an unfamiliar intersection.  Is it an overhanging
6  light as opposed to a light on the corners?
7     A.  It's an overhanging right in my view.
8     Q.  Okay.  Once you turned onto Justis Street
9  and saw the light for the first time, was it green
10 then?
11    A.  Yes.
12    Q.  Was it ever red?
13    A.  Never.
14    Q.  All right.  Now, when you saw this flash
15 from your right, you said you were proceeding through
16 the intersection?
17    A.  Yes.
18    Q.  What did you do?
19    A.  I looked to see, Mariann started screaming,
20 and I slammed on my brakes.
21    Q.  Did you hit 'em hard?
22    A.  I hit 'em hard.
23    Q.  What happens next?

110

## C. Shore - Direct

1     A.  Impacted her -- I actually remember seeing
2  the woman, she was looking straight ahead, and I hit
3  her right where she sat, pushed her out, and I
4  remember the car had a counterclock spin.
5     Q.  Your car or her car?
6     A.  My car.  I don't know what happened to her
7  car.  I know she went this way, but I had hit her,
8  almost teed her right where she sat.  And the car
9  spun, and that's that.
10    Q.  What's the next thing that happened?
11    A.  The next thing that happened, the next thing
12 I realized Mariann screaming, "Get out of the car,
13 get out of the car, the car's on fire."  I was
14 surprised Mariann and Ray were already out of the
15 car.
16       I remember a police officer stuck his head
17 out into the car and said, "Are you okay?"  I said,
18 "Yes, I'm okay" -- not knowing really that I was,
19 what I was.
20       And so then I did get out of the car.  A
21 police officer approached me, started talking to me,
22 and he says, "Are you sure you're okay?"  And I said,
23 "No, I just, something's wrong."

111

## C. Shore - Direct

1       So they put me back, immediately back into
2  the Passat in the back seat of the car, put a neck
3  brace on, put me on a backboard and took me away.
4     Q.  Before you left the scene, did you speak
5  to Officer Brown -- maybe you didn't know his name
6  at the time, you just saw his video yesterday --
7  and give him a statement with regard to what
8  occurred?
9     A.  I believe I did.
10    Q.  Do you have a specific recollection of that?
11    A.  Vaguely, yes.  But, you know, I don't have a
12 lot of detail to it.  Everything was so very
13 traumatic, there was a lot of activity.  I think I
14 was literally, I was shocked by it, absolutely.
15    Q.  Okay.  Did that end your involvement with
16 the scene of the accident that day?
17    A.  Yes.
18    Q.  Once you left in the ambulance?
19    A.  Yes.
20    Q.  Okay.  Let me fast-forward you now to
21 September 14th, 2006.  By now you were involved in a
22 lawsuit?
23    A.  Right.

112

## C. Shore - Direct

1     Q.  And you gave your deposition testimony?
2     A.  Yes.
3     Q.  Is that, as far as you know, the first time
4  anybody asked you how fast you were going and what
5  lane you were in?
6     A.  Absolutely.
7     Q.  Are you sure how fast you were going, and
8  are you sure what lane you were in?
9     A.  No.  There was no way, you cannot recall,
10 from that time ago your memory -- I had no idea what
11 -- I have never had a deposition before, I was trying
12 to give my best estimate of an answer.  But there's
13 nobody that really knows.  But what I know is that
14 light was green, I know the light was green.
15    Q.  My next question was going to be do you have
16 any doubt in your mind, but it doesn't sound like you
17 do.
18    A.  No, I have no doubt.
19       MR. FERRARA:  Thank you.  I don't have any
20 other questions.
21       THE COURT:  Mr. Hudson, you may
22 cross-examine.
23

113

115

C. Shore - Cross

CROSS-EXAMINATION

1   CROSS-EXAMINATION
2   BY MR. HUDSON:
3       Q.   Ms. Shore, you heard Mariann Kamm testify
4   earlier today that you had been friends for the last
5   five years?
6       A.   Right.
7       Q.   Does that sound about right?
8       A.   Mm-hmm.
9       Q.   And you sort of maintained this friendship
10  throughout that time.  I mean, it's not an on-again,
11  off-again, you've been in contact on a constant
12  basis, essentially, correct?
13      A.   Yeah, yes.
14      Q.   And you said that you had arrived at the
15  Iron Hill Brewery after picking them up, and that
16  was, you knew in advance that was for the purpose of
17  celebrating Mariann's birthday and also a reunion
18  sort of with her brother, you knew that in advance?
19      A.   Yes.
20      Q.   And did you know in advance that there were
21  plans to consume alcohol?
22      A.   I don't think -- yes, yes.
23      Q.   And is that why you volunteered to be the

C. Shore - Cross

1       A.   I can't say for sure.
2       Q.   So as you're testifying today, you recall at
3   the accident scene when you talked to the officer
4   that he didn't ask you if you had been drinking, you
5   volunteered, sir, I've been drinking?
6       A.   Well, maybe I'm not so sure of that.  What I
7   was remembering is the statement that I had read that
8   I had stated that I had one glass of wine, so I
9   assumed that I told him.
10      Q.   Now, let me ask the question again, then.
11  Since this accident occurred, when was the first time
12  you were ever asked how much you had been drinking
13  that night before the accident?
14      A.   I do not recall.
15      Q.   You do recall being asked that question last
16  September at your deposition?
17      A.   Right.
18      Q.   Is that correct?
19      A.   Right.
20      Q.   And you've told us earlier that because of
21  the length of time that lapsed, the fact that it was
22  a foreign procedure, a deposition you had never been
23  involved in, it's hard to remember things, right?

114

116

C. Shore - Cross

1   designated driver in advance?
2       A.   Yes.
3       Q.   That decision was made in advance rather
4   than while you all were drinking?
5       A.   Right.
6       Q.   And Mariann and her brother did consume
7   alcohol, correct?
8       A.   Yes.
9       Q.   And you saw them drinking?
10      A.   Yes.
11      Q.   Okay.  And you said you drank one glass of
12  wine?
13      A.   Right.
14      Q.   When was the first time you were asked that?
15      A.   The scene of the accident.
16      Q.   Did one of the officers ask you if you had
17  been drinking?
18      A.   Yes.
19      Q.   Did he tell you why he thought you may have
20  been drinking?
21      A.   No.  I volunteered it.
22      Q.   My question was, when was the first time you
23  were asked how much you had had to drink?

C. Shore - Cross

1       A.   Yes.
2       Q.   Okay.  Is there a reason why the precise
3   number of drinks you had had would have been fresh in
4   your mind last December -- or I'm sorry -- last
5   September when you were asked that question for the
6   first time?
7       A.   It's very fresh, because I was the
8   designated driver and I was going to protect
9   everyone, and that's what I decided.
10      Q.   And you, I think, testified earlier today
11  that you had that one glass of wine during dinner?
12      A.   Yes.
13      Q.   You didn't drink anything during the
14  cocktail hour before everybody had dinner?
15      A.   No.
16      Q.   And you went upstairs and played pool for a
17  couple of hours after dinner?
18      A.   I watched my girlfriends play pool.  I don't
19  play, so I just watched them.
20      Q.   And you sat there for two hours and didn't
21  have anything to drink?
22      A.   Right, exactly.
23      Q.   And I believe you've testified that you

117

## C. Shore - Cross

1 actually got to the Iron Hill Brewery even earlier
2 than five o'clock. Do you remember saying that when
3 you were asked?
4    A. Yeah. Sometime around, it was, I picked up
5 Mariann, it was about four o'clock, and we drove to
6 the Iron Hill Brewery.
7    Q. So whatever time it takes from Newport to
8 the Iron Hill Brewery was about a half an hour?
9    A. Good guess.
10    Q. So that you would have gotten there about
11 4:30, or so. If you had gotten there at 4:30, you
12 would have spent four hours, and maybe a little bit
13 longer, before you left the Iron Hill Brewery.
14    A. Okay.
15    Q. Prior to the impact, you said, I think, when
16 Mr. Ferrara was asking you questions, that when you
17 made the left-hand turn onto Justis Street you saw
18 the green light then?
19    A. When I made the turn and I was facing the
20 light I saw it was green.
21    Q. Had you been sitting at a red light before
22 you made that turn onto Justis Street?
23    A. The light was red.

118

## C. Shore - Cross

1    Q. Okay. Could you see the light from your
2 parked position while you were waiting for your red
3 light to change?
4    A. Ask me again, what?
5    Q. You were at an intersection red light?
6    A. Yes.
7    Q. On, I think it's Marshall Street?
8    A. Yes.
9    Q. The street that you were turning off or to
10 turn onto?
11    A. Right.
12    Q. And you were sitting at a red light?
13    A. Right.
14    Q. Could you see the green light at the
15 intersection where the accident occurred while you
16 were sitting there at that red light?
17    A. I did not look, no, I was not.
18    Q. So the first time you saw it, then, was when
19 you turned through that intersection red light onto
20 Justis Street and you're looking up the street and
21 you see a green light?
22    A. Right.
23    Q. And from that point you started

119

## C. Shore - Cross

1 accelerating?
2    A. Yes.
3    Q. You were sitting at a standstill?
4    A. Sitting at a standstill starting to
5 accelerate.
6    Q. And whether you recall or not, would it be
7 logical to conclude that you were accelerating hoping
8 to catch that green light before it turned red?
9    A. I was clear to go. I was accelerating
10 because I was clear to go.
11    Q. Right. You were clear to go when you first
12 looked up the hill or down the street. And I'm
13 asking you was it logical to conclude that you were
14 hoping that that light wouldn't change before you got
15 there?
16    A. There was no hoping, it's just a fact
17 I had the green light. I wasn't, there's not an
18 anticipation, no.
19    Q. You had the green light a block away, and
20 then you were accelerating?
21    A. I, when I turned on that street and I was
22 looking straight ahead it was green.
23    Q. Okay. And you were accelerating?

120

## C. Shore - Cross

1    A. And I accelerated from a stop to the
2 intersection.
3    Q. Okay. You were also chatting with Mariann
4 and Raymond at that time, correct?
5    A. I'm sure there was a conversation in the
6 car, I do not recall what the conversation was.
7    Q. Okay. But you do recall talking to them at
8 that point?
9    A. Sure.
10    Q. And Raymond says that he was leaning up from
11 the back seat engaged in a three-way conversation.
12      Do you recall that?
13    A. I heard his deposition, yes.
14    Q. Well, you heard it. Do you disagree with
15 his statement?
16    A. No, I don't believe, I can't either agree or
17 disagree, whether he was leaning forward or not, I do
18 not know.
19    Q. Okay. Do you recall what you were talking
20 about?
21    A. No.
22    Q. Do you recall how long you had been engaged
23 in that particular conversation as of the time that

121

C. Shore - Cross

1 you turned onto Justis Street?

2   A. No.

3   Q. You, as I understand it from your testimony

4 thus far, you continued accelerating up to the

5 intersection where the impact occurred, correct,

6 until you hit your brakes?

7   A. Yes.

8   Q. Okay. And when you first saw the Young

9 vehicle, isn't it correct that you've testified that

10 the Young vehicle was only 8 feet away from where the

11 impact occurred?

12   A. That was in the deposition. And in my

13 deposition I said many, many times that I am not good

14 at distance, measuring distance so many times.

15   Q. Okay.

16   A. So, yeah, I said that.

17   Q. Okay. And you were asked that question a

18 number of times by, I think it was Mr. Erhart and

19 also by Mr. Ferrara?

20   A. Right.

21   Q. And your statement was, after being asked a

22 number of times, that when you first saw the Young

23 vehicle she was 8 feet away from the point of vehicle

122

C. Shore - Cross

1 -- from the point of impact, correct?

2   A. Yes.

3   Q. Okay. And you also testified when

4 Mr. Ferrara was asking you and Mr. Erhart was asking

5 you questions at your deposition that at that point

6 in time you were from three to five car lengths away.

7 Would you agree with that, did you say that?

8   A. That's what I said.

9   Q. And you understood, even though that was the

10 first time you had ever had your deposition taken,

11 that you were testifying under oath?

12   A. Absolutely.

13   Q. And that you swore to tell the truth, the

14 whole truth, correct?

15   A. Yes. But many times did I say I cannot

16 measure distance. And what I was trying to do was

17 help. And --

18   Q. Okay. Let's stop, then, if you're

19 questioning whether you said it or not, let's visit

20 what you did say on that issue.

21     Mr. Ferrara asked you: How far away -- this

22 is on page 29 -- How far away do you think you were?

23 And you answered: I would say probably -- how far

123

C. Shore - Cross

1 her car was? I'm sorry.

2     And he said, You told us that already. I

3 thought you were pretty committed to 8 feet for her.

4 If you're not, you got to tell us.

5     Yeah, 8 feet.

6     And then he said: What's going to happen

7 when we're all done is she's going to have this

8 written down for all time, so if 8 feet is your

9 answer, that's fine, we just need to know your answer

10 8 feet.

11     Does that refresh your recollection as to

12 what your testimony was last September as to how far

13 away the Young vehicle was from the point of impact

14 when you first saw it?

15   A. Right.

16   Q. Okay. And on page 17 of your deposition

17 Mr. Erhart asked you on line 20: Okay. Can you

18 estimate how far away in terms of car lengths your

19 Passat was from the point of impact when you first

20 saw the car, Young car? And your answer: Five.

21     Do you remember saying that?

22   A. If that's in my deposition.

23   Q. And you've reviewed your deposition, is that

124

C. Shore - Cross

1 correct, a number of times?

2   Q. And then at page 32, again you were asked

3 how far away you were, your car was from the point of

4 impact when you first saw it. And the question was:

5 Are you not comfortable with three or five car

6 lengths? And your answer: I am comfortable with a

7 car length, I will say three car lengths as an

8 estimate.

9     And you remember saying that?

10   A. Yes.

11   Q. So at your deposition, now, you have

12 estimated you were from three to five car lengths

13 away from the point of impact when you first saw the

14 Young vehicle, correct?

15   A. That's what the deposition says.

16   Q. That's what the deposition says. And that's

17 what you said in your deposition?

18   A. Right.

19   Q. And isn't it correct that you also testified

20 that besides what you've said today that you were

21 accelerating once you saw the green light, that you

22 were doing 30 miles an hour when you first saw the

125

C. Shore - Cross

1 Young vehicle?

2    A. Yep. And that's an estimate.

3    Q. Pardon me?

4    A. That's an estimate.

5    Q. I understand that you weren't clocking

6 yourself.

7    A. I have no idea.

8    Q. Well, if you had no idea, would you have

9 sworn under oath that you were doing 30 miles an

10 hour?

11    A. I was -- it was my first deposition, I don't

12 think anybody would accurately after all these years

13 be able to say exactly their speed.

14    Q. Okay. Well, again, this is your testimony,

15 the question and answer --

16    A. And I am agreeing.

17    Q. You are agreeing that you --

18    A. This is my testimony at my deposition.

19    Q. And that you said you were going 30 miles an

20 hour?

21    A. Mm-hmm.

22    Q. Do you recall also saying that you don't

23 recall whether or not the Young vehicle's headlights

126

C. Shore - Cross/Redirect

1 were on or off?

2    A. Right.

3    Q. And did you take evasive action other than

4 hitting your brakes?

5    A. No, there was no time.

6    Q. There was no time other than --

7    A. Just hit the brakes, she was right in front

8 of me.

9    Q. And you were three to five car lengths back

10 when you first saw the car, the Young car?

11    A. (No response.)

12    Q. Is that correct?

13    A. (No response.)

14    (Court reporter indicates no response.)

15    A. If that's what my deposition says.

16    MR. HUDSON: Thank you. I have no further

17 questions.

18    THE COURT: Mr. Ferrara.

19    MR. FERRARA: I just have a couple.

20    REDIRECT EXAMINATION

21 BY MR. FERRARA:

22    Q. You were actually deposed two times, were

23 you not?

127

C. Shore - Redirect

1    A. Yes, I was.

2    Q. And in the deposition that we were just

3 talking about, September the 14th, 2006 deposition,

4 you were asked a series of questions about time and

5 distance, weren't you?

6    A. Yes, I was.

7    Q. Did you tell the inquirer, who is

8 plaintiff's counsel, that you were not good at

9 estimating speed and distance and time?

10    A. Absolutely.

11    Q. Did you tell him that more than once?

12    A. Many, many, many times.

13    Q. Did he tell you to do the best you could

14 with an answer?

15    A. Yes.

16    Q. Is that what you did?

17    A. Exactly.

18    MR. FERRARA: Thank you. I don't have

19 anything else.

20    THE COURT: Mr. Hudson, anything further?

21    MR. HUDSON: I have nothing further.

22    THE COURT: You may step down.

23    MS. SHORE: Thank you.

128

1    MR. FERRARA: Your Honor, that concludes the

2 defense case.

3    THE COURT: The defense rests. Will there

4 be any rebuttal evidence from the plaintiff,

5 Mr. Hudson?

6    MR. HUDSON: No rebuttal evidence, no.

7    THE COURT: Members of the jury, the

8 evidence is now closed in the case. I have to confer

9 with the lawyers for a little while on some legal

10 matters, so we'll take a recess hopefully of not too

11 long a duration. Please take out the jury.

12    (Jury leaves the courtroom at 2:11 p.m.)

13    THE COURT: Counsel, there are some legal

14 issues that are still outstanding and, assuming

15 they're not resolved by the parties, we need to take

16 them one by one.

17    First, plaintiffs advised yesterday that

18 they might be seeking to amend the complaint to

19 conform to the evidence with respect to speeding.

20 I saw that a speeding charge was, in fact, included

21 in the jury instructions with which defendant said he

22 was in agreement. So do I understand, Mr. Ferrara,

23 it's --

**129**

1    MR. FERRARA: I have no objection.

2    THE COURT: So that issue is resolved.

3    With respect to the Medicare payments, let

4    me hear argument again on that, please. I guess, I

5    think procedurally this is way it is now, the

6    plaintiff identified in the pretrial stipulation that

7    he would be introducing medical records. And that

8    was done.

9    MR. FERRARA: Records or bills now,

10    your Honor? I'm sorry.

11    THE COURT: I guess, the two volumes.

12    MR. FERRARA: Oh, the records, I don't have

13    any problems with the records.

14    THE COURT: And the bills, is that the

15    issue?

16    MR. FERRARA: The bills are the issue. The

17    records are not.

18    THE COURT: Let me -- maybe I better have

19    the counsel, I guess it's your request, Mr. Ferrara,

20    to have into evidence or before the jury in some way

21    the amount paid to Medicare?

22    MR. FERRARA: Your Honor, let me address

23    first the records, because you mentioned that. I

**130**

1    have always taken the position that I objected to

2    reports and not records. And, in fact, when the

3    records came in yesterday I said that, and you said

4    fine, and that's how I think they're in. I think the

5    records are in those two volumes, and I have no

6    objection to them.

7    I asked yesterday when Mr. Hudson wanted to

8    put in the $471,000, my initial reaction was to

9    object to it until we got the Medicare part of that

10    straightened out. He told me, I thought, that he

11    would do that and then we would find out what the

12    number was. I thought his representation earlier

13    today was that only $12,000 of it was, had to be paid

14    back, and that was paid back. So we're not talking

15    about very much money. I mean, if that's the case,

16    we're still talking $405,000. And accepting his

17    representation --

18    THE COURT: Well, no, they're more than

19    that, if they're 400 --

20    MR. FERRARA: It was 471, right. So we're

21    talking about four fifty-eight or nine. And so it's

22    such a diminimous amount that I really don't have a

23    position about it anymore. I thought we were going

**131**

1    to be talking about a pretty substantial number, and

2    apparently we're not. So I'm okay to let that stay

3    the way it is.

4    THE COURT: I understand you, then, to

5    withdraw any request about Medicare payments coming

6    in, so that will not be mentioned to the jury --

7    MR. FERRARA: Again, your Honor, with the

8    understanding that, as I understand Mr. Hudson to say

9    it was only 12,000, and I thought that's what he

10    said.

11    THE COURT: Is that correct, Mr. Hudson?

12    MR. HUDSON: Well, yeah. Actually, my

13    client is here, he's the administrator of the Estate,

14    and he's the best person to ask --

15    THE COURT: But I could just ask you as an

16    officer of the Court, if you've conferred with your

17    client and that's what he tells you, I'm sure

18    Mr. Ferrara would be satisfied with that.

19    MR. HUDSON: That's correct.

20    THE COURT: That takes us to the issue of

21    defendant's pending motion for judgment as a matter

22    of law on the damages issue. Let me hear further

23    argument on that, especially since you heard

**132**

1    Mr. Hudson's response.

2    MR. FERRARA: Your Honor, we had no such

3    agreement. Let me ask you a question, if I may. Was

4    the pretrial conference, did it have a reporter?

5    THE COURT: I don't think so. Because I

6    didn't rule on the motion in limine at that time, I

7    ruled on it separately.

8    MR. FERRARA: Well, I hadn't filed it yet,

9    your Honor, so you wouldn't have ruled on it.

10    THE COURT: I don't recall. But I don't

11    think so. I ordinarily don't report pretrial

12    conferences if I don't make any rulings.

13    MR. FERRARA: Well, I don't know if you made

14    notes. But here's, this is my memory of what

15    happened: Some point back in time I asked for the

16    death certificate. I got the death certificate, it

17    said cause of death was natural causes. We talked

18    about that at the pretrial. And if you look at the

19    pretrial statement, plaintiffs never identified a

20    doctor at anytime in the pretrial statement.

21    THE COURT: I have noticed that, in

22    particular, Dr. Patel, perhaps.

23    MR. FERRARA: Was identified --

133

THE COURT: He was not identified --

MR. FERRARA: No, nobody was. No, there was no doctor identified.

THE COURT: And I also note that you said that causation was at issue in the pretrial stipulation.

MR. FERRARA: My memory of what happened at the pretrial, and I'm hoping that your notes are going to reflect this, is that I said to you, obviously with Mr. Hudson present, that I had this certificate that showed the death was natural causes. I then, we then talked about the introduction of medical records. He said at the pretrial -- that's why I'm hoping it may turn out to be recorded -- he said at the pretrial --

THE COURT: Excuse me, if I may interrupt. Mary Pat, are you able to go into the docket or otherwise determine if it was reported?

THE CLERK: Your Honor, I wouldn't be able to tell from the docket if it was reported, unless the transcript was --

THE COURT: You need to call the court reporters' office.

134

THE CLERK: Yes, I could.

THE COURT: If you wouldn't mind doing that while we're having this conversation.

MR. HUDSON: Your Honor, so far there's nothing in dispute in terms of what was happening at the pretrial.

THE COURT: Well, all right, then, hold off, Mary Pat.

MR. FERRARA: Well, the next thing that happened is he asked if he would need to have a doctor to introduce the records, and I said "no." I interpreted that question, I think fairly, as do I need to bring in the records custodian to put in the records, and I said "no." And then I turned to him and said, Do I need to bring in somebody to verify this death certificate, and he said "no." So I thought that we had accommodated one another by saying that records would come in without the necessity of bringing in a witness. I never agreed that I was stipulating to causation, that's been a big part of my case from day one, because I knew that the jury shouldn't be left to speculate.

Now, did I have some question in my mind why

135

he wasn't calling a doctor? I did. But I didn't feel it was my job to suggest that he do that in defending my client.

THE COURT: Could you have filed a motion for partial summary judgment on the causation issue prior to trial?

MR. FERRARA: Your Honor, the problem with that is I don't know what you would have done with it, and I couldn't really do it till I knew he rested without a doctor. And my problem with that always is that -- well, while this may be news to you, and it's certainly not news to Mr. Hudson and I -- different judges in this court handle allowing late identified witnesses differently. And many judges will allow a witness to come in and testify if he's not on the pretrial if there's some reason that the plaintiff or the defense gives for that witness. And so the only time I was comfortable that I could actually file the motion was when he rested without calling such a doctor --

THE COURT: And you have that right. You have the complete right to make an appropriate motion at the end of the plaintiff's case.

136

MR. FERRARA: And so that's what I did. But I think, as you correctly point out -- and I didn't go back to my office, but I phoned my office during our luncheon break and confirmed that the conversation that I thought we had, because I made a note of it on my copy of the pretrial, and also the fact that I had alerted the Court that causation was a problem.

So causation has always -- in fact, you may recall, if you were listening to the openings, when Mr. Hudson said we're going to show that he died from the, the cause of death was related to the accident, I said no, he's not going to be able to show that, I've got a death certificate that shows he died of natural causes. That's always been a point of contention in the case.

So, to bring us up to Friday, we had the conference with you at the call when you ruled on the motion in limine. And that would have been Wednesday. And I don't remember exactly what day that is, I guess it was the 13th. And Mr. Hudson wasn't there, but he was represented. And at that time I mentioned to you for the first time that

137

1  Raymond Kamm was suddenly, although he had
2  represented that he was going to come, was now
3  backtracking on that, and I may need to do a
4  telephone deposition.
5          So I thought I was going to be -- and you
6  may remember this -- I thought I was going to be
7  alert in addressing Mr. Hudson directly, but he had
8  to be in Georgetown, so I didn't have a chance to
9  give him a heads-up, I thought I would tell him when
10 I saw him at the conference. So we said we would get
11 back to you and let you know what we decided. I had
12 other things to do, I'm sure he had other things to
13 do.
14         And I had my secretary call, I got a phone
15 call back from his office that said I'll let you do a
16 telephone deposition of Kamm if you let me do a
17 telephone deposition of Patel. And I didn't have a
18 problem with that. Finally he and I spoke. He said,
19 I'm okay, are you okay? And I said, Yeah, I'm fine.
20 And my memory is he said I need Patel to get in the
21 records. I said I'm not objecting to the records.
22 He said, Then I'm not going to call Patel. He never
23 said I need Patel for causation, because I wouldn't

139

1  quick of his nail he said "ouch," or mouthed an
2  "ouch." I didn't bother to ask her how she was able
3  to cut his nail and see his mouth at the same time,
4  but that's a factual argument rather than did it
5  happen.
6          THE COURT: What about subcategory (2),
7  compensation for permanent impairment, same argument
8  you make?
9          MR. FERRARA: Well, I don't know how they
10 can prove permanent impairment. The problem is that,
11 I think the one thing, in fairness to Mr. Hudson, I
12 think the one thing -- I'm going to use an example
13 here -- I think that if as a result of the accident,
14 an accident a person lost a limb, you probably don't
15 need a doctor to come in and say, you know, he had a
16 limb and now he doesn't have a limb and it got torn
17 off in a car accident.
18         The one thing that they both testified to,
19 both of the Young ladies testified to was that he had
20 lacerated his tongue. And they were, that's
21 something that they both said they observed. They
22 didn't say a doctor told them. They both said they
23 were told he had a head injury. And I think they

138

1  have stipulated to Patel for causation. I don't even
2  know what Patel did.
3          Of course, at that point it would have been
4  a little bit of a different situation because Patel
5  hadn't been identified anywhere. But for purposes of
6  avoiding a records custodian, I was on-board. But I
7  never agreed to waive my argument about causation,
8  and from a practical point of view why would I? So
9  that's kind of where we are.
10         THE COURT: If I -- I started to ask this
11 question -- if I were to grant your motion, what's
12 left, if anything, from the three listed categories
13 of damages that are on the damages personal injury
14 instruction? We have, one category is compensation
15 for pain and suffering that Mr. Young had suffered.
16         Now, we had some testimony from family
17 members about his stay in the hospital.
18         MR. FERRARA: Well, the problem is that -- I
19 mean, I guess you had some testimony about it. I
20 guess the facts could be that they could say, well,
21 on those days that I thought maybe he was reacting.
22 But really what you heard was when the pillows got
23 shifted, he appeared to wince, and when Mrs. cut the

140

1  might have even said a closed head -- I may be saying
2  that wrong -- but they both indicated he had some
3  kind of a closed head injury, or some kind of a brain
4  injury, or some kind of a head injury, or something
5  like that.
6          I didn't jump up quick enough to object to
7  that as hearsay, by the time they already said it, it
8  was a little late to come running up when I knew that
9  was the only thing they were going to say about it.
10 But I think they can clearly be compensated if they
11 find negligence on Catherine Shore for the tongue
12 injury, because the tongue injury, they don't, you
13 don't need medical people.
14         I don't know that they can talk about it any
15 more than to say he had a lacerated tongue, but
16 that's one thing that they said they saw. And I
17 think that Mrs. Young can say he didn't have it
18 before the accident and he had it after the accident,
19 you know, maybe that links up. But I'm not even sure
20 about that. I mean, I'm trying to be --
21         THE COURT: If I were to grant your motion,
22 would the damages instruction have to be revised to
23 strike out those three subcategories and, in effect,

141

1  say that you find to exist by a preponderance of the
2  evidence, colon, injuries to Mr. Young's tongue, I
3  mean, is that what they would need to be instructed?
4  I understand the consequences of my granting your
5  motion --
6          MR. FERRARA: I understand, your Honor. I
7  mean, I just think that Money case is, I'm not
8  wanting to sound too Albert Stiftle-ish, right on the
9  money here in that it's pretty on point. I mean,
10  you've got to, you've got to, you got to have a
11  doctor to link up your proximate cause causation
12  problem.
13          I mean, the Court has ruled many times that
14  the jury can't look at the records and speculate,
15  speculate's a problem in this case. And without some
16  medical person, you've got 12 lay people speculating
17  as to what all those records mean. And this Court
18  has frequently ruled that the records can come in.
19  But, you know, your job is not to be interpreting
20  them, your job is to, you know, they're really, I
21  think, more come in to say, yeah, this guy had a lot
22  of treatment, but what does it all mean.
23          THE COURT: Is it fair for me to assume that

142

1  when you saw the pretrial stipulation, saw that
2  defendant had no -- excuse me -- the plaintiff had no
3  causation expert listed, one might not testify, then,
4  which would put you in the position where you are now
5  of saying causation hasn't been established prima
6  facie? That's the phrase out of the Money case.
7          MR. FERRARA: I have to look.
8          THE COURT: Mr. Hudson.
9          MR. FERRARA: If I may say one more thing?
10          THE COURT: Yes. I'll let you finish.
11          MR. FERRARA: But, your Honor, I've also --
12  I mean, I think I did as much I could without saying
13  where's your doctor. I said at the pretrial
14  causation was a problem, I've said it every time
15  we've talked about this case causation's a problem.
16  I don't think the plaintiff can say, gee, you never
17  told me you were thinking about that.
18          And so, you know, when we ended up yesterday
19  with the idea that Sherkey was the last witness, I
20  ran back and checked and pulled out Money, and here
21  we are. Thank you, your Honor.
22          THE COURT: Mr. Hudson, in response.
23          MR. HUDSON: Your Honor, the history of

143

1  the pretrial and conversations since then about
2  Dr. Patel, who was the hospitalist who was taking
3  care of Mr. Young in the last days of his life, this
4  is really a red herring. This is not a wrongful
5  death case. And, you know, as I think through this,
6  and I perhaps should have told Mr. Ferrara then, the
7  death certificate is really meaningless. Number one,
8  it's hearsay in terms of cause of death, but it
9  doesn't matter what's written on there, he was making
10  an issue that it says "natural causes."
11          If Mr. Young had recovered fully, this
12  action would still have been a viable action as a
13  survival action for the pain and suffering and
14  medical bills that he incurred up until whatever
15  point he either died or recovered. So the Dr. Patel
16  requirement to prove or disprove the cause of death
17  is really immaterial, it's not a part of this case
18  and who said what in terms of whether or not she was
19  going to be called, or had to be called, I suggest to
20  the Court it's not even something that needs to be
21  considered.
22          THE COURT: But I think that Mr. Ferrara is
23  also arguing -- he'll correct me if I'm wrong -- that

144

1  Dr. Patel's testimony is not needed necessarily just
2  solely for the cause of death but for the cause of
3  the injuries.
4          MR. HUDSON: Well, Dr. Patel, of course, was
5  only involved -- I mean, excuse me -- or as an
6  example, in the later months or weeks of his death.
7  What we do have in evidence besides the testimony of
8  both the wife and the daughter who saw him every day
9  from the time that Mrs. Young was able to see him,
10  and the daughter saw him within days for every day,
11  was the testimony in terms of his prior health before
12  the accident immediately and his condition subsequent
13  to that, besides a split tongue.
14          This man -- and I have advised your clerk
15  that the records, the medical records that are in
16  evidence, and there's two very large notebooks, but
17  the first one is for Christiana Care and then the
18  step-down unit. The very first page in there -- and
19  I've tabbed some of these if we need to go through
20  those -- but to the extent there's any question about
21  a nexus between this automobile accident and his
22  condition for the next six months, that's very
23  clearly answered in the discharge summary, which is

1 the very first page in here.
2      You don't have to read all the records.
3 I've tabbed several pages that you could read where
4 it says, "History, motor vehicle accident,
5 subarachnoid hemorrhage." And then the progress
6 notes track his deterioration from that point
7 downward in terms of, and it makes a number of
8 references to his pain, his reaction to painful
9 stimulus, his moods, well, all of the pain and
10 suffering is documented, it's already in evidence,
11 the nexus between the accident and his condition
12 which ultimately led to his demise. But even if,
13 again, he recovered, that would have been, it
14 wouldn't have affected this case in terms of what he
15 did endure.
16      THE COURT: But do not plaintiffs have to
17 establish causation in addition to negligence?
18      MR. HUDSON: Well, it's an interesting
19 answer, your Honor, because the case -- I don't know
20 if Mr. Ferrara gave your Honor this Money vs.
21 Mansville case?
22      THE COURT: Yes.
23      MR. HUDSON: Well, this is an asbestos case.

146

1 And the Court, on a number of points, goes through
2 here pointing out and distinguishing why in an
3 asbestos case, in exposure to asbestos and a patient
4 who develops asbestosis is not something of common
5 knowledge that a layperson, would be expected to be
6 within a layperson's scope of knowledge. And if I
7 could, I'd just like to quote the one paragraph that
8 I think answers your Honor's question. This is on
9 page 7.
10      THE COURT: I'm looking at page 7 myself.
11      MR. HUDSON: And this is the second column
12 near the top. "It is permissible for a plaintiff to
13 make a prima facie case that a defendant's conduct
14 was a proximate cause of the plaintiff's injuries
15 based upon an inference from the plaintiff's
16 competent evidence if such finding relates to a
17 matter within a layperson's scope of knowledge."
18      Now, the competent evidence doesn't say it
19 has to be an expert testifying. We have, besides the
20 lay, the wife and the daughter, we have two volumes
21 of medical records there. And I can again, if
22 necessary, go through specific pages drawing the
23 nexus between the motor vehicle accident and the

1 subarachnoid hemorrhage which caused the basically
2 comatose state that he was in for the next six
3 months.
4      THE COURT: Now, it did come out at trial,
5 of course, that unfortunately Mr. Young had a number
6 of other significant ailments at the time.
7      MR. HUDSON: And, of course, the history
8 gives those, I mean, the diabetes and the other
9 things. But none of those are causally related to
10 the subarachnoid hemorrhage. I mean, there are CAT
11 scans, there are numerous references in there to the
12 trauma-induced subarachnoid hemorrhage, and the only
13 trauma was the motor vehicle accident.
14      THE COURT: Procedurally, let's just assume
15 I were to, as I can under the rule, reserve decision
16 on the motion pending submission of the case to the
17 jury, what's the, is the motion mooted if the jury
18 comes back with more than 50 percent negligence on
19 behalf of Catherine Shore? I thought I said that
20 right.
21      MR. FERRARA: I think you meant to say
22 Barbara Young.
23      THE COURT: I said it wrong. Yes, is the

148

1 motion mooted if the jury should come back and say
2 that Barbara Young was more than 50 percent?
3      MR. FERRARA: Yes.
4      MR. HUDSON: I think you're right.
5      THE COURT: I don't know what the jury's
6 going to do. But I'm going to reserve decision on
7 the motion for judgment as a matter of law. The
8 only, I need to make slight changes to the jury
9 instructions. Actually, the only change is to add
10 the phrase I said I was going to add about the Court
11 can't furnish you with transcripts, etc.
12      So we're in recess. How much time do you
13 need to prepare for closings?
14      MR. FERRARA: I'm ready now.
15      THE COURT: Let's take 15 minutes. All
16 right. We'll take a 15-minute recess.
17      (Recess taken, 2:34 to 2:52 p.m.)
18      THE COURT: Please bring in the jury.
19      MR. HUDSON: Your Honor, I neglected to ask
20 you, you'll be giving the charge after?
21      THE COURT: Yes. I should have said that.
22 Yes, the charge will come afterwards.
23      (Jury enters the courtroom at 2:53p.m.)

149

1    THE BAILIFF: May I approach, your Honor?

2    THE COURT: Yes.

3    (Bailiff confers with judge.)

4    THE COURT: Mr. Hudson, you may proceed to

5    give plaintiff's closing argument in the case.

6    MR. HUDSON: Thank you, your Honor.

7    Good afternoon again, ladies and gentlemen.

8    This is, as Judge Cooch has just indicated, closing

9    argument, it's the opportunity that Mr. Ferrara and I

10   have to again speak to you directly. And it's our

11   opportunity to try to pull all the evidence,

12   testimony that you've heard together. And obviously

13   we're representing our individual clients. But what

14   we say is not evidence, and Judge Cooch will instruct

15   you as to that. You are to make your decision based

16   on your collective wisdom, what the 12 of you have

17   heard, and conclude what's the testimony, what's the

18   evidence.

19   And Judge Cooch, before you deliberate,

20   before you retire, after Mr. Ferrara and I are

21   finished talking, will read to you the instructions

22   on the law. You've heard the evidence, you now

23   decide what the facts are. He will instruct you as

150

1    to what the law is and how that's to be applied. And

2    then it's up to you to deliberate among the 12 of you

3    and to reach a decision as to who was at fault. And,

4    secondly, after you decide the liability issue, to

5    decide the issue of damages in terms of what

6    Mr. Donald Young suffered both mentally and

7    physically, as well as the monetary damages in the

8    form of the medical bills.

9    Let me go back and try to recapture and

10   comment on the testimony first in terms of the

11   version of the accident from the defendant's

12   perspective. And unlike many cases, this case is a

13   little bit easier because Mr. Young, of course, is

14   not able to testify as to anything that he saw. The

15   only other witness in Mr. Young's vehicle was the

16   driver Barbara Young. And she, as a result of the

17   injuries, remembers nothing about the accident. As

18   you recall, she said the first thing she remembers is

19   somebody cutting her clothes off after the accident.

20   So let's talk about the three eyewitnesses

21   that the defendant has produced and that you've heard

22   testimony from -- the driver, the defendant Catherine

23   Shore, each of the passengers, the brother and sister

1    Raymond and Mariann Kamm.

2    As you know now, Mariann Kamm and Catherine

3    Shore were friends, had been friends for about five

4    years. Catherine and the brother didn't know each

5    other, but the brother was there to help celebrate

6    Mariann's birthday, as well as sort of a reunion

7    after not having seen each other for a while. So

8    they had made plans to go to the Iron Hill Brewery,

9    and although there was some reluctance to acknowledge

10   it, their plans included before they got there

11   drinking and celebrate, their form of celebrating,

12   clearly drinking alcohol.

13   They all agree that they were there at least

14   three-and-a-half hours. It could have been four

15   hours. But even under the most conservative estimate

16   they got there no later than 5:30 and left 8:30,

17   8:45, and went directly towards home. So they were

18   there for three-and-a-half hours eating, drinking,

19   and we'll never know exactly how much alcohol was

20   consumed, but it is known that there was alcohol.

21   Catherine Shore says she drank one glass of

22   wine. She said she drank that at dinner and

23   afterwards went upstairs and played pool, or watched

152

1    her girlfriend play pool for two hours. Raymond Kamm

2    said he had one glass of wine, and that he sat at

3    dinner and listened to three women talk for three

4    hours, which he said was very boring. Now, obviously

5    that's a conflict between what his sister and

6    Catherine said that they went upstairs to play pool,

7    they said that he went downstairs to the bar to pick

8    up chicks.

9    And why is this whole issue of how much

10   anyone had to drink of any relevance to this case?

11   Well, it's not a drunk driving case, that's not at

12   issue. But you do have three people here now saying

13   that they saw a green light, and they are giving you

14   details about how this accident happened, so it is

15   fair to consider what they were doing prior to that.

16   And if that involved drinking alcohol, and you can

17   reach your own conclusions in terms of whether or not

18   their ability to perceive and to recall was impaired

19   in any way. And you can, it's fair for you to form

20   your own conclusion as to whether the amount of

21   alcohol affected that ability to perceive or to

22   recall.

23   Mariann, the front seat passenger, said she

153

1  acknowledged she had three drinks, it could have been
2  more, a glass of wine at dinner, then she went
3  upstairs and played pool and had two more drinks.
4  Again, we're talking three-and-a-half to four-hour
5  period, not unreasonable to think that that much
6  alcohol had been consumed.
7        So they immediately leave the bar, and
8  they're going back home to drop off Mariann at her
9  house and, I guess, the brother over in Glenville,
10  and they're going through Newport. So what do they
11  recall, what do the defendants tell you were the
12  circumstances leading up to the accident?
13        Well, Catherine Shore says that she was
14  doing 30 miles an hour. That's what she said in her
15  testimony. Initially she said she was guessing, but
16  when I read her testimony back she said she was doing
17  30 miles an hour, and that was last September. And
18  she acknowledged that her memory would have been
19  sharper then than it was now nine months later.
20        Raymond Kamm, the back seat driver, said in
21  his testimony, which you heard which was read back,
22  that she was doing 40 to 50 and she was accelerating.
23  He said that the Young vehicle was going even faster.

154

1  Now, nobody had a radar gun out there, so you're
2  going to have to decide what's most likely so.
3  That's your job, what's most likely so going on here.
4        You saw Mrs. Young. Does she look like
5  somebody driving an Oldsmobile Cutlass station wagon
6  who would be doing faster than 50 miles an hour
7  going through there? Much faster, according to
8  Mr. Young (sic).
9        What happened just prior to the impact?
10  Well, you've heard all of them say that they had the
11  green light. It's something that's crystal clear in
12  their minds, they all had the green light. But then,
13  again, you have to ask yourself why would they at
14  that point in time all three have been focusing on
15  what color this light was? We know they'd been
16  drinking. We know, according to everybody's
17  acknowledgment, that the two women in the front seat,
18  the driver and the passenger were chatting, they were
19  engaged in conversation. And Raymond was sitting in
20  the back seat, according to his testimony, leaning up
21  listening to them and talking to them, too. So to
22  the extent that they were distracted, we know that
23  they were talking, they weren't all three focusing on

155

1  that green light, even though that's what they have
2  told you.
3        What did they see? Well, Catherine Shore
4  says when she turned onto Justis Street a block back
5  at the red light she saw the green light then. If
6  she saw the green light, then I asked, Well, and then
7  you continued to accelerate? Yes. Were you hopeful
8  as you were accelerating that you were going to catch
9  the light, that if it was green it was going to stay
10  green? And she said -- and she wouldn't acknowledge
11  that. And, I mean, we all feel that way, when we see
12  a light from a block away we hope it's going to stay
13  green, if it's green until we get through it. And
14  she was accelerating. So is it fair to conclude that
15  if that was the case, if she was accelerating hoping
16  to get through the light before it changed?
17        She said she was driving in the center lane.
18  In her deposition today she started to equivocate on
19  that saying now she doesn't know. And, of course,
20  she's now heard the testimony of not only the
21  investigating police officer Corporal Mason, but also
22  the traffic reconstruction expert Mr. Sherkey who
23  testified this morning that the forensic evidence is

156

1  pretty clear, she was in the right lane, and that's
2  where her skid marks started. So one recollection
3  that we know was not accurate based on the forensic
4  evidence is where she was when she was approaching
5  that light.
6        What was, what did Catherine Shore say her
7  view was as she was coming up to the red light -- I'm
8  sorry -- to the intersection, what was her view of
9  the Young vehicle? First off, she said she doesn't
10  recall if the Young vehicle had headlights on or not.
11        And you may have picked up that when
12  Mr. Ferrara was asking Mr. Sherkey, well, isn't it
13  true that at night, that you can see a vehicle coming
14  from a blind spot because of the headlights, the
15  glare of the beam before you see the vehicle? And
16  Mr. Sherkey correctly pointed out that that may be
17  so, but this wasn't, this was a well-lit intersection
18  which would be masking any headlight beam that might
19  otherwise indicate a vehicle approaching from a blind
20  corner. Ms. Shore said she doesn't recall whether
21  the lights were on or not. So that's not a factor in
22  terms of whether or not she saw the headlights first
23  or the beam.

157

1    She said, also, that her car -- I'm sorry --
2    that the Young vehicle was 8 feet away from the point
3    of impact when she first saw it. This is Ms. Shore,
4    last fall in her deposition, that the Young vehicle
5    was only 8 feet away from the point of impact. At
6    the same time she was from three to five car lengths.
7    And using her car of 16 feet in length, three to
8    five, that's from 48 to, what's that, 80 feet? I'm
9    doing the math real quick. But that's what she,
10   how far away she said she was. And if she was doing
11   30 miles an hour, as she said she was, then the Young
12   vehicle would have been well beyond the point of
13   impact before she ever arrived there.
14   What does Raymond Kamm say in his
15   observations? He says the light was green. He said
16   that they were in the center lane. Again, that's
17   been proved wrong. He said that she was accelerating
18   as she got closer to the intersection. And that's
19   something that I think is a pretty significant fact
20   in this case. All three of the witnesses for the
21   defendant agree that she was accelerating, from the
22   time that she pulled onto Justis Street until the
23   intersection collision she was accelerating, that is,

158

1    of course, until she hit the brakes.
2    Mr. Raymond Kamm said it a number of times,
3    you heard it in his deposition, because it was a
4    recorded trial deposition, I have a copy of the
5    transcript here, I'm just going to read to you a
6    couple of the references, he made it repeatedly
7    talking about how she was accelerating.
8    Page 6: As she got closer to the
9    intersection the light was green, stayed green, she
10   accelerated through the intersection. Page 9: As
11   soon as I saw the, you know, lights, Catherine
12   started slamming on her brakes, you know, because she
13   was accelerating through and hit the brakes, and we
14   hit that car.
15   Keep in mind that this is their witness
16   talking about her accelerating through the
17   intersection.
18   Page 12, the question was: Do you have an
19   opinion as to what Catherine's speed was as she was
20   going into the intersection?
21   ANSWER: It seemed like Catherine, when she
22   accelerated, because this car, you know, you could,
23   you know, it's a good car, you could feel it, it

159

1    seemed to me like it was that she was accelerating
2    through the intersection probably somewhere between
3    like 40 to 50 miles an hour, somewhere in that range.
4    Page 23: I'm looking, and I saw that
5    Catherine was accelerating through the intersection
6    because we still had the green light.
7    There are a number of other references, but
8    you get the, I think, a general theme that there's no
9    question in his mind that even though he's out of it,
10   the light was green, that she was accelerating up to
11   and through the intersection, hits her brakes, bam,
12   then there's a collision. This is their witness,
13   their passenger Raymond Kamm.
14   He said, also, that he looked to the right
15   while they were proceeding down that block before
16   they got to the intersection to see if any cars were
17   coming, and no vehicles were on the roadway. No, it
18   was empty, he said. And when he was asked how far
19   back from the intersection was he, he said 100 to
20   200 feet. And this, of course, is another very
21   important factor in this case. 113 feet is right
22   here, so 100 feet would start here and back here, as
23   Mr. Sherkey pointed out, is the 200-foot point. So

160

1    he would have been somewhere between here and here
2    when he said he looked right and saw that there were
3    no vehicles on this road approaching the
4    intersection. Wilmington Trust Bank, of course, he
5    said impossibility (indicating).
6    What did Mariann Kamm, the front seat
7    passenger, have to say? Mariann says that Ms. Shore
8    was accelerating because the light was green. She
9    was accelerating to go through the light, doesn't
10   remember which lane she was in. And then she said
11   that three seconds lapsed between when she saw the
12   Young car and the impact. And as Mr. Sherkey has
13   demonstrated, three seconds, that would put her 130
14   feet back, this is 113. So that would have put her
15   back there when she said she first saw the Young
16   vehicle. Of course, she couldn't see the Young
17   vehicle unless it was already in the intersection,
18   and they were 130 feet back.
19   Now, those are the eyewitnesses of the
20   defendant. They're here to say one thing, that the
21   light was green, and beyond that they're all over the
22   map in terms of where they were, where the cars were
23   and how the accident happened.

161

1 What's plaintiff's explanation of the
2 accident? Well, plaintiff has done what is often
3 done in these cases, which is to attempt to
4 reconstruct the accident based on not hearsay or
5 memory or perception of someone who's possibly
6 impaired to begin with, but based on the forensic
7 evidence, the evidence at the scene.
8 And Mr. Sherkey, you heard from this
9 morning, is a certified nationally recognized
10 accident reconstruction specialist. And you heard
11 his testimony, it was somewhat technical at times,
12 but he has given you an unequivocal opinion that
13 based on where the skid marks were located at the
14 accident by Corporal Mason, and by the photographs,
15 and based on the defendant Catherine Shore's sworn
16 testimony that she was doing 30 miles an hour, that
17 the skid marks were here (indicating). And if she
18 was doing 30 miles an hour, in order to make those
19 skid marks her point of perception backed up would
20 have put her here when she would have first, based on
21 the statistical averages of people's reaction times
22 at night, would have put her here when she first
23 perceived something, some hazard, that would have

162

1 resulted in her then reacting at this point. And
2 he's got all the times down here showing time to
3 impact 2.78 seconds here, time to impact 1.78
4 seconds, one second later here, and when she actually
5 hit the brakes and skidded 25 feet to impact .78
6 seconds away, and then the skid, and then the
7 collision.
8 This is forensic evidence. This is not who
9 you believe, who said what, what they recall, maybe,
10 this is what the evidence says based on the
11 defendant's sworn testimony as to how fast she was
12 going. 30 miles an hour, and you now know that that
13 is the most conservative testimony or estimate as to
14 how fast she was going. Mr. Kamm has her doing 40 to
15 50, which would have placed her back here somewhere
16 in order to have then reacted and caused the skid
17 marks, which are part of the evidence.
18 The significance of this is, of course,
19 Wilmington Trust Bank, it's a blind corner, that's
20 where she was when she saw whatever it was that
21 caused her to hit her brakes and caused the skid
22 marks, she could not have seen the Young vehicle.
23 And, again, using the timing and the actual

163

1 evidence when she was at that point in time prior to
2 impact, if the Young vehicle was doing 15 miles an
3 hour it would have been located here. And this is
4 precisely to scale where a surveyor who prepared it
5 for Mr. Sherkey's analysis, this is where the Young
6 vehicle would have been prior to impact at 15 miles
7 an hour, that's, again, 2.78 seconds. This is where
8 she would have been at 2.78 seconds -- I'm sorry --
9 1.78 seconds -- no, 2.78 seconds that she would have
10 been here, the Young vehicle would have been here if
11 she was doing 15.
12 If the Young vehicle was doing 30, it would
13 have been here. If the Young vehicle was doing 50,
14 it would have been here. Look at the lines, these
15 are sight lines, all three of them go through the
16 Wilmington Trust Bank (indicating). It's an
17 impossibility for this accident to have occurred the
18 way Catherine Shore said it did, based on the skid
19 marks, the location, and Catherine Shore's testimony
20 that she was doing 30 miles per hour.
21 Again, estimate, Mr. Sherkey said if she was
22 doing 25, it wouldn't have affected this much, she
23 would have been here instead of here. Again, you can

164

1 draw the sight lines to the Young vehicle. If she
2 was doing more than 30, it would have placed her back
3 here, her perception. Perception, reaction, brakes
4 actually being engaged (indicating).
5 What does this then lead us to conclude?
6 Well, we know that Catherine Shore did hit her
7 brakes, we know that a collision did occur. But what
8 we don't know, and this again gets me to the realm of
9 what's more likely so than not, and I will submit to
10 you it's more likely so, since she couldn't see the
11 Young vehicle at that point, and she was, beginning
12 here, perceiving something, reacting to something and
13 her brakes being employed, she was reacting to
14 something else.
15 And if it's not the Young vehicle, because
16 that's blind, she can't see it, what other hazard
17 would there be? What's most likely so? That light
18 wasn't green, it was red. Or it was yellow and she
19 was, after accelerating, changing her mind, hitting
20 her brakes, which engaged here, and she had a car
21 coming through the other side which would now have a
22 green light.
23 Judge Cooch is going to give you

165

1  instructions, as I've already indicated, and these
2  instructions, this is the law, relate to the facts of
3  this case as you conclude were what actually
4  happened. I would just like to read some of the
5  instructions to you.
6       One is -- and this all has to do with
7  negligence. And, again, he's going to define
8  negligence to you. I did that in my opening
9  statement. Negligence is the lack of ordinary care.
10 It's the absence of the kind of care that is of a
11 reasonably prudent and careful person would exercise
12 in similar circumstances.
13      There's been a lot of discussion about green
14 light. Well, green light violation is not the only
15 issue, it is not the only allegation of negligence in
16 this case, as Judge Cooch is going to instruct you.
17 There is also the duty to maintain a proper lookout.
18 And I'd just like to quote from the instruction a
19 little bit.
20      "Drivers have a duty to keep a proper
21 lookout for their own safety. The duty to look
22 implies the duty to see what is in plain view unless
23 some reasonable explanation is offered. A person is

166

1  negligent not to see what is plainly visible where
2  there is nothing to obscure one's vision."
3       Keep in mind, Catherine Shore has said she
4  was from three to five car lengths back when the
5  Shore -- the Young vehicle was 8 feet from the point
6  of impact, which was in the middle of the
7  intersection. You have to decide whether Catherine
8  Shore has violated her duty to maintain a proper
9  lookout, even if you conclude that the light was
10 green on her side.
11      "Duty of control. A driver must keep a
12 vehicle under proper control. It means the vehicle
13 must be operated at such a speed and with such
14 attention that the driver can stop with a reasonable
15 degree of quickness or steer safely by objects or
16 other vehicles on the highway depending on existing
17 circumstances and the likelihood of danger to
18 others."
19      There is a statute on speeding. "No person
20 shall drive a vehicle on a highway at a speed greater
21 than is reasonable and prudent under the conditions,
22 and without having regard to the actual and potential
23 hazards then existing. In every event, speed shall

167

1  be controlled as may be necessary to avoid colliding
2  with any vehicle on the highway."
3       Again, you have to make the decision based
4  on the testimony from all the witnesses. And, again,
5  it's primarily from the defense, the driver and her
6  two passengers, plus what Mr. Sherkey says could not
7  have happened in terms of what caused her to react to
8  that and apply her brakes when she did. You have to
9  make that decision as to whether or not Catherine
10 Shore was negligent, whether she exercised a
11 reasonable degree of care, ordinary care for the
12 purpose of a reasonably prudent person would.
13      Let me talk to you a little bit about the
14 damages issue. Mr. Shore was an 80-year-old who was
15 experiencing some complications with health. He had
16 a history of diabetes, he had a stroke about ten
17 years earlier. If you look at the records you'll see
18 that he had something called an enlarged, benign
19 enlarged prostate, which is something that us men
20 think about the older we get. But he was somebody
21 who also enjoyed life. You heard his wife and his
22 daughter talking about that. He was in his later
23 years restricted to a wheelchair for most of the time

168

1  in ambulating, although he did use a cane on
2  occasion.
3       It didn't keep him from traveling. He went
4  at least once a year out to visit his daughter in
5  Arizona. He had just been up, one of his passions
6  was the opera, within a month previous to the
7  accident he had just been up to New York City to see
8  the opera. He loved to read, he loved to play games,
9  watch TV. He was a person who enjoyed life.
10      And that's what this case is about in terms
11 of the damages, it's called a survival action. It is
12 how much Mr. Young's Estate should be compensated for
13 the pain and suffering, both emotional and physical,
14 that he endured during those six months from the time
15 that he went from being a person who enjoyed life to
16 a person who was surviving life.
17      If you look at the records, it's clear --
18 and I've tabbed some of these, I will take these tabs
19 off, these are for my reference -- these are
20 references in the early days to the pain and
21 suffering, how he reacts to pain, to stimulus. He
22 would open his eyes, he would respond, he would
23 sometime verbalize, but he had what's called a

169

1  subarachnoid hemorrhage, it was trauma-induced. And
2  it's this bleeding, this hemorrhage that caused
3  additional damage as it continued to his brain. And
4  he became less and less able to even respond to
5  someone. But it didn't mean he didn't suffer.
6          It was trauma-induced. Again, I don't
7  expect you to, unless you're someone who enjoys
8  reading medical records, these are half of the
9  medical records, the three markers indicate the
10  different hospitals. This first part is the month
11  that he spent at Christiana Care Hospital. And it
12  talks about, "Status, post head injury." This is the
13  discharge summary: "Subarachnoid hemorrhage, tongue
14  laceration, left clavicle fracture." This is a
15  person who basically eventually failed to become a
16  person. He was alive, but he was only alive in the
17  physical sense at the end. And that's what led to
18  the very difficult and painful decision to terminate
19  the life support six months later.
20          In addition to the pain and suffering, the
21  mental and physical, you also, there will be a lot of
22  exhibits going back in the jury room with you,
23  including these exhibits. But one of them is Exhibit

170

1  No., it looks like 2, Plaintiff's Exhibit 2, this is
2  a summary of the medical bills for the different
3  hospitals that he was in. And the total medical
4  bills that he incurred as a result of the injuries
5  from this accident were $471,016.25.
6          You will be asked to fill out a form after
7  your conclusions, and if you find that Catherine
8  Shore was negligent, and her negligence was the cause
9  of the injuries to Donald Young, then you will be
10  asked to compute a number that is sufficient to
11  equitably and fairly compensate his Estate for the
12  pain and suffering, both mental and physical, and the
13  medical bills that he sustained as a result of the
14  accident.
15          That concludes my comments for now. I'll
16  have an opportunity to very briefly address you once
17  again in what's called rebuttal after Mr. Ferrara
18  speaks. But thank you again for your attention
19  throughout the trial.
20          THE COURT: Mr. Ferrara, you may give
21  defendant's closing argument in the case.
22          MR. FERRARA: Thank you, your Honor. If I
23  can just move this out of the way a minute,

171

1  your Honor (indicating easel).
2          Ladies and gentlemen, this is my one chance
3  to talk to you, the plaintiff gets to talk to you a
4  second time. It's late, this evidence is fresh in
5  your minds, and I'm going to be pretty brief.
6          Both of these people could not have had a
7  green light, only one of them could have a green
8  light. And the plaintiff doesn't get to get the
9  benefit of claiming that they both had a red light.
10  We've already resolved this case with one person,
11  that tells you almost everything you need to know
12  about what color the light was. The judge is going
13  to explain that to you at a later time. He's going
14  to say that both parties, both Barbara Young and
15  Catherine Shore were defendants, Barbara Young
16  settled the case, it's something that you have to
17  consider when you decide who had the light.
18          Think about what happened here. This case
19  starts out as a lawsuit against both drivers claiming
20  they both had the red light. They settled the case
21  against Barbara Young. Read from that what you will.
22          What happens next? Next Sherkey gets
23  involved in the case. And he comes up with some

172

1  numbers and some theories to now argue that, well,
2  maybe Catherine Shore actually had the light. And
3  you just heard plaintiff's counsel argue that. I
4  don't like the fact that they get to talk twice and I
5  only get to talk once. It's always great when you're
6  arguing with somebody and you get the last lick in.
7  I don't get to do that under the rules of the court.
8  You know how good that is when you're arguing with
9  your significant other, you always want to get the
10  last word in, I don't get a chance to do that. The
11  judge is going to tell you that I only get to talk to
12  you this one time.
13          So I've got to do two things: I've got to
14  anticipate things he's going to say and tell you the
15  things that I think are important. One of the things
16  that I suggest that maybe he would address is if you
17  conclude that Catherine Shore was negligent because
18  she ran the red light, well, then that means Barbara
19  Young didn't run the red light, is there going to be
20  a refund?
21          Sherkey was described as nationally
22  recognized. I've never heard that from anybody
23  except plaintiff's counsel. What he did was he took

173

1 a statement that was an estimated statement of speed
2 given three years after the accident in which
3 Catherine said several times I'm not good at judging
4 speeds, I'm not good at estimating distances, and
5 ended up saying she thought she was doing 30. They
6 locked on 30 and did their calculations.
7        Mariann Kamm said 25 as an estimate.
8 Plaintiff's counsel pointed out, well, you didn't say
9 it was a guesstimate. And he read it to her, How
10 fast do you think she was going? Maybe 25. I
11 suggest to you "maybe" is as much of an estimate as
12 anything in this case.
13        We know that speed is not a factor in this
14 case. We know that because Mason, who was there,
15 told us that. Mason's the reconstructionist, he said
16 I looked at the scene, speed was not a factor.
17 Alcohol wasn't a factor, either. Clearly alcohol
18 wasn't a factor in this case. Because we know, if
19 you remember Brown's testimony that they took a blood
20 reading, they took a test right on the spot that was
21 a .02. And then by the time they got to the hospital
22 and tested her blood she was a .00. So all this talk
23 about how much everybody had to drink is irrelevant

175

1 thing.
2        If I said to the 14 of you how long do you
3 think this room is, we might get 12 different
4 answers. It's human nature that people are not
5 necessarily good at estimating speeds and distances.
6 And Sherkey says that's the most common things that
7 happens when he investigates accidents, they were
8 good on the color of the light, they were not good on
9 times and speeds and distances. And we know that
10 because you got three different speeds.
11        The slower she's going, the closer she is,
12 and the better she can see. So when she estimates
13 30, and when Raymond says 40 to 50, and when Mariann
14 says maybe 25, it could have been 15, it could have
15 been 17, who knows, nobody knows that. But what we
16 do know is this: they saw the car, they had the green
17 light, they braked to avoid, and an accident
18 happened, and that's what it was.
19        The plaintiff has to prove to you by a
20 preponderance of the evidence who had the light. If
21 after hearing all the testimony you say to yourself I
22 don't know who had the light, then I suggest it's
23 pretty clear that Barbara Young did. But if you

174

1 as it relates to Catherine Shore because Catherine's
2 blood alcohol reading was 0 and 02 on a portable
3 breath test at the time.
4        What happened in this case is pretty simple,
5 Barbara Young ran the red light. She knows she ran
6 the red light, that's why she settled her case.
7 Catherine Shore is the extra, you know, can we
8 convince a jury, can we get Sherkey involved to
9 convince a jury, maybe we can collect again. Because
10 that's really what they're trying to do here.
11        And it's really simple. Immediately after a
12 traumatic event a police officer interviews three
13 people in her car. All three of them said they had
14 the green light. They were interviewed separately,
15 they were interviewed in a stressful situation. The
16 suggestion that somehow the three of them got
17 together and said, oh, let's just say we had a green
18 light doesn't make any sense. There's no support for
19 that, there's no proof for that. They were not asked
20 until three years later where were you, how fast were
21 you going, and how far away were you when all this
22 happened. And you know, because even Sherkey agreed
23 with that, that time and distance is a difficult

176

1 conclude we don't know, the plaintiff hasn't met its
2 burden of proof, and the plaintiff fails in its case.
3        It's a lot of medical records, you don't
4 really need to look at them because Catherine Shore
5 was not at fault. There's six questions on the
6 questionnaire that you're going to have handed to you
7 at the end of the jury instructions, the jury
8 instructions given by your Honor will take 15 or 20
9 minutes, and then there's a questionnaire at the end,
10 it's six questions. You only really have to answer
11 the first one. Because the first question is do you
12 find that Catherine Shore was negligent? If the
13 answer to that question is no, you don't have to
14 answer 2 through 6.
15        Ladies and gentlemen, the evidence in this
16 case is clear, they could not both have had a green
17 light or a red light. One had one, one had the
18 other. And they already collected from the negligent
19 person. That should be the end of it. Thank you.
20        THE COURT: Mr. Hudson, you may give
21 plaintiff's rebuttal argument.
22        MR. HUDSON: As I mentioned to you, Judge
23 Cooch is going to instruct -- and as Judge Cooch is

177

1  going to instruct you, this isn't just about a red
2  light, that's all Mr. Ferrara was talking to you
3  about, it's not either she had a red light or she had
4  a green light.
5      Even if you conclude that Catherine Shore
6  had the green light, she also has the duty under the
7  law to conform with those other laws that Judge Cooch
8  is going to instruct you about -- maintaining a
9  proper lookout, maintaining a reasonable and prudent
10 speed. Even if the light was green, she still had
11 those duties. And you have to make the decision if
12 accelerating and accelerating and accelerating
13 through the intersection, first off, why would one
14 want to accelerate, exercising reasonable care
15 through an intersection, especially a blind
16 intersection such as this? Is that exercising
17 reasonable care? You have to make that decision,
18 even if she had the green light.
19     Mr. Ferrara is telling you that it's a
20 preponderance of the evidence case. And I'm glad he
21 mentioned it because I forgot to, even though Judge
22 Cooch is going to tell you this is a civil case, this
23 is not a criminal case. Absolutely different burdens

179

1  things that you're going to be able to decide for
2  yourself in terms of Mr. Sherkey's qualifications
3  because his CV is Exhibit No. 6. And if you want to
4  read it, it's there if there's any questions raised
5  by Mr. Ferrara's comment about his national
6  recognition and factors when it's International
7  Association of Accident Reconstruction Specialists,
8  and he was a charter member back in 1981. But this
9  is going to be available for your review in terms of
10 his ability to do a forensic analysis such as he did
11 and form an opinion which he has given to you, again,
12 based on reasonable medical (sic) probability. And
13 that's the standard that Judge Cooch will tell you
14 the experts have to meet.
15     Again, a lot of emphasis has been put on the
16 green light/red light, that's all Mr. Ferrara wants
17 to talk about, but that's not all of the case. And
18 please keep an open mind and listen to the
19 instructions in the other areas of law that
20 Ms. Shore was required to comply with in driving her
21 car that night prior to that intersection.
22     I will conclude my comments at this point in
23 time. Again, there's going to be a number of

178

1  of proof here. In a criminal case, you heard the
2  term "beyond a reasonable doubt," meaning a
3  reasonable doubt in order for you to reach your
4  verdict. In the civil case it's called a
5  preponderance of the evidence. And in simple terms
6  what that means is what's more likely so than not.
7      You don't have to sit there and say this is
8  absolutely what happened, she absolutely had the
9  green light or she absolutely had the red light. And
10 what you have to conclude, and this is what, this is
11 your function is to conclude what is most likely the
12 case, what more likely than not happened, that's
13 preponderance of the evidence. And once you reach
14 that verdict, you have done your job. Whether you
15 return a verdict in favor of the defendant or the
16 plaintiff, your threshold, your standard is what is
17 most likely the case.
18     Mr. Ferrara made a comment sort of in
19 passing that I had referred to Mr. Sherkey as a
20 nationally recognized, and he said he'd never heard
21 that term from any other attorney. Well, we don't
22 even know if he's ever tried a case with Mr. Sherkey
23 or not before. But, nevertheless, that's one of the

180

1  exhibits. You've seen them from afar, you'll have an
2  opportunity now to read them. I again want to thank
3  you for your very rapt attention for the last few
4  days. Some of this material has been difficult to
5  follow because of the diversion of testimony, but,
6  again, I have faith in the jury system, and I have
7  faith that the collective wisdom of the 12 of you
8  will result in a fair and equitable verdict, whatever
9  you decide. And thank you again for your time.
10     THE COURT: Members of the jury, I will now
11 read jury instructions to you. They'll take about 15
12 minutes. And I'll be sending in two copies of the
13 jury instructions into the jury room for you to look
14 at, if you wish.
15     Now that you have heard the evidence and
16 have heard the arguments of counsel, it is my duty to
17 instruct you about the law governing this case.
18 Although you as jurors are the sole judges of the
19 facts, you must follow the law stated in my
20 instructions and apply the law to the facts as you
21 find them from the evidence. You must not single out
22 one instruction alone as stating the law, but must
23 consider the instructions as a whole.

183

Nor are you to be concerned with the wisdom of any legal rule that I give you. Regardless of any opinion you may have about what the law ought to be, it would be a violation of your sworn duty to base a verdict on any view of the law other than what I give you in these instructions. It would also be a violation of your sworn duty, as judges of the facts, to base a verdict on anything but the evidence in the case.

Justice through trial by jury always depends on the willingness of each juror to do two things: first, to seek the truth about the facts from the same evidence presented to all the jurors; and, second, to arrive at a verdict by applying the same rules of law as explained by the judge. You should consider only the evidence in this case. Evidence includes the witnesses' sworn testimony and the items admitted into evidence. You are allowed to draw reasonable conclusions from the testimony and exhibits, if you think those conclusions are justified. In other words, use your common sense to reach conclusions based on the evidence.

You have been chosen and sworn as jurors in

182

this case to decide issues of fact. You must perform these duties without bias for or against any of the parties. The law does not allow you to be influenced by sympathy, prejudice, or public opinion. All the parties and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law, and reach a just verdict, regardless of the consequences.

What the attorneys say is not evidence. Instead, whatever they say is intended to help you review the evidence presented. If you remember the evidence differently from the attorneys, you should rely on your own recollection.

The role of attorneys is to zealously and effectively advance the claims of the parties they represent within the bounds of the law. An attorney may argue all reasonable conclusions from evidence in the record. It is not proper, however, for an attorney to state an opinion as to the truth or falsity of any testimony or evidence. What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant, and you are instructed to disregard any personal opinion

or belief offered by an attorney concerning testimony or evidence.

In a civil case such as this one, the burden of proof is by a preponderance of the evidence. Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not. Preponderance of the evidence does not depend on the number of witnesses. If the evidence on any particular point is evenly balanced, the party having the burden of proof has not proved that point by a preponderance of the evidence, and you must find against the party on that point.

In deciding whether any fact has been proved by a preponderance of the evidence, you may, unless I tell you otherwise, consider the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them.

In this particular case, the plaintiff must prove all the elements of their claims against the

184

defendant by a preponderance of the evidence. Those elements are as follows:

1. That the defendant was negligent and breached standard of care.

2. That if the defendant was negligent and breached the standard of care, that such breach was a proximate cause of the harm alleged to have occurred.

3. The nature and extent of any damages claimed by plaintiff.

If the plaintiff fails to meet his burden as to any one of these claims, your verdict must be in favor of the defendant.

Generally speaking, there are two types of evidence from which a jury may properly find the facts: One is direct evidence -- such as the testimony of an eyewitness. The other is indirect or circumstantial evidence -- circumstances pointing to certain facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires the jury to find the facts from all the evidence in the case, both direct and circumstantial.

185

1    Some testimony is in the form of sworn
2  recorded answers to questions asked of a witness
3  before trial. This is known as deposition testimony.
4  This kind of testimony is used when a witness, for
5  some reason, cannot be present to testify in person.
6  You should consider and weigh deposition testimony in
7  the same way as you would the testimony of a witness
8  who has testified in court.
9    A witness may be discredited by evidence
10  contradicting what that witness said, or by evidence
11  that at some other time the witness has said or done
12  something, or has failed to say or do something, that
13  is inconsistent with the witness' present testimony.
14    It's up to you to determine whether a
15  witness has been discredited, and if so, to give the
16  testimony of that witness whatever weight you think
17  it deserves.
18    You are the sole judges of each witness'
19  credibility. That includes the parties. You should
20  consider each witness' means of knowledge; strength
21  of memory; opportunity to observe; how reasonable or
22  unreasonable the testimony is; whether it is
23  consistent or inconsistent; whether it has been

186

1  contradicted; the witness' biases, prejudices or
2  interests; the witness' manner or demeanor on the
3  witness stand, and all circumstances that, according
4  to the evidence, could affect the credibility of the
5  testimony.
6    If you find the testimony to be
7  contradictory, you must try to reconcile it, if
8  reasonably possible, so as to make one harmonious
9  story of it all. But if you cannot do this, then it
10  is your duty and privilege to believe the testimony
11  that, in your judgment, is most believable and
12  disregard any testimony that, in your judgment, is
13  not believable.
14    Expert testimony is testimony from a person
15  who has a special skill or knowledge in some science,
16  profession or business. This skill or knowledge is
17  not common to the average person but has been
18  acquired by the expert through special study or
19  experience.
20    In weighing expert testimony, you may
21  consider the expert's qualifications, the reasons for
22  the expert's opinions, and the reliability of the
23  information supporting the expert's opinions, as well

187

1  as the factors I have previously mentioned for
2  weighing the testimony of any other witness. Expert
3  testimony should receive whatever weight and credit
4  you think appropriate, given all the other evidence
5  in the case.
6    You have heard experts being asked to give
7  opinions based on reasonable probabilities. In
8  Delaware, an expert may not speculate about mere
9  possibilities. Instead, the expert may offer an
10  opinion only if it is based on a reasonable
11  probability. Therefore, in order for you to find a
12  fact based on an expert's testimony, that testimony
13  must be based on reasonable probabilities, not just
14  possibilities.
15    This case involves claims of negligence.
16  Negligence is the lack of ordinary care; that is, the
17  absence of the kind of care a reasonably prudent and
18  careful person would exercise in similar
19  circumstances. That standard is your guide. If a
20  person's conduct in a given circumstance doesn't
21  measure up to the conduct of an ordinarily prudent
22  and careful person, then that person was negligent.
23  On the other hand, if the person's conduct does not

188

1  measure up to the conduct of a reasonably prudent and
2  careful person, the person was not negligent.
3    A person is also considered negligent if he
4  or she violates a statute that has been enacted for
5  people's safety. The violation of Motor Vehicle Code
6  Section 4168(a) (Speeding) or 4164(b) (Yield the
7  right of way) is negligence as a matter of law. If
8  you find that Defendant Catherine Shore has violated
9  the statute I'm about to read to you, then you must
10  conclude that Defendant Catherine Shore was
11  negligent.
12    I'll read the statute a little later in the
13  instructions.
14    When this case began, the Estate of Donald
15  Young alleged in the complaint that the joint
16  negligence of Catherine Shore and Barbara Young was
17  the proximate cause of Donald Young's injuries.
18  Before this trial, Barbara Young reached a settlement
19  with the Estate of Donald Young on all of its claims
20  against her. Your deliberations, however, must
21  determine whether Catherine Shore, Barbara Young, or
22  both of them were negligent and whether that
23  negligence was the proximate cause of the injuries to

189

1  Donald Young.

2       Catherine Shore has asserted a cross-claim
3  against Barbara Young asserting that her negligence
4  was the proximate cause of the injuries to Donald
5  Young. You must determine whether either or both of
6  Catherine Shore and Barbara Young were negligent, and
7  whether that negligence proximately caused Donald
8  Young's injuries. If you find that either one or
9  both of the defendants were guilty of negligence and
10 that the negligence was a proximate cause of the
11 injuries to Donald Young, you must then determine the
12 amount of damages you should award to the Estate of
13 Donald Young to compensate him fairly and reasonably
14 for the injuries.

15      In computing these damages, do not be
16 concerned with the fact that a settlement was made
17 with the Estate of Donald Young. You must not
18 speculate about what the Estate of Donald Young may
19 have or should have received in that settlement. If
20 you find from the evidence that both Catherine Shore
21 and Barbara Young were guilty of negligence
22 proximately causing Donald Young's injuries, then you
23 should award damages to compensate the Estate of

191

1       If you find that any party failed to
2  maintain a proper lookout, you must find that party
3  negligent.

4       A driver must keep a vehicle under proper
5  control. This means that the vehicle must be
6  operated at such a speed and with such attention that
7  the driver can stop with a reasonable degree of
8  quickness or steer safely by objects or other
9  vehicles on the highway, depending upon existing
10 circumstances and the likelihood of danger to others.

11      Therefore, if you find that any party failed
12 to exercise a proper degree of control over a motor
13 vehicle, you must find that party negligent.

14      The speeding statute reads as follows:

15      No person shall drive a vehicle on a highway
16 at a speed greater than is reasonable and prudent
17 under the conditions and without having regard to the
18 actual and potential hazards then existing. In every
19 event, speed shall be so controlled as may be
20 necessary to avoid colliding with any vehicle on the
21 highway, in compliance with legal requirements and
22 the duty of all persons to use due care.

23      Every driver has the right to assume that

190

1  Donald Young for his fair and reasonable damages in
2  full. In addition, you should apportion your verdict
3  to attribute a percentage of negligence to each
4  defendant in a percentage range from zero to 100.
5  You will be provided with a verdict form to guide you
6  in this process.

7       Each party has alleged that the other was
8  negligent in various ways, but a party does not have
9  to be negligent in all these ways to be liable. You
10 may find a party liable if that party was negligent
11 in any one of the ways charged and if that negligence
12 was a proximate cause of the accident.

13      Drivers have a duty to keep a proper lookout
14 for their own safety. The duty to look implies the
15 duty to see what is in plain view unless some
16 reasonable explanation is offered. A person is
17 negligent not to see what is plainly visible where
18 there is nothing to obscure one's vision, because a
19 person is not only required to look, but also to use
20 the sense of sight in a careful and intelligent
21 manner to see things that a person in the ordinary
22 exercise of care and caution would see under the
23 circumstances.

192

1  others will use ordinary care and obey the rules of
2  the road. This right continues until the driver
3  knows, or should know, that someone else isn't using
4  ordinary care or obeying the rules of the road.

5       The operator of any vehicle who has come to
6  a full stop as provided in subsection (a) of this
7  section shall yield the right-of-way to any vehicle
8  or pedestrian in the intersection or to any vehicle
9  approaching on another roadway so closely as to
10 constitute an immediate hazard and shall not enter
11 into, upon or across such roadway or a highway until
12 such movement can be made in safety.

13      Negligence alone is not enough to hold a
14 party liable. The party's negligence must also be a
15 cause of the claimed injuries or harm. Whenever I
16 use the term "cause," I mean "proximate cause."
17 Proximate cause is a legal term meaning a cause which
18 brings about a result and without which the result
19 would not have followed. Negligence is considered a
20 proximate cause of an injury when the injury would
21 not have happened but for the negligence. The "but
22 for" test is your guide in determining proximate
23 cause. Even if you believe that a party acted

193

1  negligently, unless you are convinced by a
2  preponderance of the evidence that such negligence
3  was a proximate cause of the claimed injury, that
4  party cannot be held responsible. There may be more
5  than one proximate cause to an accident and/or
6  injury.
7      If you do not find that the plaintiff has
8  sustained his burden of proof, the verdict must be
9  for defendant. If you do find that the plaintiff is
10  entitled to recover for damages proximately caused by
11  the injury, you should consider the compensation to
12  which he is entitled.
13      The purpose of a damages award in a civil
14  lawsuit is just and reasonable compensation for the
15  harm or injury done. Certain guiding principles must
16  be employed to reach a proper damages award. First,
17  damages must be proved with reasonable probability
18  and not left to speculation. Damages are speculative
19  when there is merely a possibility rather than a
20  reasonable probability that an injury exists. While
21  pain and suffering are proper elements on which to
22  determine monetary damages, the damages for pain and
23  suffering must be fair and reasonably determined and

194

1  may not be determined by a fanciful or sentimental
2  standard. They must be determined from a conclusion
3  about how long the suffering lasted, the degree of
4  suffering, and the nature of the injury causing the
5  suffering.
6      If you find for the plaintiff, you should
7  award the plaintiff the sum of money that in your
8  judgment will fairly and reasonably compensate the
9  plaintiff for the following elements of damages that
10  you find to exist by a preponderance of the evidence:
11      (1) compensation for pain and suffering
12  that Mr. Young had suffered;
13      (2) compensation for permanent impairment;
14      (3) compensation for reasonable and
15  necessary medical expenses incurred.
16      In evaluating pain and suffering, you may
17  consider its mental as well as its physical
18  consequences. You may also consider such things as
19  discomfort, anxiety, grief, or other mental or
20  emotional distress that may accompany any deprivation
21  of usual pleasurable activities and enjoyments.
22      In evaluating impairment or disability, you
23  may consider all the activities that Mr. Young used

195

1  to engage in, including those activities for work and
2  pleasure, and you may consider to what extent these
3  activities were impaired because of the injury, and
4  to what -- because of the injury.
5      The law does not prescribe any definite
6  standard on which to compensate an injured person for
7  pain and suffering or impairment, nor does it require
8  that any witness should have expressed an opinion
9  about the amount of damages that would compensate for
10  such injury. Your award should be just and
11  reasonable in light of the evidence and reasonably
12  sufficient to compensate the plaintiff fully and
13  adequately.
14      The fact that I have instructed you about
15  the proper measure of damages should not be
16  considered as my suggesting which party is entitled
17  to your verdict in this case. Instructions about the
18  measure of damages are given for your guidance only
19  if you find that a damages award is in order.
20      I have read a number of instructions to you.
21  The fact that some particular point may be covered in
22  the instructions more than some other point should
23  not be regarded as meaning that I intended to

196

1  emphasize that point. You should consider these
2  instructions as a whole, and you should not choose
3  any one or more instructions and disregard the
4  others. You must follow all the instructions that I
5  have given you.
6      The Court will not be able to give you
7  transcripts of all or part of the trial testimony in
8  connection with your deliberations. You must use
9  your collective recollection of all of the testimony
10  of all of the witnesses.
11      Nothing I have said since the trial began
12  should be taken as an opinion about the outcome of
13  the case. You should understand that no favoritism
14  or partisan meaning was intended in any ruling I made
15  during the trial or by these instructions. Further,
16  you must not view these instructions as an opinion
17  about the facts. You are the judges of the facts,
18  not me.
19      How you conduct your deliberations is up to
20  you. But I would like to suggest that you discuss
21  the issues fully, with each of you having a fair
22  opportunity to express your views, before committing
23  to a particular position. You have a duty to consult

1  with one another with an open mind and to deliberate
2  with a view to reaching a verdict. Each of you
3  should decide the case for yourself, but only after
4  impartially considering the evidence with your fellow
5  jurors. You should not surrender your opinion or
6  defer to the opinions of your fellow jurors for the
7  mere purpose of returning a verdict, but you should
8  not hesitate to re-examine your own view and change
9  your opinion if you are persuaded by another view.
10  Your verdict, whatever it is, must be unanimous.
11      We'll send in also a verdict sheet along
12  with the jury instructions. And by ancient Delaware
13  custom, Juror No. 1 becomes the foreperson of the
14  jury. So at such time as the jury has a verdict, the
15  prothonotary will ask Juror No. 1 to read back the
16  verdict sheet. I'll walk through it with you.
17      The verdict sheet, question No. 1: Do you
18  find that Catherine -- defendant Catherine L. Shore
19  was negligent? Your options are yes or no.
20      2) Do you find that the negligence of
21  Catherine L. Shore a proximate cause to Donald A.
22  Young? If your answer to Question 1 was "No," then
23  your answer to this Question No. 2 must also be "No."

Question No. 6: State the full amount of
2  your award of damages to the Estate of Donald Young,
3  with a dollar sign to put in.
4      So with the conclusion of these instructions
5  I'll now excuse the two alternates. Thank you very
6  much. I know I speak for the parties when I say
7  thank you for your service to the Court and to the
8  State in this case.
9      (Alternates excused at 3:56 p.m.)
10      THE COURT: Before I swear the bailiff, let
11  me just make this administrative note. It's five
12  minutes of four. Our normal stopping time is
13  five o'clock. If you should not reach a verdict by
14  five o'clock, you would be asked to come back
15  tomorrow as early as you're all able to do it to
16  continue your deliberations. And I'm telling you
17  this now so that we don't potentially have to
18  reconvene at five minutes of five for me to tell you
19  then which I can tell you now, which is if you do
20  take an overnight recess, of course you're not
21  allowed to discuss the case with anyone or allow
22  anyone to discuss the case with you.
23      Secondly, when you do come back to the jury

198

1  You have the options "Yes" or "No."
2      Question No. 3: Do you find that defendant
3  Barbara Young was negligent? Your options are "Yes"
4  or "No."
5      Question 4: Do you find that the negligence
6  of Barbara Young was a proximate cause of injury to
7  Donald A. Young? If your question to question -- if
8  your answer to Question 3 was "No," then the answer
9  to this Question No. 4 must also be "No." And you
10  have the options of "Yes" or "No."
11      If your answer is "No" to both Question 2
12  and Question 4, call the bailiff. If your answer is
13  "Yes" to either Question 2 or Question 4, or both,
14  please go on to Question 5.
15      Question 5 reads: Apportion the amount of
16  negligence among the party that you have found to
17  have been negligent. If you find that a party was
18  not negligent or did not proximately cause the
19  injury, that party must be assigned zero percent.
20  The assigned percentages must total 100 percent.
21      Then you see Catherine Shore, blank line
22  percentage sign; Barbara Young, blank line percentage
23  sign.

200

1  .room to continue deliberations tomorrow morning, if
2  that's what you do, you're not allowed to renew those
3  deliberations until all 12 of you are physically
4  present in the jury room. And by my mentioning a
5  five o'clock deadline time is not a deadline time,
6  it's just when court business stops. I don't mean to
7  suggest that you should or should not reach a verdict
8  by five o'clock. However long a jury wants to
9  deliberate before reaching a verdict is entirely up
10  to you.
11      I have to make a couple of typographical
12  changes to the jury instructions, so I'll send them
13  into you as soon as I can.
14      But now please swear the bailiff.
15      (Clerk swears bailiff at 3:57 p.m.)
16      THE COURT: Please take out the jury to
17  begin deliberations.
18      (Jury begins deliberations at 3:58 p.m.)
19      THE COURT: Are there any exceptions to the
20  jury instructions other than previously noted?
21      MR. HUDSON: Your Honor, I don't know which
22  ones you -- I think you have the same ones -- on page
23  9 you struck the word "medical," I believe.

1 THE COURT: Yes. I didn't mean to mention
2 that.
3 MR. HUDSON: And on page 21 you struck the
4 second paragraph beginning with, "And to what extent
5 that they will continue to impair the rest of his
6 life."
7 THE COURT: On page what?
8 MR. HUDSON: 21, has to do with --
9 THE COURT: My page 21 is proximate cause.
10 There was an original submission, and then there was
11 the disk. So what's the title of the page?
12 MR. HUDSON: This is damages, personal
13 injury, the last page of that.
14 THE COURT: Yes. Well, I've struck the
15 phrase, "And to what extent they will continue to be
16 impaired for the rest of his life expectancy," since
17 that crept in, wasn't intended.
18 We're in recess until there's a note or a
19 verdict from the jury.
20 (Court recessed at 3:56 p.m.)
21 (Following took place in chambers regarding
22 a jury note:)
23 (Mr. Ferrara present in chambers, Mr. Hudson

1 Donald Young? Then, Question 3, about which the jury
2 asks, says, 3: Do you find that defendant Barbara
3 Young was negligent, yes or no? And their note says,
4 again, Do we have to answer No. 3 since Barbara Young
5 has already settled?
6 And, again, my suggestion was the jury just
7 be told, quote, Yes, unquote.
8 MR. FERRARA: That's the correct answer.
9 THE COURT: They have to answer it.
10 MR. HUDSON: I think that's correct,
11 your Honor, I agree with that.
12 THE COURT: All right. Do stay by your
13 phone, who knows what this portends. So there might
14 even be, who knows, a verdict by five o'clock. So,
15 well, we'll keep you posted.
16 MR. HUDSON: Thank you, your Honor.
17 THE COURT: All right. Bye.
18 (Following took place in Courtroom 6C,
19 without any of the parties present.)
20 THE BAILIFF: Okay. It is now 4:46. At
21 this time the jury's going home until 9 a.m. tomorrow
22 morning, by order of the Judge.
23 (Jury went home for the evening and

202

1 appearing by teleconference.)
2 MR. HUDSON: Yes, Judge Cooch, Bruce Hudson.
3 THE COURT: I have the court reporter. I'm
4 going to show this note to Mr. Ferrara at the same
5 time while I'll read it to you, it's very short.
6 Quote, Do we have to answer No. 3 since
7 Barbara Young has already settled? question mark.
8 I'll read it back: Do we have to answer
9 question No. 3 since Barbara Young has already
10 settled? question mark.
11 Well, they must not have quite understood
12 the instruction on settling defendants, that they do
13 need to consider that, as well as the verdict sheet
14 itself walks you through every question. So I
15 propose to send the note back into the jury just with
16 the answer "yes." But I'll hear from counsel.
17 Mr. Hudson.
18 MR. HUDSON: Your Honor, I'm not sure which
19 question No. 3 was.
20 THE COURT: Oh, I'm sorry. Question No --
21 the first two questions, Question 1 is do you find
22 defendant Catherine Shore negligent? 2: Do you find
23 negligence was the proximate cause of injury to

204

1 reconvened deliberations on 6/20/07.)
2 * * *
3 (Following verdict proceedings took place on
4 June 20, 2007, in Courtroom No. 6C, at 1:11 p.m.,
5 with The Honorable Richard R. Cooch presiding:)
6 THE COURT: Good afternoon, counsel.
7 COUNSEL: Good afternoon, your Honor.
8 THE COURT: The bailiff advises me that the
9 jury has reached a verdict. Mr. Ferrara, something
10 to take up before we bring the jury?
11 MR. FERRARA: Well, your Honor, I just,
12 before you say "go get the jury," I'd like one more
13 last peek out in the hall, because my client's been
14 here all morning --
15 THE COURT: Oh.
16 MR. FERRARA: And she went to lunch, and she
17 said she'd be back at one, I'm afraid she might have
18 gotten stuck in a restaurant. If I can just take one
19 more look for her for a minute?
20 THE COURT: Yes.
21 (Mr. Ferrara leaves momentarily.)
22 MR. FERRARA: I don't see her.
23 THE COURT: Well, it is, I have 12 minutes

205

207

after one. I think we better take the verdict.

MR. FERRARA: I don't want the Court to hold up. Since Bruce doesn't have anybody here, either, they may not realize the clients are supposed to be here.

THE COURT: All right. We'll say nothing.

Please bring in the jury.

THE COURT: To my law intern Travis, if you should see Ms. Shore come in during the reading of the verdict, can you just sort of quietly escort her up to Mr. Ferrara's seat.

LAW INTERN TRAVIS: Sure.

MR. FERRARA: Yes, for sure.

(Jury enters the courtroom at 1:14 p.m.)

THE COURT: Good afternoon, members of the jury. The bailiff advises me that the jury has reached a verdict. Would the prothonotary please take the jury's verdict.

THE CLERK: Madam Forelady, please rise.

Has the jury agreed upon a verdict?

THE FORELADY: Yes.

THE CLERK: Please read the answers to the questions that I shall now ask you.

wait a second while I ask Mr. Hudson a question?

THE COURT: Yes.

(Counsel confer.)

MR. FERRARA: May we approach, your Honor?

THE COURT: Yes. Court reporter.

MR. FERRARA: We don't need a court reporter, your Honor, if that's okay with you.

THE COURT: Well, I'll start off.

(A sidebar, without reporter, was held.)

THE COURT: Members of the jury, this does conclude your service to the Court and the State for two years. As I was saying, I know I speak for all persons in the courtroom when I say thank you very much for the time and attention you've paid to the case. I would like to come back and just thank you personally for those who can stay. I don't intend to get into the merits of the case, but I just want to, as I say, thank you briefly. So please take out the jury.

(Jury leaves the courtroom at 1:18 p.m.)

THE COURT: Well, first, a couple of housekeeping-type matters. First, let's introduce as a Court Exhibit the note that was received from the

206

208

Do you find that defendant Catherine L. Shore was negligent?

THE FORELADY: No.

THE CLERK: Do you find that the negligence of Catherine L. Shore was a proximate cause of injury to Donald A. Young?

THE FORELADY: No.

THE CLERK: Do you find that defendant Barbara Young was negligent?

THE FORELADY: No.

THE CLERK: Do you find that the negligence of Barbara Young was a proximate cause of injury to Donald A. Young?

THE FORELADY: No.

THE CLERK: Members of the jury, harken to the special verdict, so say you all?

THE JURY: Yes.

THE CLERK: Your Honor.

THE COURT: Are there any applications?

MR. FERRARA: None by me, your Honor.

THE COURT: Hearing none, the Court will excuse the jury with the real thanks of the Court --

MR. FERRARA: Your Honor, could you just

jury and the Court's response.

Secondly, there is pending defendant's motion for judgment as a matter of law with respect to damages, but that motion is mooted by the jury's verdict, so there's no need for the Court to act on that. The prothonotary is instructed to enter a verdict as per the verdict of the jury. I've examined the verdict sheet and it is the same as was called out.

I wish all well in the future, and no one enjoys having to come to court for situations like this, but the jury has spoken.

Is there anything further to come before the Court?

MR. FERRARA: Not from me, your Honor.

MR. HUDSON: Your Honor, I'd just like to thank your Honor for the handling of this matter which you presided over the trial.

MR. FERRARA: (Pause.)

THE COURT: Aren't you going to say anything, Mr. Ferrara? Because my son is sitting in the back of the courtroom, I was going to introduce you to him.

209

1    MR. FERRARA: I was waiting for him to sit
2    down. I was trying to be respectful.
3         Your Honor, I said this to Bruce before when
4    we talked before you came in, I said, Well, maybe we
5    can go back and talk to the jury depending on what
6    the verdict is. And he said, Well, how does Judge
7    Cooch handle that? And I said, You know, believe it
8    or not, as long as I've been doing this, this is the
9    first time you and I have ever tried a case that's
10   gone to verdict. We've picked jury a couple times,
11   we settled that big personal injury case that looked
12   like it was going to take us two weeks last spring
13   with Bart Dalton and Dave Culley, and that whole
14   gang, but this is the first time we've ever gone to
15   verdict. And I join Bruce, it's always a pleasure to
16   try a case when you got a judge that knows what he's
17   doing and keeps things moving along. And I said to
18   Bruce, it's always a pleasure to try a case when you
19   get along with the lawyer on the other side and
20   there's not a lot of contention.
21        MR. HUDSON: The feeling's mutual.
22        THE COURT: There was a great demonstration
23   of professionalism and civility.

## 210

1         With that, we're adjourned, other than my
2    introducing you to my son sitting in the back row
3    with Marie Callahan; he with a cast who gets that off
4    this afternoon.
5         We're in recess.
6         (Court adjourned at 1:20 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

211

REPORTER CERTIFICATE PAGE
STATE OF DELAWARE:
NEW CASTLE COUNTY:

          I, Thomas E. Maurer, RPR, Official Court
Reporter of the Superior Court, State of Delaware, do
hereby certify that the foregoing is an accurate
transcript of the proceedings had, as reported by me
in the Superior Court of the State of Delaware, in
and for New Castle County, in the case therein
stated, as the same remains of record in the Office
of the Prothonotary at Wilmington, Delaware, and that
I am neither counsel nor kin to any party or
participant in said action, nor interested in the
outcome thereof.

          This certification shall be considered null
and void if this transcript is disassembled in any
manner by any party without authorization of the
signatory below.

          WITNESS my hand this 10th day of October,
2007.

                    _____
                    Thomas E. Maurer, RPR
                    Official Court Reporter
                    Delaware Cert. No. 155-PS